UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:

305 EAST 61ST STREET GROUP, LLC,

Debtor.
-----------------------------------------------------------x

Chapter 11

Case No.: 19-11911 SHL

## STATUS REPORT OF INTERIM MANAGER FOR THE DEBTOR

COMES now Nat Wasserstein, the interim manager (hereinafter, "Manager") of 305 East 61st Street Group, LLC (the "Debtor"), and files this Status Report on the above referenced case, and respectfully states as follows:

1.      On June 10, 2019 (the "Petition Date"), the Debtor filed a voluntary case (the "Bankruptcy Case") under Chapter 11 of Title 11 of the United States Code, U.S.C. §§ 101 et.seq., as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York.

2.      The United States Trustee has not appointed a committee of unsecured creditors in this case.

3.      On September 3, 2019, the Debtor filed a Plan and Disclosure Statement.

4.      By Order of the Court dated September 13, 2019, the Court approved a September 9, 2019 stipulation, whereby I was appointed the Manager of the Debtor.

5.      The Debtor owns and operates a building located at 305 East 61st Street, New York, New York (the "Building").

6.      As an aid to the Court and the parties in interest, set forth below are the Manager's initial, preliminary observations and analysis with regard to (a) the construction issues, (b) the

1

resolution of the secured claim of the Lender, (c) the litigation by and between the Debtor and its

Tenant, and other matters important to the administration of the estate.

A. **Preliminary Statement**

Since my appointment, I have performed my own independent review of the construction at the building and the Department of Buildings ("DOB") filings.   I have spoken and met, and/or I am scheduled to meet, with most of the members and their counsel and I have met and or spoken with construction professionals from all groups, prospective funding sources and, capital advisors and real estate brokers.   The list of individuals and their companies (if applicable) that I have met and or discussed this case are as follows:

Mitchell Marks (Little Hearts Marks Family II, LP ("Tenant" or "LHMF"), Member)

Justin Bonanno (Counsel for LHMF)

Joan Toro (Counsel for Spa – Aqua Ancien)

Ignacio Alonzo (Acqua Ancien Bath New York Inc. ("Subtenant" or "Spa"), Architect)

Amadeo Serra (Spa CEO)

Jason Carter (61 Prime LLC, Member)

Kyle Halperin (Counsel to 61 Prime)

Thomas Draghi (Counsel to Jason Carter)

Noreen O'Malley (AEC Consulting & Expediting, Inc.)

Anthony Rini ME (Mottola Rini Engineers, P.C.)

Christopher Carrano (Architect - ADG Architecture & Design)

Marguerite Pinto PE (Thornton Tomasetti)

Till Biederman (Architect – C3D

Paul Massey and Jeff Hubbard – Broker - B6 Advisors

Harold Bordwin – Broker - Keen Summit

Richard Maltz (Maltz Auctions)

Frank Socarras (Heso Electrical, Inc.)

Trevor Coates (TC Heating & Cooling)

Roland Williams (NAS Electric)

2

Sandy Marks (Clearnote Capital)

Robert Delitsky (Northmarq Capital LLC)

Steven Newman (Counsel for 305 E 61st Street Lender LLC ("Lender")

Jason Leibowitz (Counsel for Maverick Real Estate Partners/Lender)

Ted Martell (Principal, Maverick Real Estate Partners/Lender)

David Aviram (Principal, Maverick Real Estate Partners/Lender)

Thad Pollock (Member - scheduled to meet 10/17)

Marco Casella (OneStone 305 LLC, Member – scheduled to meet 10/17)

I cannot ignore the context and circumstances I find the Debtor in at this point in time, but I am also not bound by what other managers have done.   I have kept an open mind and the conclusions and analysis set forth herein are my own.   In the interest of transparency and urgency, I am providing enough detail as possible here so that the parties in interest can understand the reasoning and complications of certain critical matters.   I am seeking a resolution that will be, in the Debtor's business judgment, benefit the Debtor and the estate.

### B.  <u>The Debtor has Obtained Required Insurance</u>

The Debtor has obtained new property insurance per the Stipulation and Order Appointing the Interim Manager; to wit:  The Debtor has obtained a "Builder's Risk" property insurance policy which is also an "All Risk" policy as required under the Debtor's mortgage with its lender.   The policy has a limit of $35,000,000 and is effective as of 9/30/2019.   In connection with the switch to the new property insurance, the Debtor was advised by its insurance broker that it needed to obtain a new general liability policy.   Accordingly, new general liability coverage was obtained effective 9/27/19.   The policies name the lender as an additional insured and the UST as a notice party.   Binders and certificates of coverage have been provided to the lender and UST and filed with the Court.   [ECF 65].   I am advised that pro-rated refunds from the now cancelled prior policies will be forthcoming in the next 60 days or so and may be applied as a credit to premiums under the new policies.   The Debtor has also obtained directors and officers (D&O) insurance with CNA.

### C.  <u>Refinance/Resolution of the Secured Claim of Mortgagee</u>

As the Court is aware, the Debtor is incurring interest charges on its matured first mortgage at the rate of over $18,000 per day.   (See attached **Exhibit A** payoff dated July 19, 2019).   The loans with Banco Popular were all sold to the current lender, 305 E 61st Street Lender, LLC ("Lender") in or about November 2018.   It is my understanding that the Lender purchased the loans at par (with a small acquisition fee estimated at 1%).   After acquiring the loans, the new lender retroactively defaulted the Debtor to the inception date of the loan based on pleadings and

allegations therein in state court litigation by and between the members of the Debtor.  The Lender does not appear to have made its own findings of default under the loan documents to justify the retroactive default.

Since my engagement, I have reached out and met with several potential financing sources in order to ascertain whether the secured debt can be refinanced.   From what I have been advised thus far, there are limited if any sources who will lend the Debtor the approximately $44MM necessary to take out the existing lender (approx. $42MM payoff as of 10/31/19 plus mortgage tax of $1.1MM plus about 2 points ($840,000)).   Moreover, there is another practical problem.   The existing loan incurs default rate interest (24%) on the original principal amount of about $27MM ($18,214/day). If the Debtor obtained a DIP loan at half that rate (12%) over the per diem rate would reduce by only about $3,000/day to $15,000 (in interest alone) but would cost almost $2,000,000 in fees (mortgage tax and points).   Even a loan at 9% based on a one-year term, when you factor in the cost of $2,000,000, the loan would cost the Debtor over $16,000 /day for the 1 year when you factor in interest and costs.   Nevertheless, the Debtor has received three unsigned letters/communications of interest.   One of the interested parties was brought to the Debtor by a relative of Mitchell Marks.

While the Debtor is keeping its options open, it must either sell the Building as soon as practicable and/or look to parties in interest for a resolution of the debt to make any DIP financing cost effective and worthwhile for the Debtor.

While it has been suggested that the Debtor should call certain promissory notes the Debtor holds against the members, I understand that the notes total only about one-half the outstanding debt and that the members would not simply pay the notes on demand because of claims the members have against the Debtor.  So, based on the shortfall and the likely litigation to collect the notes, satisfying the existing debt in a timely manner through collection on the notes does not appear to be a quick or practical solution.

This is without prejudice.   The Debtor reserves all rights as it continues to review options to refinance and or otherwise resolve the Lender's secured claim.

**D.  Lender's Entitlement to Retroactive Default Rate Interest and Late Fees**

Here are the amounts sought by the Lender as of July 31, 2019:

| Closing Date | 8/16/16 | 6/8/2017 | 6/8/2017 | |
|---|---|---|---|---|
| **Payoff Calculations** | **Acquisition** | **Building** | **Project** | **Total** |
| Principal Balance | $20,000,000.00 | $4,777,264.12 | $2,170,000.00 | $26,947,264.12 |
| Interest | $8,406,849.13 | $1,902,494.88 | $650,144.68 | $10,959,488.68 |
| Late Charges | $1,263,675.79 | $296,566.05 | $137,028.30 | $1,697,270.14 |
| Exit Fee | $50,000.00 | $19,575.00 | $5,425.00 | $75,000.00 |
| Protective Advances | $307,309.65 | $0.00 | $0.00 | $307,309.65 |
| Legal Fees/Costs[2] | $104,075.59 | $0.00 | $0.00 | $104,075.59 |
| **Total Due** | **$30,131,910.16** | **$6,995,900.05** | **2,962,597.98** | **$40,090,408.18** |
| | | | | |
| Per diem | $13,582.86 | $3,184.84 | $1,446.67 | $18,214.37 |

The above table is taken from the Lender's payoff letter of July 19, 2019 (annexed hereto as **Exhibit A).** The interest rate for the acquisition loan based on the variable 30 day LIBOR Rate was between 5.25% and 5.88% from inception through the consolidation date of June 8, 2017. The Building and Project loans were based on the same interest rate formula as the Acquisition loan and once all 3 loans were consolidated as of June 8, 2017, the aggregate loan amount bore interest at the rate of between 5.88% and 7.15% from inception to the Maturity Date.   Thereafter, the rate on the aggregate principal balances of the various loans runs at the default rate of 24% unless there is an extension of the maturity date.  On the Acquisition loan, accrued interest should be approximately $866,667 (through 6/8/17 based on a blended rate of 5.32%) and on the aggregate amount, interest in the amount of $2,635,442 (based on a blended rate of 6.52% from 6/8/17 through the date of maturity 12/8/18) which equals: $3,502,109 pre-maturity interest.   If the post maturity interest at the rate of 24% is added, ($3,200,000 through 7/31/19), the Debtor would owe $6,702,109 less any interest payments/credits to date.   The amount of $1,050,000 was paid into a "locked" interest reserve account on August 16, 2016, the amount of $2,170,000 was retained by lender as an interest reserve in June 2017, the Bank picked up $164,103.50 at closing in August 2016 (no description of this payment in the closing statement was provided) and I was advised that $260,388.00 was requested and paid in October 2018.   These are the only interest payments I am aware of.  I have asked the Lender for an accounting of same along with a payment history.   The Lender is seeking $10,959,488.68 in total interest which is at least $4.25MM more than the Debtor would pay if the Lender was not entitled to the retroactive default rate interest.  Based on the payments/credits the Debtor may be entitled to, the amount may be as high as $7.5MM.   Also, this does not include the interest for August 2019 through October 2019 of $1,639,293.30 (@18,214.37/day).

I have begun reviewing the loan documents with Debtor's counsel and I am exploring possible objections to the Lender's secured claim.   Based on my review thus far, I believe that there is merit to a challenge of, at a minimum, the retroactive default rate interest, the approximately $1.7MM in late fees as well as possible inequitable conduct by Lender's predecessor in connection with the loan origination and servicing.

This is without prejudice.    The Debtor reserves all rights as it continues to research the merits of an objection to the secured claim.

### E.  Building Issues

As stated herein, I have met with and reviewed documents provided by various construction professionals.  These professionals were engaged by and or associated with either the Debtor, the Spa, LHMF, 61 Prime LLC or the Lender.    I have had an opportunity to review the DOB filings with Debtor's existing consultant, Noreen O'Malley of AEC Consulting, and I have retained Richard Cote as the Debtor's consultant on construction and DOB filings.    The findings below are not meant to be exhaustive but should provide an explanation of the status of the construction as that construction relates to applications and permits at DOB.    If the construction issues can be resolved, it would need to be resolved on a global basis (for all constituents in the Building).    The consultants have completed an initial review of the drawings, filings and work in place and there are significant issues with the filings at DOB, that need to be resolved prior to moving forward.

1.  **Life and Fire Safety**.   Life safety issues are normally the first matters that are taken into consideration for any type of construction.    That does not appear to have been the case here.    The consensus among the construction professionals is that the Building was constructed to this point with major omissions in the fire safety system.     Here are some of the notable fire and safety deficiencies:

    a.  The as built construction does not allow proper access to the existing fire escape.   A new fire stair is now required and must be retrofitted onto the Building.  Windows need to be removed from every level and doors to the fire stairs must be installed.
    b.   The building is 136 ft tall which means it will require an emergency generator for the life safety system. There is no generator in any plans or filings. "Generators" for the Building are provided for in the Offering Plan annexed to the Operating Agreement for the Debtor.  This will need immediate rectification before the Debtor can move forward
    c.  There is no record of any sprinkler or fire alarm filings or sign offs with the FDNY, this needs to be rectified before we can move forward.  There is also no water service for the sprinkler system.
    d.  The new level created by the Tenant (see below) only has one egress when 2 means of egress are required.

The above list is not meant to be all inclusive as we are continuing our research and inspections. The above are examples of corrective actions that are required before building ownership can approve any further work.

2.  **Applications and Permits for the Work**.   I have met extensively with AEC Consulting & Expediting, Inc., (an expeditor and filer of applications with the DOB).   I have also consulted with Rich Cote of Hudson Meridian Construction Group.  Rich is a construction services specialist and is new to the case.   I brought him in the review the applications

filed with DOB and to inspect the Building.   Attached hereto as **Exhibit B** is a list and summary of the applications filed by the Tenant/Spa and Building which list summarizes the application type, work, and some of the issues of which I have been made aware, for each application.   Below is a non-exhaustive list of the issues the Debtor has identified with the filings for the Building, and the Tenant including filings by the purported sub-tenant, Spa:

a.   First and foremost is that fact that the base Building application (Alteration Type 1) that allowed the Company to change the use, occupancy and egress of the building does not match subsequent Tenant filings (Alteration Type 2's).  A brief description of the ALT 1 and ALT 2 applications is necessary here.

An Alteration Type 1 permit ("ALT 1") is a permit issued by the New York City Department of Buildings when proposed construction will alter a Building's use, egress or occupancy. The basic difference between an ALT 1 and an Alteration Type 2 ("ALT 2") is the effect on the Certificate of Occupancy for the building.   If the proposed work requires getting a new or amended Certificate Of occupancy an ALT 1 must be filed. Alternatively, if the work does not require a new or amended certificate of occupancy an ALT 2 can be filed.   Work that precipitates changes in use, egress or occupancy cannot be performed under other types of building permits (i.e.; Alteration Type 2 or Alteration Type 3 permits).  Changing a Certificate of Occupancy in NYC will always require an ALT 1.  In the Debtor's case, an ALT 1 was necessary because of the conversion of the commercial storage building to residential use and occupancy, and the Tenant's intended use of the basement and first 2 floors as a physical cultural establishment ("PCE").  A PCE is a health club or similar business that improves a person's physical condition through exercise or by massage. A PCE needs a Special Permit from the NYC Board of Standards and Appeals ("BSA") to locate and operate in New York City.   I understand that the BSA application in this case was not filed by the Spa until September 2017, more than one year after the Debtor's then manager, LHMF, filed the Building's ALT 1 application (filed 7/12/16).   The ALT 1 application does not mention the PCE ("APPLICATION FILED HEREWITH FOR CONVERSION OF AN EXISTING 10 STORY AND BASEMENT STORAGE TO MIXED-USE. NO CHANGE IN BULK IS PROPOSED").   Construction started in the Spa area to create a space for a PCE without the DOB being on notice of what was happening and the Spa (and Tenant) used ALT 2 application type when work called for in the ALT 2 applications did not relate back to the ALT 1 application.   Moreover, the Spa was permitted to start construction of the intended PCE without the Spa having acquired governmental and other approvals necessary as a pre-condition to acquisition of related building permits. To acquire building permits related to construction of the PCE the Tenant/Spa wrongfully (expressly and impliedly) stated that PCE approval was obtained (when it wasn't) and that PCE use was indicated on the Debtor's ALT-1 permit application – which it also was not.

b. In fact several of those filings also change the use, occupancy and/or egress of the building and should have been filed at the very least in conjunction with post approval amendments[1] ( PAA) to the original application ( ALT 1) and not as tenant improvements ( ALT 2's). The architects and/or engineers that filed this work need to be consulted so they can explain the logic of the work and justify the self-certification and how they consulted and or collaborated with the base building (ALT1) architect of record. The conversion from Storage to residential and commercial PCE would change the egress, use and occupancy of the Building.  In other words, an ALT 1 was required for the work in the basement and first floor.   Tenant's subtenant filed all ALT 2 applications.   ALT 2 applications are for change of use within the same type of business (i.e., restaurant to restaurant).   Storage to PCE is not something you can do on an ALT 2 application I am told.   Also, all the ALT 2 applications refer to the 591-application saying that it contains the PCE but there was no PCE approval or even mention of it in the ALT 1 application.   The PCE approval wasn't received until January 2018.  That means that all the work in the Demised Premises was performed in contravention of the DOB regulations governing ALT 1 and ALT 2 applications. The work was "self-certified" when it should have been inspected by the DOB.

c. Much of the work done in the Cellar, Basement and Roof that changes the use, occupancy and egress of the building is not included or does not conform to any of the approved filings with DOB.  The architects and engineers need to conduct a site inspection of the work in place to determine what amendments they need to file to correct the applications based on what was done in the field. Also, they should issue any non-conformance reports (NCR) so that work can be corrected.

d. The excavation(s) that were done in the cellar do not have any accompanying geotechnical reports, special inspections sign offs or other documentation on file to support the work. This critical structural change to the building needs to be reconciled, corrected, and refiled before any work can proceed. This re-filing needs to be part of the PAA to the ALT1 **not** as a stand-alone ALT 2. A non-conformance report ("NCR")[2] should be produced by the engineer of record to identify what is needed for approval and sign off.  Moreover, there were two applications filed for the excavation. The first by Vladimir Constant, PE (Application ending in 630), was for a 3-foot excavation of the "basement" level.   This is not an accurate filing.   What appears to have occurred is an excavation of the ground under the Building of between 12 and 16 feet.   This was not an expansion of an existing room but rather the creation of a **new** level (as described in the sublease between Tenant and Spa). Nowhere is this

---

[1] After the DOB approves your application and plans, changes are common as the job progresses. There may be a minor change in the work or you may discover you need to correct an error in your initial filing. The DOB requires applicants to maintain a current and accurate record of their jobs by filing Post-Approval Amendments (PAAs) for these changes.

[2] A non-conformance report, or non-conformity report or NCR, is a construction-related document that addresses specification deviation or work that fails to meet quality standards.

clear in the DOB filings by the Spa (applications ending in 630 and 669).  The second filing was by John S. Deerkoski, PE (application ending in 669), and that was for an excavation of the same new level, but which asked for permission to dig 7 feet.  Again, I am advised that this application, which was filed in support of existing application ending in 630 should have been filed as its own application because a separate application is needed for excavations.   The nomenclature for the floors was wrong ("Basement" in 630 (as if the excavation was occurring in an already existing level) and "New Cellar" in 669).  I am advised that excavations require their own separate filing.   Unfortunately, the excavation applications were filed on an ALT-2 (when clearly, the egress and use were changing.   The professionals – Constant and Deerkoski – already signed off on the projects by self-certifying the completion.   That means that these applications cannot now be amended.   A new application needs to be filed along with the amended ALT-1 application in order to correct all the problems with applications 630 and 669.   As an additional issue, the  asbestos report filed with the excavation application could not have tested the ground beneath the Basement floor because the space did not exist in 2016 (when the report was done) and I have reviewed the report and it does not have any testing done on the ground under the Basement.

It should be noted that on July 23, 2018, Vladimir Constant (filer of the Spa's application 630) voluntarily surrendered his rights to self-certify at DOB because of multiple failed audits.

e.  It appears from the Tenant filings that the work on the roof and the work in place on the roof is intended as a public space or at minimum for spa clients to use.  It should be noted that a PCE cannot occupy outdoor space as it would violate the PCE.   The base building application does not address this and will need to be amended prior to moving forward. Additionally, there is a significant amount of HVAC, Electrical and structural work that is in place on the roof that does not match any drawings. Again, an NCR for this work should be produced by the design engineer.  There is a violation against one of the contractors, Trevor Coates, which violation states: "*work does not conform to approved construction documents and or amendments. noted: on roof level hvac units installed under job # 123025715and location of units does not confirm to approved plan page # m. 108*."  A steel frame for a jacuzzi and pavers are also installed on the roof without plans for same being filed.  The ALT 1 does not show the Jacuzzi on its plans.

f.  The Spa's application ending in 803 does not include work on the roof.

g.   The Spa's application ending in 803 incorrectly places 5 proposed boilers on Schedule B.  This is a building with greater than 6 family units, and a commercial tenant space.   This needs to be corrected.

h.  Spa permits in connection with applications #'s ending in 794, 790 and 803 were purportedly renewed August 2018 by a notarized signature of Mitchell Marks but Mr. Marks has acknowledged that the signatures are not his.  (See attached **Exhibit C**).

i.  There is no plumbing permit for the demolition work that took place in 2016 when  6 to 8 toilets (the applications say 8 and the plans show only 6) and a sink were removed. The walls are now closed so the original plumber may be able to sign off on the job if he can be found.   Otherwise, the DOB may require the walls to be opened again to certify that the plumbing fixtures were properly removed and cut-off.  The demolition application with DOB was one of the first if not the first filing.   This is typical of the sloppiness and/or negligence (and/or something worse) inherent in the DOB filings.

j.  The second-floor work does not match the use and occupancy of the base building filings. The approved ALT 1 shows this floor as "commercial office" space when it is built as residential space.  According to Rich Cote, this change may violate the zoning floor area ratio (FAR) and may require a waiver and PAA to the ALT 1 FAR.

k.  The utility connections and metering plan in the base building system does not match the tenant filings or field conditions. The design engineer should conduct a field inspection verify that the metering of water, gas and electric is done in such a manner as to assure the tenants they are only paying for the utilities they use and that base building and commercial space tenants utilities are not on others meters.

l.  The permanent power for Con-Ed is not in place and there does not seem to be a plan in place to move that forward. The licensed electrician performing that work needs to be consulted and provide a plan as soon as possible.

m.  Any temporary utilities i.e. water and electric need to be surveyed and understood before moving forward

n.  The building is 136 ft tall which means it will require an emergency generator for the life safety system. There is no generator in any plans or filings. This will need immediate rectification before we can move forward

o.  There is no record of any sprinkler or fire alarm filings or sign offs with the FDNY, this needs to be rectified before we can move forward.

p.  Mechanical/Electrical/Plumbing.        According to Chris Sheridan of Thornton Tomasetti, based on comparison site observations and what he believes to be latest filed plans reveals a number of material differences. In some places the layout of the space and/or the installation of MPFP equipment does not match the plans and in other places important elements of the MPFP systems have either yet to be installed or have

10

been omitted. Finally, in some places, certain elements have been improperly installed. A partial listing of some of these items is as follows:

1. The location of the gas meter banks does not match any of the GSE drawings.
2. Rooftop condensing units are not located per the plans and the installation is incomplete.
3. Mechanical outside air distribution to non-naturally ventilated portions of the building is either not yet installed or omitted. Where portions have been installed, the code required fire dampers were not installed.
4. The code required fire dampers at branch duct connections to toilet and kitchen exhaust duct risers are either not yet installed or omitted.
5. The sprinkler heads at lot line windows do not provide code required coverage, this is most likely due to the ceiling/soffit detail in place being different than the architectural drawings. The field modification of the ceiling/soffit triggered additional sprinkler heads/sprinkler coverage.

**Please note, this list is not meant to be all inclusive as we are continuing our research and inspections. The above are examples of omissions/inaccuracies in the DOB filings and corrective actions that are required before building ownership can approved any further work. Moreover, the conclusions and analysis are not necessarily dispositive of the issues identified. I invite the parties in interest to voice their own comments and analysis after they review what I have stated herein which is based on my research, discussions with people who know the Building and have expertise in their given fields.**

This is without prejudice. The Debtor reserves all rights as it continues to review options concerning the Building and the construction issues it faces.

**F. SWOs/Violations**.

The Debtor is in receipt of a monthly summary of ECB, DOB violations and other information about Building applications and DOB status from a company called Jack Jaffa & Associates. A copy of the October 6, 2019 report is attached as **Exhibit D**. Currently, there are:

25 DOB Violations, 4 ECB Hearings, 19 ECB Corrections and 10 Stop Work Orders. Notable violations are as follows:

Violation # 039002517P @ Trevor Coates; Description: "work does not conform to approved construction documents and or amendments. noted: on roof level hvac units installed under job # 123025715and location of units does not confirm to approved plan page # m. 108."

Violation # 035250444K @ 305 East 61st Street Group, LLC; Description: "work w/o a permit. noted: on the rooftop observed new steel frame installed w/o a permit, dim. approx

45'l x 25'd x 1'h approx:70% of work completed. (stop work on roof level only) remedy:stop work & obtain all permits"

Violation # 035246152R @ 305 East 61 St Group LLC; Description: "changes inconsistent with building dept records. p. c. job 2 #12123874 (expires 4/6/19) for physical cultural establishment at cel 001 and basement. at time of inspection observed active construction at cel"

## G. Lease Disputes/ Litigation

I have reviewed the adversary complaint filed by LHMF against the Debtor, the Debtor's counterclaim in the adversary proceeding, and the various DOB filings by the Spa and the Debtor. I am also familiar with the SWO's and violations. I have also reviewed the Debtor's lease with LHMF for the "cellar/Basement and first floor" (the "Demised Premises") and the unredacted sublease between LHMF and the Spa. The Tenant has requested through Mitchell Marks that I sign off on certain applications on hold so that the Tenant and the Spa can continue their work. However, I need to review this request in the context of the litigation, and relevant documents. In short, the Tenant appears to have no insurance and has never had insurance in its name and naming the Debtor as an additional insured. The Debtor does not accept the Spa's purported insurance for the work the Tenant is doing. The Tenant appears to have performed the demolition of the basement and first floor space without any insurance. The Tenant did not get approval for the PCE before it began construction. Instead, the Tenant began construction of the Spa utilizing ALT 2 applications. ALT 2 applications are for construction when a similar type business is going to use the space. For instance, a restaurant to a coffee shop. One cannot use an ALT 2 when egress, use and occupancy are being affected but that is what the Tenant and, the former manager, did here. Here, this was a conversion of storage space to a physical culture establishment. The Tenant should have gotten the PCE before it began the construction. Instead, it filed documents through its professionals, hiding the true intent from the DOB. Tenant also used its dual role as manager to take the ground under the Building from the Debtor. The Tenant was not given the ground under the Building as part of its lease. The excavation was illegal according to the professionals I met with. The work on the roof is illegal and there are no permits for that work. The only contractor who pulled a permit for the work on the roof (Trevor Coates) is facing a DOB violation. The violation reads that the "*work does not conform to approved construction documents and or amendments. noted: on roof level hvac units installed under job # 123025715 and location of units does not confirm to approved plan*." And lastly, the Spa signed a purported sublease, but it considers an unauthorized master lease to be the master lease and not the master lease that exists by and between the Debtor and the Tenant.

The Tenant, through Mitchell Marks, has been pressing me since the first day I was engaged to sign off on the existing applications. The Tenant has not addressed the issues in the counterclaims in the adversary proceeding. Here are the issues as I see them between the Debtor and its Tenant:

1.      **The Demised Premises.** 305 to LHMF August 2016 (the "Master Lease").   The Master Lease provides LHMF with use of the "basement/cellar and 1st Floor."   The Master Lease provides no other uses of the Building.   The "cellar" at the time of the Master Lease is and was a small mechanical room.

2.      **Insurance**.   The Master Lease calls for proof of insurance at paragraphs 3, 6 and 8. As far as I know, the Tenant has no insurance.   Paragraph 3 of the Master Lease requires that "Tenant agrees to carry and will cause Tenant's contractors and sub-contractors to carry such workman's compensation, general liability, personal and property damage insurance as Owner may require."   Paragraph 8 of the Master Lease provides:

> *Tenant agrees, at Tenant's sole cost and expense, to maintain general public liability insurance in standard form in favor of Owner and Tenant* against claims for bodily injury or death or property damage occurring in or upon the demised premises, *effective from the date Tenant enters into possession and during the term of this lease.* Such insurance shall be in an amount and with carriers acceptable to the Owner. *Such policy or policies shall be delivered to the Owner.*

3.   **Roof**.   There is work that was done on the roof for which there were no permits.   The steel dunnage and the mechanicals installed are defective as far as the documentation with the DOB is concerned.   Also, it appears to me that the Spa is utilizing and going to utilize space on the roof for its mechanicals and perhaps for more uses.

4.   **Miscellaneous**.   The vent pipe from the Spa was placed in the trash shoot space for the residential apartments.   It also was not properly insulated/coated to ensure that the smells from the Spa does not permeate the walls of the residential apartments.   It appears the Tenant diverted power from the residential space.   I reviewed this area the other day with the electrician from Heso.   He told me that it would cost $12,000 to repair the exposed wires, etc., to make the wiring safe.   I reviewed the mechanical applications for the Spa and the applications call for "sub" meters to be installed.   The Tenant needs to install its own water, gas and electric meters.   I believe that in its current state, the Spa has been using the Debtor's electric without any compensation to the Debtor.   The is no water service for the building so any sprinkler system could not operate even if it were ready to be turned on.   There is a rodent violation which was just received.   This is the Tenant's issue per paragraph 4 of the Master Lease.

5.   **Claims In the Adversary Proceeding**.   I have reviewed the adversary counterclaims and I have found the document to be well pled.   The Debtor asserts in the counterclaim that the Tenant's defaults are uncurable – namely, the failure to maintain insurance and DOB violations/illegality of work performed in the demised premises. (See i.e., *Prince Fashions v.   60g 542 Broadway Owner LLC*, 149 A.D.3d 529 (1st Dept. 2017)).   In

addition to the termination of the Master Lease, the Debtor also seeks to void the Master Lease for lack of consideration from LHMF.   LHMN was supposed to pay $2,000,000 for its rights to this lease (and other things) pursuant to the Operating Agreement.   The Debtor also claims that LHMF did not pay the consideration for the Master Lease in that it converted the $2,000,000 contract deposit (capital investment) to a loan owed by the Debtor.   The Debtor also asserts that LHMF was paid back from the closing(s).   I have received some documentation regarding these allegations, and I am reviewing them.    The Debtor is going forward with its adversary counterclaims.    With the assistance of Debtor's counsel, we will amend the counterclaim to include at least a cause of action for turnover of property of the estate.

6.  **Subtenant and the Incorrect "Master" Lease**.   The subtenant's lease is subject to the Master Lease (para 103) however, because of the Tenant's alleged "mistake" a second and inferior master lease was given to the subtenant.   This "mistake" is critical. Under the Master Lease, the Tenant received use of the "cellar/basement/first floor" whereas under the unauthorized "mistaken" master lease, the Tenant received the "cellar level and basement."  It is obviously the Tenant's responsibility to remedy this situation.   So far, although the Tenant has known of the problem for approximately one year, the Tenant appears to have offered no solution.   I know the Tenant has acknowledged the Master Lease as the correct lease, but the subtenant has not acknowledged the correct Master Lease.   In fact, as recently as June 10, 2019, the subtenant was referring to the incorrect lease as the main lease in sworn pleadings in State Court. Tenant chose to refer to itself as the "Owner" of the Building in the sublease.   This is more telling when the "Owner" gave the subtenant the right to build "***an additional floor below the existing basement floor level*** ………………….. to which Landlord consents. Tenant shall have the right to add an additional elevator stop to the ***new floor level*** being contemplated to be built by Tenant, at Tenant's sole cost and expense, providing that Tenant at Its sole cost and expense contracts with ***Landlord's elevator company*** to perform all of the work, including purchasing all parts required for a new elevator stop."

The Tenant and Spa insist that the I must sign off on whatever applications they have on file with DOB on behalf of the Debtor, but their request is out of context in light of the litigation and obvious unresolved issues regarding the now 3 lower levels of the Building. The Master Lease requires the Tenant to comply with the law.   Based on what I have seen and heard to date, the Tenant has not done that and is in violation of the Master Lease as laid out in detail in the adversary proceeding.   There are SWOs and violations, and disputes over what LHMF has taken from the Debtor, no insurance for the Tenant which also names the Debtor as an insured  incorrect (at best) filings with the DOB, forged signatures on renewals (that the Tenant has acknowledged the signatures are indeed forged), no insurance from the Tenant, a lack of consideration for the Master Lease itself, evidence that the common elements are being sacrificed to make room for the Spa, a disconnect between the Master Lease and the sublease with the Spa as far as what the "demised premises" means and which "master lease" is the correct one.

This is without prejudice.   The Debtor reserves all rights, remedies and claims as it continues to advance its counterclaims in the adversary proceeding and to defend the causes of action interposed by the Plaintiff LHMF.

## H.  Prospects for Completing the Construction

Based on my meetings and discussions with all groups, and in lieu of the litigation (discussed below) any work going forward in the Building will need to be coordinated through the Debtor and its chosen professionals.   The work to date is out of synch to say the least.   In my judgment, absent such an arrangement, there can be no work going forward; only a sale.   There is also other factor that needs to be resolved for the work to proceed.   The litigation with the Tenant needs to be resolved to the Debtor's satisfaction.   As discussed above and below herein, the applications for the work and the drawings do not match what has been done in the building.   Moreover, the purported subtenant Spa is operating under a purported master lease that has been disavowed by the Tenant itself.  The Debtor's concerns are very real.   The Debtor does not want to end up like the projects Mitchell Marks has orchestrated at the following other locations:

**182 Lafayette Street, NY, NY**– Mitchell Marks as Tenant operates an illegal PCE at 182 Lafayette.   As perhaps a forewarning to the Debtor and the estate, earlier this year, Mr. Marks brought a suit against the Landlord/Owner of 182 Lafayette seeking a Yellowstone injunction to prevent the Landlord/Owner from terminating an illegal PCE tenancy wherein Mr. Marks is the tenant who leases to a subtenant fitness entity.   Attached hereto as **Exhibit E** is the Court decision, dated June 3, 2019, denying Mr. Marks' application.   The Judge cites not only the illegal PCE but also the fact that Mr. Marks was disingenuous with the Court and that there was considerable doubt as to his good faith:

> Here, plaintiff has not made the requisite showing of its willingness to cure the lease violations and the evidence in this record raises considerable doubt as to plaintiff's good faith.
>
> ***
>
> Plaintiff argues that he requires an immediate temporary restraining order because the second notice to cure expires on March 11, 2019 and that he needs more time to cure the alleged violations.  Plaintiff also contends that if the relief he seeks is not granted, then he risks losing a valuable downtown storefront lease that has 77 years remaining on it as well as the ownership interest in the cooperative corporation.
>
> Defendant argues that plaintiff has failed to show in his application that he is willing and able to cure the Lease violations pertaining to the illegal construction in unit 1, the illegal use of Monster cycle spin studio in violation of the building certificate of occupancy and the lack of the required special use permit from the NYC Board of Standards and Appeals.  Defendant further argues that plaintiff has failed again to present any credible evidence of any good faith effort to bring his sub-lessee into compliance within the applicable law and to cure any of the violations in the notice to cure.

15

***

Further, it is disingenuous for plaintiff to contend that he "needs more time" to cure the alleged violations when he denied that any default exists. Since the commencement of the litigation, plaintiff has wholly failed to take an active role in curing the alleged violations to ensure compliance with the lease and any NYC Commercial Music code regulations.

As to motion sequence 002, plaintiff thrusts himself at the mercy of the court because he "will face the imminent loss of the lease-and its valuable business and investment". Here, plaintiff again fails to show that he is able and willing to cure the Lease violations pertaining to the illegal construction in Unit 1 and the illegal use of Monster Cycle spin studio in violation of the building certificate of occupancy and without the special use permit from the NYC Board of Standards and Appeals. In both motion sequences, plaintiff's supporting affidavits are not only similar but contain conclusory self-serving statements without any evidentiary support for the relief he seeks. The fact that plaintiff served a Notice to Cure dated February 25, 2019 on his sub-lessee to cure the Lease violations of operating a cycling studio is completely contradictory to plaintiff's affidavit whereby he acknowledges that the work on unit 1 was done

**213 West 23rd Street, NY, NY**– Mitchell Marks and Chris Carrano of ADG filed an application in 2018 to "reinstate" an ALT 1 application they filed in 2004. Marks and company are apparently trying to legalize a PCE 14-15 years after the fact.

**88 Franklin Street, NY, NY** - The ALT 1 Application for the building filed in 2010 never mentions the "subcellar". The original Schedule A to the ALT 1 makes no mention of the PCE which was supposed to go into the space. The subtenant is the same Spa that has possession of the 3 lower levels in the Debtor's Building. The ALT 1 Schedule A was later amended in 2012 to mention the PCE. However, because the correct space is not mentioned on the ALT 1, there was no approval to do the work in the subcellar. It is my understanding that the subcellar was excavated as well - just like with the Debtor's Building. I do not believe they even have final approval for a CO yet – 9 years after the first filing. Moreover, in 88 Franklin, the Spa has allegedly expanded laterally under Franklin Street and illegally connected to 84 Franklin. There was also a dispute involving the roof and the Members of 88 Franklin appear to have settled with the owner of the penthouse apartment by giving the penthouse unit more of the common space on the roof. This "agreement" by - amendment to the condominium's declaration - is found on ACRIS.

Since before my appointment by the Court, Mitchell Marks has pressured me to sign off on PAAs to restart/renew construction, specifically, in the Tenant/Spa area. He calls and emails me daily and I have counted more than 120 calls and more than 80 emails from him in the last 30-40 days. At this point, based on my own observations and judgment and the information I have received from construction professionals, unless and until there is a global solution to the construction issues for the entire Building (that all constituents must agree upon) and a resolution of the issues raised in the Debtor's counterclaims in the adversary proceeding (regarding the status of the tenancy in the Building's first 3 levels), I cannot even consider restarting construction. The Tenant does not even have insurance and the purported subtenant thinks that the Unauthorized Lease is the Master Lease. There is material evidence of illegal work in the excavated ground

under the Building and on the roof.  How could any Landlord agree to restart work/renew permits and applications under these circumstances?

Notwithstanding the foregoing, and without waiving any of the foregoing pre-conditions, prior to the recommencement of construction either the Building's architect and or engineer must create new drawings to be filed with and approved by the NYCDOB and (in the case of life safety issues) the FDNY.  The new drawings will reflect the field changes to the Building.  Permits must be secured for the work to be performed.  Fire Alarm and Fire Protection Plan Applications must be filed. Plans for the generator, if it is to be installed, must be filed. This is a costly and time-consuming process.

As Manager, I want to make sure the Building issues raised herein are legalized and that any further construction is code compliant and otherwise legal.   As Manager of the Debtor, I have liability concerns that include but are not limited to current and future issues relating to:

> Title insurability and marketability for the Property and individual units
> Condominium Plan and Sponsor liability
> Public liability
> Insurability of the Building
> Liability from third parties
> Liability and failure to comply with condominium rules and laws and with the
>  Attorney General's Office

Moreover, the Class A and Class B members are impacted by any illegality as are present and future owners and renters.  We need to resolve the issues now and not put them off on future inhabitants, owners and renters.   I have not yet determined whether there will be cooperation among the many parties in interest to achieve a resolution.

This is without prejudice.   The Debtor reserves all rights, remedies and claims related to the construction of the Building.


I. **Additional Claims Against Members and Third Parties**

I have received bank statements and other corporate and financial records over the past couple of weeks and I am reviewing those items along with the Debtor's accountant to establish a good and working set of books and records for the Debtor.   I am also looking into the claims and causes of action set forth in the petition and schedules as well as potential claims against third parties and insiders.


J. **Upcoming Events**

I am meeting with the Class A members, Thaddeus Pollock and Onestone 305 LLC on October 17, 2019 to discuss their concerns and to see if there is a consensus on how to proceed in this case. These are the only members I have not met with yet.

On October 21, 2019 at 10:00 am there is a Court appearance where I will provide an update of this Status Report and discuss any concerns the Debtor or any party in interest has.

On October 10, 2019, LHMF called a Special Meeting of Members on October 21, 2019 at 8:00 am (2 hours prior to the Court status conference).   According to the agenda, the meeting is to discuss my performance and to discuss replacing me as Interim Manager.  I believe that this meeting was called in direct response to my having not signed off on the documents to renew/restart the work in the Tenant/Spa's occupied space.

After meeting with other brokers, I have selected Keen Summit.   An application to retain broker Keen Summit will be filed soon.

The contents of this report are without prejudice to the Debtor's rights, claims and remedies.  All rights are reserved, and none are waived.  The Debtor and its Manager reserve the right to supplement, amend, and or withdraw any statements or analysis set forth herein.   The contents of this report are intended as information and to allow the parties in interest to better understand the facts and circumstances of this case and the matters of importance to the Debtor and the estate.

Dated: October 15, 2019

305 East 61st Street Group, LLC
Debtor and Debtor-In-Possession

By:_____
Nat Wasserstein, Interim Manager

18

On October 21, 2019 at 10:00 am there is a Court appearance where I will provide an update of this Status Report and discuss any concerns the Debtor or any party in interest has.

On October 10, 2019, LHMF called a Special Meeting of Members on October 21, 2019 at 8:00 am (2 hours prior to the Court status conference).    According to the agenda, the meeting is to discuss my performance and to discuss replacing me as Interim Manager.  I believe that this meeting was called in direct response to my having not signed off on the documents to renew/restart the work in the Tenant/Spa's occupied space.

After meeting with other brokers, I have selected Keen Summit.    An application to retain broker Keen Summit will be filed soon.

The contents of this report are without prejudice to the Debtor's rights, claims and remedies.  All rights are reserved, and none are waived.  The Debtor and its Manager reserve the right to supplement, amend, and or withdraw any statements or analysis set forth herein.    The contents of this report are intended as information and to allow the parties in interest to better understand the facts and circumstances of this case and the matters of importance to the Debtor and the estate.

Dated: October 15, 2019

305 East 61st Street Group, LLC
Debtor and Debtor-In-Possession

By:_____
Nat Wasserstein, Interim Manager

18

# EXHIBIT A

**305 E 61ST STREET LENDER LLC**
c/o Maverick Real Estate Partners LLC
100 Park Avenue, Suite 2805
<u>New York, New York 10017</u>

July 19, 2019

<u>*Via Overnight Courier & Electronic Mail (where indicated)*</u>

| | |
|---|---|
| SMITH & SHAPIRO<br>116 East 27th Street, 3rd Floor<br>New York, New York 10016<br>Harry Shapiro, Esq. | LAZARUS, KARP & KALAMOTOUSAKIS LLP<br>Seven Penn Plaza<br>370 Seventh Avenue, Suite #720<br>New York, New York 10001<br>Thomas J. Kalamotousakis, Esq. |
| MITCHELL ADAM MARKS<br>1 Dartmouth Drive<br>Glen Cove, New York 11542 | JASON D. CARTER<br>445 Park Avenue, 9th Floor<br>New York, New York 10022 |
| 305 EAST 61ST STREET GROUP<br>LLC<br>488 Madison Avenue, 19th Floor<br>New York, New York 10022 | 305 EAST 61ST STREET GROUP LLC<br>c/o 61 Prime, LLC<br>Jason Carter<br>445 Park Avenue, 9th Floor<br>New York, New York 10022 |
| GANFER SHORE LEEDS &<br>ZAUDERER LLP<br>360 Lexington Avenue<br>New York, New York 10017<br>Steven J. Shore, Esq.<br>Justin R. Bonanno, Esq.<br>sshore@ganfershore.com<br>jbonanno@ganfershore.com | SPENCE LAW OFFICE, P.C.<br>55 Lumber Road, Ste. 5<br>Roslyn, New York 11576<br>Robert J. Spence, Esq.<br>rspence@spencelawpc.com |
| | WESTMAN BALL EDERER MILLER ZUCKER &<br>SHARFSTEIN, LLP<br>1201 RXR Plaza<br>Uniondale, New York 11556<br>Thomas A. Draghi, Esq.<br>tdraghi@westermanllp.com |

Re:    <u>*305-307 East 61ST Street, New York, New York (Block 1436; Lot 5)*</u>

Dear Mr. Draghi,

Please accept this letter as 305 E 61st Street Lender LLC's (the "Lender") response to your request for an updated statement of indebtedness for 305 East 61st Street Group LLC (the "Borrower"). Reference is hereby made to that certain:

(a) Acquisition loan (the "Acquisition Loan") evidenced by that certain (i) *Secured Restated*

*Promissory Note* dated as of June 8, 2017, in the principal amount of $20,000,000.00 (the "Acquisition Note"), which was duly executed and delivered by 605 East 61st Street Group LLC (the "Borrower") and delivered to Popular Bank (f/k/a Banco Popular North America) ("PB") dated as of June 8, 2017, secured by that certain *Mortgage Extension, Modification and Security Agreement* (the "Acquisition Mortgage"), dated as of June 8, 2017 in the principal amount of $20,000,000.00 encumbering the real property commonly known as 305-307 East 61ST Street, New York, New York (Block 1436; Lot 5) (the "Property") which was recorded in the City Register of the City of New York, County of New York (the "Register") on July 7, 2017 as CRFN 2017000250851, and that certain

(b) Building loan (the "Building Loan") evidenced by that certain (i) Building Loan Agreement dated as of June 8, 2017, in the principal amount of up to $7,830,000.00 (the "Building Loan Agreement"), which was duly executed and delivered by the Borrower to PB, as evidenced by that certain (ii) *Building Loan Note* principal amount of up to $7,830,000.00 (the "Building Loan Note"), which was duly executed and delivered by the Borrower to PB dated as of June 8, 2017, secured by that certain (iii) *Building Loan Mortgage and Security Agreement* (the "Building Mortgage"), dated as of June 8, 2017 in the principal amount of $7,830,000.00 encumbering the Property which was recorded in the Register on July 7, 2017 as CRFN 2017000250852, and that certain

(c) Project loan (the "Project Loan" and together with the Acquisition Loan and the Building Loan, collectively, the "Loans") evidenced by that certain (i) Project Loan Agreement dated as of June 8, 2017, in the principal amount of up to $2,170,000.00 (the "Project Loan Agreement" and together with the Building Loan Agreement, collectively the "Agreements"), which was duly executed and delivered by the Borrower to PB, as evidenced by that certain (ii) *Project Loan Note* principal amount of up to $2,170,000.00 (the "Project Loan Note" and together with the Acquisition Loan Note and the Building Loan Note, collectively, the "Notes"), which was duly executed and delivered by the Borrower to PB dated as of June 8, 2017, secured by that certain (iii) *Project Loan Mortgage and Security Agreement* (the "Project Mortgage" and together with the Acquisition Mortgage and the Building Mortgage, collectively, the "Mortgages"), dated as of June 8, 2017 in the principal amount of $2,170,000.00 encumbering the Property which was recorded in the Register on July 7, 2017 as CRFN 2017000250853.

(d) Reference is further made to that certain (x) *Guarantee* dated as of June 8, 2017 (the "Guarantee"), which was duly executed and delivered by Carter and Mitchell Adam Marks ("Marks" and together with Carter, the "Guarantors") and in favor of PB and (y) that certain *Guaranty of Completion* dated as of June 8, 2017 (the "Completion Guarantee" and together with the Guarantee, the "Guarantees", and together with the Agreements, Notes and Mortgages, and all other documents evidencing, securing or guarantying the Loans collectively, the "Loan Documents") in favor of PB.

(e) Reference is further made to that certain (i) *Assignment of Mortgage* (the "Acquisition Assignment") dated as of November 15, 2018, through which PB assigned all of its right, title and interest in and to the Acquisition Loan to the Lender,[1] (ii) *Assignment of*

---

[1] The term Lender as used herein may be used to describe both PB and 305 E 61st Street Lender LLC as successor-in-

*Mortgage* (the "Building Assignment") dated as of November 15, 2018, through which PB assigned all of its right, title and interest in and to the Building Loan to the Lender and (iii) *Assignment of Mortgage* (the "Building Assignment" and together with the Acquisition Assignment and the Building Assignment, collectively the "Assignments") dated as of November 15, 2018, through which PB assigned all of its right, title and interest in and to the Project Loan to the Lender. All of the foregoing Assignments were recorded in the Register on or about January 28, 2019 as CRFN 2019000031748 (Acquisition Assignment), 2019000031749 (Building Assignment), 2019000031750 (Project Assignment) respectively.

Except as otherwise indicated herein, capitalized terms used herein but not otherwise defined shall have the same meanings given to them as set forth in the Loan Documents.

Furthermore, the Lender hereby directs the Borrower's attention to the below, as and for the estimated amounts necessary to satisfy the indebtedness due in connection with the Loans by July 31, 2019 by 3:00 p.m. EST (the "Effective Date").

| Payoff Calculations | Acquisition | Building | Project | Total |
|---|---|---|---|---|
| Principal Balance | $20,000,000.00 | $4,777,264.12 | $2,170,000.00 | $26,947,264.12 |
| Interest | $8,406,849.13 | $1,902,494.88 | $650,144.68 | $10,959,488.68 |
| Late Charges | $1,263,675.79 | $296,566.05 | $137,028.30 | $1,697,270.14 |
| Exit Fee | $50,000.00 | $19,575.00 | $5,425.00 | $75,000.00 |
| Protective Advances | $307,309.65 | $0.00 | $0.00 | $307,309.65 |
| Legal Fees/Costs[2] | $104,075.59 | $0.00 | $0.00 | $104,075.59 |
| **Total Due** | **$30,131,910.16** | **$6,995,900.05** | **2,962,597.98** | **$40,090,408.18** |
| | | | | |
| Per diem | $13,582.86 | $3,184.84 | $1,446.67 | $18,214.37 |

**Total Estimated Payoff**                                                    **$40,090,408.18**

Funds must be in the form of a wire transfer to:

**305 E 61ST STREET LENDER LLC**
**FIRST REPUBLIC BANK**
**111 PINE STREET**
**SAN FRANSCISCO, CA 94111**
**ABA NO: 321081669**
**ACCT NO: 80007255856**

The foregoing estimated amount necessary to payoff is effective until 7/31/2019 by 3:00 p.m. EST. If settlement has not taken place by the Effective Date, please send a new request to this office.

---

interest to PB.
[2] This sum includes the amounts due for Legal Fees/Costs through June 30, 2019. Additional legal fees and costs have accrued and continue to accrue.

**Please be further advised that additional legal fees and/or costs continue to be incurred by the Lender in enforcing its rights and remedies under the Loan Documents, including, but not limited to such amounts necessary to pay attorney's fees and costs, protective advances and such other fees and/or costs which may be incurred in connection with the discontinuance of any pending foreclosure action, satisfaction of the mortgages, all of which will be added to the Total Estimated Payoff figure (collectively, the "Obligations") as set forth hereinabove.**

**ACCORDINGLY, YOU ARE HEREBY DIRECTED TO REQUEST, IN WRITING, AN UPDATED PAYOFF FIGURE FROM THE UNDERSIGNED UPON NO LESS THAN TWENTY-FOUR (24) HOURS PRIOR TO THE DATE AND TIME OF PAYOFF IN ORDER TO ENSURE THAT ALL AMOUNTS DUE UNDER THE LOANS AND LOAN DOCUMENTS ARE PAID IN FULL AT THE TIME PAYMENT IS MADE.**

The aforesaid sums are subject to change pending the Lender's payment of such items, which may include, but are not limited to, protective advances or incurred legal fees. Please be further advised that the Lender reserves the right to make adjustments to the above amounts in the event that a mathematical, typographical, or clerical error has occurred. This letter shall not be binding until verified with Lender.

Nothing herein shall be deemed or constitute a waiver or release of any of the terms or provisions of the Loan Documents or of Borrower's defaults thereunder, or constitute a waiver, release or an estoppel of by or against any of Lender's rights or remedies under the Loan Documents, at law and/or in equity, including, without limitation, with respect to any action to foreclose pursuant to the Loan Documents, all of which rights and remedies are specifically reserved.

Furthermore, the Lender expressly reserves all of its rights, powers, privileges and remedies under the Loan Documents and/or applicable law, including, without limitation, its right at any time, as applicable, (i) to commence any legal or other action to collect any or all of the Obligations from Borrower, the Guarantors, and any other person(s) liable therefore and/or any collateral securing the obligations under the Loans, including without limitation appropriate interest as set forth in the Loan Documents, (ii) to foreclose or otherwise realize on any or all of the Property and/or as appropriate, set-off or apply amounts received to the indebtedness due under the Loans, (iii) to take any other enforcement action or otherwise exercise any or all rights and remedies provided for by any or all of the Loan Documents or applicable law, and (iv) to reject any forbearance, financial restructuring or other proposal made by or on behalf of Borrower the Guarantors or any creditor or equity holder. Lender may exercise its rights, powers, privileges and remedies, including those set forth in clauses (i) through (iv) above at any time in its sole and absolute discretion without further notice. No oral representations or course of dealing on the part of Lender or any of its officers, employees or agents, and no failure or delay by Lender with respect to the exercise of any right, power, privilege or remedy under any of the Loan Documents or applicable law shall operate as a waiver thereof, and the single or partial exercise of any such right, power, privilege or remedy shall not preclude any later exercise of any other right, power, privilege or remedy. Except as specified herein, this demand does not attempt to summarize all (i) existing misrepresentations, breaches, defaults and Events of Default existing under the Loan Documents and (ii) rights and remedies of Lender under the Loan Documents. Accordingly, this

4

letter is not, and shall not be deemed to be, a waiver of, or a consent to, any misrepresentation, breach, default or Event of Default now existing or hereafter arising under the Loan Documents.

      Please contact the Lender to make arrangements for the payment of the indebtedness by calling (646) 960-9959.

      Please be guided accordingly.

                    Your truly,

                  **305 E 61ST STREET LENDER LLC**

By:

                Jason S. Leibowitz, Counsel
                Maverick Real Estate Partners LLC
                100 Park Avenue, Suite 2805
                New York, New York 10017
                (646) 960-9959
                jleibowitz@maverickrep.com

cc:

*Via Electronic Mail*
Steven H. Newman, Esq.
Katsky Korins LLP
605 Third Avenue
New York, New York 10158
*snewman@katskykorins.com*

5

# EXHIBIT B

| | | | ACRIS control | | entered in section 22 of (in PW) | ACRIS scanned into BB | but ACRIS control | | Job description matches (B.1, etc.) contact match in filing | Other submissions of the Control B have different job description |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | No. approved plans scanned into PIS | | | | | | | |
| 2018-397 | IR | | | REV-2_D_14 | 896(c) | PC | CCS | | HEREWITH FILING STRUCTURAL DRAWINGS FOR THE MODIFICATION OF 3 EXISTING FOOTINGS IN CELLAR AND TO ENLARGE THE EXISTING MASONRY OPENING IN THE CELLAR | |
| | | PROHIBA SPOLINA PL (07/02) | | | | | PAUL Application filed and approved. Remaining Cost Penalties to be paid. C.R. A invoice uploaded. PW2 by current General Contractor & Construction Superintendent to obtain permit. One permit issued. Certificate of Correction can be submitted to clear violations | | | | |
| | | Quality Assurance failed on 3/27/2018 | | | | | ACRIS Control #14711(b) matches job description | | | |
| | | | | | | | Application approved, may be in four accord (3/27/-10/08 | | | |
| | | | | | | | Remaining Cost Penalties to be paid. C.R. A invoice uploaded. PW2 by current General Contractor & Construction Superintendent to be submitted to obtain permit. One permit issued certificate of correction can be submitted to clear violations | | | |
| | | John Venkatesan | | | | | | | | |
| | | 14968-74169 | REV-2_D_14 | 896(c) | PC | 1001_010 | JOB WITHDRAWN 10/10/2017 EXTERIOR FACADE REPAIR, BRICK REPLACEMENT AND WATERPROOFING. NO CHANGE IN USE EGRESS OR OCCUPANCY | | | |
| | | ROBERT M GARIS, RA | | | | | Filed 07/20/2017 | | | |
| | | | | | | | | | | |
| | | 14268-94180 | REV-2_D_14 | 896(c) | PC | BAS 001 thru 010 | JOB WITHDRAWN 11/25, 13/15 SCOPE OF WORK WILL BE SCOPE OF WORK WILL BE STRUCTURAL DEMOLITION AS INDICATED ON PLANS. NO CHANGE IN USE, EGRESS OR OCCUPANCY | | | |
| | | JOHN H R A, RA (07/25) | | | | | Filed 11/25/2016 | | | |
| | | | | | | | | | | |

# EXHIBIT C

**305 EAST 61ST STREET GROUP LLC**
488 MADISON AVENUE - 19TH FLOOR - NEW YORK NY  10022
Tel 212-682-9840 Fax (212) 682-9302
email: m@fnyr.com

August 17, 2018

NYC Department of Buildings
Borough of Manhattan
280 Broadway – New York, NY  10007

Attn: Permits

Re:  305 East 61st Street – New York, NY
      Alt II Application # 123455803

Dear Sir / Madam:

Kindly be advised that our company, owners of the above-referenced premises, herewith authorize
Cypress Green Construction Co., to replace the superintendent of construction of record, Victor Sanchez,
with Lorenzo Baldera, for the two (2) referenced Alt II Applications.

Kindly issue the updated work permits with the superseded superintendent of construction.

We appreciate your kind assistance in this matter.

Very truly yours,

Mitchell Marks
Managing Agent

MM/ebg

Sworn to before me on _____7_____, August 2018

_____
Notary                                                    Notary Seal:

## 305 EAST 61ST STREET GROUP LLC
### 488 MADISON AVENUE - 19TH FLOOR - NEW YORK NY  10022
Tel 212-682-9840 Fax (212) 682-9302
email: m@fnyr.com

August 3, 2018

NYC Department of Buildings
Borough of Manhattan
280 Broadway – New York, NY  10007

Attn: Permits

Re:  305 East 61st Street – New York, NY
     Alt II Application # 121238794
     Alt II Application # 123295790

Dear Sir / Madam:

Kindly be advised that our company, owners of the above-referenced premises, herewith authorize Cypress Green Construction Co., to replace the superintendent of construction of record, Victor Sanchez, with Lorenzo Baldera, for the two (2) referenced Alt II Applications.

Kindly issue the updated work permits with the superseded superintendent of construction.

We appreciate your kind assistance in this matter.

Very truly yours,

Mitchell Marks
Managing Agent

MM/ebg

Sworn to before me on _____7_____, August 2018

Notary

Notary Seal:

# EXHIBIT D

# Jack Jaffa & Associates
### REAL ESTATE CONSULTANTS

## Monthly Summary

## The Bresky Law Firm, PLLC

91-31 Queens Blvd
Suite 520
Queens, NY 11373



**CONTACT:**
KYLE HALPERIN

*Sunday, October 6, 2019*
7:39:51 PM EST

# TABLE OF CONTENTS

| SECTION | PAGE |
|---|---|
| Building Overview | 3 |
| DOB Violations | 4 |
| DOB Complaints | 6 |
| DOB Boiler Inspections | 7 |
| DOB Elevator Inspections | 8 |
| DOB Facade Inspections | 9 |
| DEP Boiler Registrations | 10 |
| LL84 Benchmarking | 11 |
| LL87 Energy Efficiency Report | 12 |
| ECB Hearings | 13 |
| ECB Corrections | 14 |
| ECB Open Balances | 17 |
| ECB Complaints | 20 |
| FDNY Criminal Summons | 21 |
| FDNY Violation Orders | 22 |
| HPD Violations | 23 |
| HPD Complaints | 24 |
| HPD Litigations | 25 |
| HPD Registrations | 26 |
| Permits | 27 |
| Work Orders | 29 |

# BUILDING OVERVIEW

This report covers important compliance data for the following 2 properties:

| | ADDRESS | DOB VIOL | DOB COMP | STOP WORK | VACATE ORDER | ECB HEARING | ECB CORRECT | ECB DEFAULT | ECB IMPOSED | HPD VIOL | HPD% UNIT | HPD COMP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 305 - 307 East 6 .. MN | 25 | 1 | 10 | | 4 | 19 | $82,940 | $12,900 | | | |
| 2 | 71-35 165 Street QN | | | | | | | | | | | |
| | **Total** | 25 | 1 | 10 | | 4 | 19 | $82,940 | $12,900 | | | |

# 25

DOB
Violations

# 4

ECB
Hearings

# 19

ECB
Corrections

# DOB VIOLATIONS

We found 35 Open DOB Violations in your portfolio.



## 12
DOB
Violation
Types

| | TYPE | VIOLATIONS |
|---|---|---|
| 1 | AEU Failed to Certify | 2 |
| 2 | Benchmarking | 3 |
| 3 | Boiler Local Law | 2 |
| 4 | Category 1 Test | 1 |
| 5 | Category 5 Test | 4 |
| 6 | Construction | 4 |
| 7 | Elevator Affirmation | 4 |
| 8 | Elevator PVT | 1 |
| 9 | Facade Local Law | 1 |
| 10 | Local Law 87 Energy | 2 |
| 11 | Plumbing | 1 |
| 12 | Stop Work Order | 10 |

## 35
Open
DOB
Violations

| | ADDRESS | VIOLATION | ISSUED | TYPE | HIRED |
|---|---|---|---|---|---|
| 1 | 305 - 307 East 61 Street | 053014ACC103577 | 5/30/2014 | Elevator Affirmation | ⊗ |
| 2 | 305 - 307 East 61 Street | 053014ACC103578 | 5/30/2014 | Elevator Affirmation | ⊗ |
| 3 | 305 - 307 East 61 Street | 060116EEVCAT580371 | 6/1/2016 | Category 5 Test | ⊗ |
| 4 | 305 - 307 East 61 Street | 060116EEVCAT580372 | 6/1/2016 | Category 5 Test | ⊗ |
| 5 | 305 - 307 East 61 Street | 082316E9028/583775 | 8/23/2016 | Elevator PVT | ⊗ |
| 6 | 305 - 307 East 61 Street | 010317ACC103545 | 1/3/2017 | Elevator Affirmation | ⊗ |
| 7 | 305 - 307 East 61 Street | 1466043 | 11/21/2017 | Stop Work Order | ⊗ |
| 8 | 305 - 307 East 61 Street | 032718EARCX00015 | 3/27/2018 | Local Law 87 Energy | ⊗ |
| 9 | 305 - 307 East 61 Street | 040618LBLVIO01206 | 4/6/2018 | Boiler Local Law | ⊗ |
| 10 | 305 - 307 East 61 Street | 040618LBLVIO01207 | 4/6/2018 | Boiler Local Law | ⊗ |

**Jack Jaffa & Associates**
REAL ESTATE CONSULTANTS

# DOB VIOLATIONS

| | ADDRESS | VIOLATION | ISSUED | TYPE | HIRED |
|---|---|---|---|---|---|
| 11 | 305 - 307 East 61 Street | 053118FISPNRF01222 | 5/31/2018 | Facade Local Law | ⊗ |
| 12 | 305 - 307 East 61 Street | 1486510 | 8/8/2018 | Stop Work Order | ⊗ |
| 13 | 305 - 307 East 61 Street | 1486711 | 8/10/2018 | Stop Work Order | ⊗ |
| 14 | 305 - 307 East 61 Street | 1492631 | 10/17/2018 | Stop Work Order | ⊗ |
| 15 | 305 - 307 East 61 Street | 103118AEUHAZ100141 | 10/31/2018 | AEU Failed to Certify | ⊗ |
| 16 | 305 - 307 East 61 Street | 1496264 | 12/3/2018 | Stop Work Order | ⊗ |
| 17 | 305 - 307 East 61 Street | 120518CC0803MP | 12/5/2018 | Construction | ⊗ |
| 18 | 305 - 307 East 61 Street | 021719BENCH00041 | 2/17/2019 | Benchmarking | ⊗ |
| 19 | 305 - 307 East 61 Street | 031819EARCX00346 | 3/18/2019 | Local Law 87 Energy | ⊗ |
| 20 | 305 - 307 East 61 Street | 040519EVCAT101368 | 4/5/2019 | Category 1 Test | ⊗ |
| 21 | 305 - 307 East 61 Street | 1509020 | 5/1/2019 | Stop Work Order | ⊗ |
| 22 | 305 - 307 East 61 Street | 050219BENCH00695 | 5/2/2019 | Benchmarking | ⊗ |
| 23 | 305 - 307 East 61 Street | 052019EVCAT500787 | 5/20/2019 | Category 5 Test | ⊗ |
| 24 | 305 - 307 East 61 Street | 052019EVCAT502149 | 5/20/2019 | Category 5 Test | ⊗ |
| 25 | 305 - 307 East 61 Street | 1513267 | 6/18/2019 | Stop Work Order | ⊗ |
| 26 | 305 - 307 East 61 Street | 1513327 | 6/18/2019 | Stop Work Order | ⊗ |
| 27 | 305 - 307 East 61 Street | 1513328 | 6/18/2019 | Stop Work Order | ⊗ |
| 28 | 305 - 307 East 61 Street | 1513331 | 6/18/2019 | Stop Work Order | ⊗ |
| 29 | 305 - 307 East 61 Street | 062019P19-00477 | 6/20/2019 | Plumbing | ⊗ |
| 30 | 305 - 307 East 61 Street | 062519C084DD | 6/25/2019 | Construction | ⊗ |
| 31 | 305 - 307 East 61 Street | 062619C0804DD | 6/26/2019 | Construction | ⊗ |
| 32 | 305 - 307 East 61 Street | 070119C19-00514 | 7/1/2019 | Construction | ⊗ |
| 33 | 305 - 307 East 61 Street | 080219BENCH00342 | 8/2/2019 | Benchmarking | ⊗ |
| 34 | 305 - 307 East 61 Street | 080719AEUHAZ100100 | 8/7/2019 | AEU Failed to Certify | ⊗ |
| 35 | 305 - 307 East 61 Street | 090619ACC102908 | 9/6/2019 | Elevator Affirmation | ⊗ |

## DOB COMPLAINTS

We found 1 Active DOB Complaints in your portfolio.

Special Enforcement ............... 1

Sep - Profession..., 1

0          1          2

**1**
DOB
Complaint
Category

| | CATEGORY | COMPLAINTS |
|---|---|---|
| 1 | Sep - Professional Certification Compliance Audit | 1 |

**1**
DOB
Complaint
Bureau

| | ASSIGNED | COMPLAINTS |
|---|---|---|
| 1 | Special Enforcement | 1 |

**1**
Active
DOB
Complaint

| | ADDRESS | COMPLAINT | REPORTED | CATEGORY | ASSIGNED |
|---|---|---|---|---|---|
| 1 | 305 - 307 East 61 Street | 1391175 | 3/13/2015 | Sep - Professional Certification Compliance Audit | Special Enforcement |
| | Disposition: 2015-04-21 - c1 - Inspector unable to gain access - attempt made | | | | |

# DOB BOILER INSPECTIONS

No required DOB Boiler Inspections found...

# DOB ELEVATOR INSPECTIONS

We found 6 required DOB Elevator Inspections in your portfolio.

## 6
Required
DOB Elevator
Inspections

| | ADDRESS | DEVICE NAME | DEVICE # | INSPECTED | TEST | STATUS | DUE |
|---|---|---|---|---|---|---|---|
| 1 | 305 - 307 East 61 S... | | 1P7708 | December 15, 2016 | 1-Year | Satisfactory | December 31, 2019 |
| 2 | 305 - 307 East 61 S... | | 1P7708 | October 7, 2013 | 5-Year | Rejected | December 31, 2019 |
| 3 | 305 - 307 East 61 S... | | 1F4352 | August 9, 2017 | 1-Year | Unsatisfactory | December 31, 2019 |
| 4 | 305 - 307 East 61 S... | | 1F4352 | October 7, 2013 | 5-Year | Rejected | December 31, 2019 |
| 5 | 305 - 307 East 61 S... | | 1P49752 | February 21, 2017 | 1-Year | | December 31, 2019 |
| 6 | 305 - 307 East 61 S... | | 1P49752 | February 21, 2017 | 5-Year | | February 21, 2022 |

# DOB FACADE INSPECTIONS

We found 1 required DOB Facade Inspections in your portfolio.

## 1

Required
DOB Facade
Inspection

| | ADDRESS | INSPECTED | RESULT | DUE |
|---|---|---|---|---|
| 1 | 305 - 307 East 61 Street | Not Available | No Report Filed | February 21, 2017 |

# DEP BOILER REGISTRATIONS

No required DEP Boiler Registrations found...

# LL84 BENCHMARKING

We found 1 required LL84 Benchmarking in your portfolio.

Please note, if these reports have been submitted, please notify our office so we can update accordingly. You can also update this information on our website directly by visiting system.JackJaffa.com.

**1**

Required
LL84
Benchmarking

| | ADDRESS | BUILDING AREA | SUBMISSION DUE | STATUS |
|---|---|---|---|---|
| 1 | 305 - 307 East 61 Street | 65,965 sq ft. | May 1, 2020 | DUE |

# LL87 ENERGY EFFICIENCY REPORT

We found 1 required LL87 Energy Efficiency Report in your portfolio.

Please note, if these reports have been submitted, please notify our office so we can update accordingly. You can also update this information on our website directly by visiting system.JackJaffa.com.

## 1

**Required LL87 Energy Efficiency Report**

| | ADDRESS | BUILDING AREA | SUBMISSION DUE | STATUS |
|---|---|---|---|---|
| 1 | 305 - 307 East 61 Street | 65,965 sq ft. | December 31, 2016 | PAST DUE |

# ECB HEARINGS

We found 4 Upcoming ECB Hearings in your portfolio.



DOHMH, 1

DOB, 3

Responsibility of Client                                                                4

0     1     2     3     4     5

## 2
### ECB Hearing Agencies

| | AGENCY | HEARINGS |
|---|---|---|
| 1 | DOB | 3 |
| 2 | DOH | 1 |

## 4
### Upcoming ECB Hearings

| | ADDRESS | AGENCY | VIOLATION | RESPONDENT | HEARING | HIRED |
|---|---|---|---|---|---|---|
| 1 | 305 - 307 East 61... | DOB | 035401360Z | Trevar Coates | 10/10/2019 | ✕ |

Description: failure to comply with the commissioners order contained in summons/violation #39002517p issued on 5-1-2019 and to file a certificate of correction pursuant to 28-201.1 and 1rony 102-01 work not conforming to a

| | | | | | | |
|---|---|---|---|---|---|---|
| 2 | 305 - 307 East 61... | DOB | 035438631K | Triera Contractin... | 10/10/2019 | ✕ |

Description: pedestrian protection does not meet code specification 3307.6.5.3.note;at the time of inspection observed a heavy duty sidewalk shed installed at under that sidewalk shed.observed sidewalk shed not built/mainta

| | | | | | | |
|---|---|---|---|---|---|---|
| 3 | 305 - 307 East 61... | DOB | 035438630Z | Triera Contractin... | 10/10/2019 | ✕ |

Description: temporary construction eqiptment on site expired permit note:at the time of inspection observed temporary construction equipment a heavy duty sidewalk shed installed at exposure one,on the 10 story building at

| | | | | | | |
|---|---|---|---|---|---|---|
| 4 | 305 - 307 East 61... | DOH | 0801715898 | 305 East 61st Str... | 10/30/2019 | ✕ |

Description: fail to eliminate rodent infestation shown by active rodent signs 1st

# ECB CORRECTIONS

We found 19 Required ECB Corrections in your portfolio.



Local Law, 1

Electrical, 1

Construction, 17

Responsibility of Client

## 3
ECB Correction Types

| | TYPE | REQUIRED |
|---|---|---|
| 1 | Construction | 17 |
| 2 | Electrical | 1 |
| 3 | Local Law | 1 |

## 19
Required Corrections

| | ADDRESS | AGENCY | VIOLATION | RESPONDENT | TYPE | HIRED |
|---|---|---|---|---|---|---|
| 1 | 305 - 307 East 61... | DOB | 037010389R | 305 East 61st St... | Local Law | ✕ |

Description: failure to submit acceptable 8th round report of critical examinationdocumenting condition of exterior walls and appurtenances required by28-302. 4 for control#805228. rmdy submit required technical report.

| 2 | 305 - 307 East 61... | DOB | 035339065L | Pccm Management Corp | Construction | ✕ |

Description: failure to comply with the commissioners order contained in summons/violation#35329192p issued on 4/10/18 and to file a certificate of correction pursuant to 28-201. 1 and 1rcny 102-01. failure to provide unobstr

| 3 | 305 - 307 East 61... | DOB | 035336314J | Carter Management... | Construction | ✕ |

Description: work w/o a permit . at the time of inspection i observed part wall being removed in cellar, also sides of concrete foundation walls being removed, structural steel beams are being exposed, this can affect the

| 4 | 305 - 307 East 61... | DOB | 035358641Y | 305 East 61st St... | Electrical | ✕ |

Description: unapproved/unsafe/unsuitable electrical equipment, apparatus, materials, devices, appliances or wiring in use. at the time of my inspection, i observed the riser feeding the spa was disconnected from the main d

| 5 | 305 - 307 East 61... | DOB | 035265924L | Smart Bldg Mainte... | Construction | ✕ |

Description: failure to provide hot work permit during hot work construction activity. @ time of insp. construction workers were using spark generating tools (cut off angle grinder, chop saw), which can cause a fire. no hot w

| 6 | 305 - 307 East 61... | DOB | 035326892M | Pccm Mgmt Corp | Construction | ✕ |

Description: pedestrian protection observed on street material storage area w/no protection in place. no debris netting, no barriers, no yococks, no flag men, present at time of inspection, 6 workers removing scaffold from sws,

# ECB CORRECTIONS

| | ADDRESS | AGENCY | VIOLATION | RESPONDENT | TYPE | HIRED |
|---|---|---|---|---|---|---|
| 7 | 305 - 307 East 61... | DOB | 035322025X | Sj Construction S... | Construction | ✕ |

Description: failure to comply with the commissioner's order contained in summons/violation #35294803h issued on 11/21/2017 and to file a certificate of correction pursuant to 28-201. 1 and 1rcny 102-01. rem: comply with the

| 8 | 305 - 307 East 61... | DOB | 035294803H | Sj Construction S... | Construction | ✕ |

Description: work does not conform to approved construction documents and/or approved amendments. at the time of inspection at the above address on the above date i observed facade work taking place on the exterior of exposu

| 9 | 305 - 307 East 61... | DOB | 039002517P | Trevor Coates | Construction | ✕ |

Description: work does not conform to approved construction documents and or amendments. noted: on roof level hvac units installed under job # 123025715 and location of units does not confirm to approved plan page # m. 108. 0

| 10 | 305 - 307 East 61... | DOB | 035254004P | 305 East 61 St Gr... | Construction | ✕ |

Description: failure to provide adequate safety measure such as sidewalk sheds, fence, netting, etc. where require to protect and secure public safety from documented unsafe condition as per 14cny 103-04. complaint #1439459. note:

| 11 | 305 - 307 East 61... | DOB | 035326890Z | Pccm Mgmt Corp | Construction | ✕ |

Description: no ssm present observed 6 workers removing scaffolding from sws at exp#1 upon request for ssm none was given & none were present at time of inspection, workers stated site was closed & no one was present, 3 worke

| 12 | 305 - 307 East 61... | DOB | 035401360Z | Trevar Coates | Construction | ✕ |

Description: failure to comply with the commissioners order contained in summons/violation #39002517p issued on 5-1-2019 and to file a certificate of correction pursuant to 28-201. 1 and 1rcny 102-01. work not conforming to a

| 13 | 305 - 307 East 61... | DOB | 035327220Y | Pccm Management Corp | Construction | ✕ |

Description: bc3310. 5/no site safety manager as required site safety manager mohamed o. mohamed lic#1293, withdrew from above site on april 19, 2018 and again may 11, 2018 as noted in attached e-mails. at time of inspection no

| 14 | 305 - 307 East 61... | DOB | 035250447X | Smart Building Ma... | Construction | ✕ |

Description: failure to provide approved/accepted construction documents at job site at time of inspection. noted:permit#122829591-alt01 issued to convert an existing 10 story building & construction work in progress. howev

| 15 | 305 - 307 East 61... | DOB | 035329192P | Pccm Management Corp | Construction | ✕ |

Description: failure to provide unobstructed exit passageway at the time of inspection at main entrance to the building 2 large garbage bags, several small sheetrocks obstructed and cause narrow passageway. rem:remove obstru

| 16 | 305 - 307 East 61... | DOB | 035250444K | 305 East 61st Str... | Construction | ✕ |

Description: work w/o a permit. noted:on the rooftop observed new steel frame installed w/o a permit, dim. approx 45'l x 25'd x 1'h approx:70% of work completed. (stop work on roof level only) remedy:stop work & obtain all p

| 17 | 305 - 307 East 61... | DOB | 035438631K | Triera Contractin... | Construction | ✕ |

Description: pedestrian protection does not meet code specification 3307. 6. 5. 3. note;at the time of inspection observed a heavy duty sidewalk shed installed at under that sidewalk shed. observed sidewalk shed not built/mainta

| 18 | 305 - 307 East 61... | DOB | 035246152R | 305 East 61 St Gr... | Construction | ✕ |

Description: changes inconsistent with building dept records. p. c. job 2 #12123874(expires 4/6/19) for physical cultural establishment at cel 001 and basement. at time of inspection observed active construction at cel,

# ECB CORRECTIONS

| | ADDRESS | AGENCY | VIOLATION | RESPONDENT | TYPE | HIRED |
|---|---|---|---|---|---|---|
| 19 | 305 - 307 East 61... | DOB | 035438630Z | Triera Contractin... | Construction | |

Description: temporary construction eqiptment on site expired permit. note at the time of inspection observed temporary construction equipment a heavy duty sidewalk shed installed at exposure one, on the 10 story building at

# ECB OPEN BALANCES

1 of 3

We found 24 ECB Open Balances in your portfolio.



|   | STATUS | VIOLATIONS | DUE |
|---|--------|-----------|-----|
| 1 | DEFAULTED | 19 | $82,940.00 |
| 2 | IMPOSED | 4 | $12,900.00 |
| 3 | REFUND | 1 | $1,300.00 |

## 24
ECB Open
Balances

The following violations have Defaulted to maximum penalties due to lack of appearance at ECB Court. If you would like our office to reduce this amount please call 718.855.6110 Ext. 118 or email ECB@JackJaffa.com

## 19
Defaulted
Penalties

| | ADDRESS | AGENCY | VIOLATION | ISSUED | STATUS | BALANCE |
|---|---------|--------|-----------|--------|--------|---------|
| 1 | 305 - 307 East 61... | DOB | 035327220Y | 5/17/2018 | Defaulted | $12,520.00 |

Description: bc3310. 5/no site safety manager as required site safety manager mohamed o. mohamed lic#1293, withdrew from above site on april 19, 2018 and again may 11, 2018 as noted in attached e-mails. at time of inspection no

| 2 | 305 - 307 East 61... | DOB | 035238739X | 5/8/2017 | Defaulted | $8,000.00 |

Description: b106, 1, bc3307. 4. 7. work on storage zone. note: @ time of my insp. of a10 story alteration construction work in progress. i observed storage& work zone area @ exp. 1 adjacent to sidewalk & sidewalk shed was no

| 3 | 305 - 307 East 61... | DOB | 035327219R | 5/17/2018 | Defaulted | $6,270.00 |

Description: site safety plan. at time of inspection i requested to see site safetypla, none was was provided on site, when one was finally delivered to site approx 3hrs later, it was a copy measuring 8 1/2 x 14 stop all work

| 4 | 305 - 307 East 61... | DOB | 035329192P | 4/21/2018 | Defaulted | $6,270.00 |

Description: failure to provide unobstructed exit passageway at the time of inspection at main entrance to the building 2 large garbage bags, several small sheetrocks obstructed and cause narrow passageway. rem:remove obstru

| 5 | 305 - 307 East 61... | DOB | 035265916L | 8/17/2017 | Defaulted | $6,000.00 |

Description: material storage. @ time of insp. answering above complaint #1458059 incident # 24543 i observed 2 planks & 2x4' that have been moved to theside of the room. the site safety manager stated are the boards that f

| 6 | 305 - 307 East 61... | DOB | 035265917N | 8/17/2017 | Defaulted | $6,000.00 |

Description: guardrails improper. @ time of insp. answering above complaint # 1458059 incident # 24543 i observed @ exp. 1 entire bldg all 10 fls they are cutting open the window & don't have adequate guardrails where they

# ECB OPEN BALANCES

| | ADDRESS | AGENCY | VIOLATION | ISSUED | STATUS | BALANCE |
|---|---|---|---|---|---|---|
| 7 | 305 - 307 East 61... | DEP | 000283170N | 11/4/2017 | Defaulted | $5,250.00 |
| | Description: construction activities at impermissable times/days | | | | | |
| 8 | 305 - 307 East 61... | NYPD | 0191541790 | 4/3/2017 | Defaulted | $5,000.00 |
| | Description: street closing without permit | | | | | |
| 9 | 305 - 307 East 61... | DOB | 035265918P | 8/17/2017 | Defaulted | $4,000.00 |
| | Description: bc3314. 6. 1. scaffold supported. @ tim eof insp. of 10 story alt1 i observed a 3 tier pipe scaffold on the roof that isn't secured to the wall with proper fastings. there is a rope & thali string in place of a d | | | | | |
| 10 | 305 - 307 East 61... | DOB | 035265920Y | 8/17/2017 | Defaulted | $4,000.00 |
| | Description: bc3303. 7. 2. fire extinguasher shall be provided in accordance with thenyc fire code. @ time of insp. observed missing fire extinguashers on1st fl, 4 fl, 5 fl, 8 fl & 10 fl. b20 fire extinguasher should be on all | | | | | |
| 11 | 305 - 307 East 61... | DOB | 035265921X | 8/17/2017 | Defaulted | $4,000.00 |
| | Description: bc3301. 1. 2. no fire watch person designated during hot work activity. @ time of insp. i observed men grinding & using cut of saw to cut steel, there were sparks & hot debris flying aprox. 8ft inside the bldg. th | | | | | |
| 12 | 305 - 307 East 61... | DOB | 035265922H | 8/17/2017 | Defaulted | $4,000.00 |
| | Description: bc3301. 7. design for pulley system. @ time of insp. i observed men @ 10 fl exp. 1 using a rope & pulley to raise a bucket of material. thispulley was tied to the scaffolding by a piece of rope upon request for | | | | | |
| 13 | 305 - 307 East 61... | NYPD | 0202898814 | 11/18/2017 | Defaulted | $2,250.00 |
| | Description: construction materials/equipment stored on street w/o permit | | | | | |
| 14 | 305 - 307 East 61... | DOT | 0701311610 | 12/20/2017 | Defaulted | $2,250.00 |
| | Description: construction materials/equipment stored on street w/o permit | | | | | |
| 15 | 305 - 307 East 61... | DOT | 0701330621 | 1/14/2018 | Defaulted | $2,250.00 |
| | Description: construction materials/equipment stored on street w/o permit | | | | | |
| 16 | 305 - 307 East 61... | DOB | 035265919R | 8/17/2017 | Defaulted | $2,000.00 |
| | Description: no "smoking " signs posted during construction. @ time of insp. i didn't observe any no smoking signs on any fls @ the staircase location. remedy: provide no smoking signs as per code. | | | | | |
| 17 | 305 - 307 East 61... | DOB | 035265923J | 8/17/2017 | Defaulted | $2,000.00 |
| | Description: bc3303. 4. 1. tripping hazard on steps. @ time of insp. i observed @ allfloors w/o poured decks there is a 2 " steel bar @ the top tred. thisis a hazard to persons walking up & down the stairs. remedy: provide a | | | | | |
| 18 | 305 - 307 East 61... | NYPD | 0196160920 | 7/15/2017 | Defaulted | $750.00 |
| | Description: no street protection under construction material/equipment | | | | | |
| 19 | 305 - 307 East 61... | DSNY | 0206745312 | 7/27/2019 | Defaulted | $130.00 |
| | Description: failure to clean 18 inches into street | | | | | |

The following violation penalties have been imposed by a Judge after an ECB Hearing has been completed:

| | ADDRESS | AGENCY | VIOLATION | ISSUED | STATUS | BALANCE |
|---|---|---|---|---|---|---|

# ECB OPEN BALANCES

## 4 Imposed Penalties

| | ADDRESS | AGENCY | VIOLATION | ISSUED | STATUS | BALANCE |
|---|---|---|---|---|---|---|
| 1 | 305 - 307 East 61... | DOB | 035294802X | 11/21/2017 | Imposed | $10,000.00 |

Description: failure to safeguard all persons and property affected by constructionoperations. at the time of my inspection at the above address on the above date i observed brick + facade work on going at the exposure 3 wal

| 2 | 305 - 307 East 61... | DOB | 035246152R | 11/26/2018 | Imposed | $1,250.00 |

Description: changes inconsistent with building dept records. p. c. job 2 #12123874(expires 4/6/19) for physical cultural establishment at cel 001 andbasement. at time of inspection observed active construction at cel,

| 3 | 305 - 307 East 61... | DOB | 035339065L | 6/1/2018 | Imposed | $1,250.00 |

Description: failure to comply with the commissioners order contained in summons/violation#35329192p issued on 4/10/18 and to file a certificate of correction pursuant to 28-201. 1 and 1rcny 102-01. failure to provide unobstr

| 4 | 305 - 307 East 61... | DOB | 035322026H | 3/3/2018 | Imposed | $400.00 |

Description: failure to comply with the commissioner's order contained in summons/violation #35294802x issued on 11/21/2017 and to file a certificate ofcorrection pursuant to 28-201. 1 and 1rcny 102-01. rem: comply with the

The following violations have been overpaid and may be eligible for a refund:

| | ADDRESS | AGENCY | VIOLATION | ISSUED | STATUS | BALANCE |
|---|---|---|---|---|---|---|
| 1 | 305 - 307 East 61... | FDNY | 012818700P | 5/14/1987 | Refund | ($1,300.00) |

## 1 Overpaid Penalties

# ECB COMPLAINTS

We found 2 ECB Complaints in your portfolio.



## 1
### Complaint Agency

| | AGENCY | COMPLAINTS |
|---|---|---|
| 1 | DEP | 2 |

## 2
### ECB Complaint Type

| | TYPE | COMPLAINTS |
|---|---|---|
| 1 | Air Quality | 1 |
| 2 | Noise | 1 |

## 2
### ECB Complaints

| | ADDRESS | AGENCY | COMPLAINT | RECEIVED | TYPE | STATUS |
|---|---|---|---|---|---|---|
| 1 | 305 - 307 East 61 Street | DEP | 37026281 | 8/24/2017 | Air Quality | OPEN |
| 2 | 305 - 307 East 61 Street | DEP | 37547220 | 10/28/2017 | Noise | OPEN |

# FDNY CRIMINAL SUMMONS

We found 4 Active Criminal Summons in your portfolio.



| | DISPOSITION | SUMMONS |
|---|---|---|
| 1 | Execution Of Default | 1 |
| 2 | N/A | 3 |

**2** FDNY Dispositions

| | ADDRESS | SUMMONS | ISSUED | APPEAR | ENTITY | DISPOSITION | HIRED |
|---|---|---|---|---|---|---|---|
| 1 | 305 - 307 East 61 Street | 442805724 | 7/16/2019 | TBD | Tbd | | ⊗ |
| | Description: Failure To Comply - Commissioner's Order | | | | | | |
| 2 | 305 - 307 East 61 Street | 442805726 | 7/16/2019 | 9/24/2019 | Hair Justin | | ⊗ |
| | Description: Failure To Comply - Commissioner's Order | | | | | | |
| 3 | 305 - 307 East 61 Street | 442805725 | 7/16/2019 | TBD | Tbd | | ⊗ |
| | Description: Failure To Comply - Commissioner's Order | | | | | | |
| 4 | 305 - 307 East 61 Street | 444121575 | 5/1/2018 | 4/23/2019 | Pccm Corp | Execution Of Default | ⊗ |
| | Description: Failure To Comply - Commissioner's Order | | | | | | |

**4** FDNY Criminal Summons

## FDNY VIOLATION ORDERS

No Open FDNY Violation Orders found...

# HPD VIOLATIONS

No HPD Violations found...

# HPD COMPLAINTS

No Active HPD Complaints found...

# HPD LITIGATIONS

No Open HPD Litigations found...

# HPD REGISTRATIONS

No HPD Registrations found...

# PERMITS

We found 9 Permits Issued in your portfolio.



## 1
Permit Agency

| AGENCY | | PERMITS |
|--------|---|---------|
| 1 | DOB | 9 |

## 5
Permit Types

| | TYPE | PERMITS |
|---|------|---------|
| 1 | Electrical | 3 |
| 2 | General Construction | 3 |
| 3 | Mechanical/HVAC | 1 |
| 4 | N/A | 1 |
| 5 | Sprinkler | 1 |

## 9
Permits Issued

| | ADDRESS | AGENCY | PERMIT # | ISSUED TO | TYPE | EXPIRES |
|---|---------|--------|----------|-----------|------|---------|
| 1 | 305 - 307 East 61 Street | DOB | M00110302-I1-EL | Heman Socarras | Electrical | 11/9/2019 |
| | Description: service work / notify utility | | | | | |
| 2 | 305 - 307 East 61 Street | DOB | M00059707-I1-EL | Boris Nasimov | Electrical | 12/30/2019 |
| | Description: temporary construction service temporary light & power | | | | | |
| 3 | 305 - 307 East 61 Street | DOB | M00120452-I1-EL | Boris Nasimov | Electrical | 12/30/2019 |
| | Description: service work / notify utility general wiring lighting work | | | | | |
| 4 | 305 - 307 East 61 Street | DOB | 121238794-01-EW OT | Victor Sanchez | General Cons... | 2/21/2020 |
| 5 | 305 - 307 East 61 Street | DOB | 123295790-01-EW OT | Victor Sanchez | General Cons... | 2/21/2020 |
| 6 | 305 - 307 East 61 Street | DOB | 123368159-01-EW OT | Victor Sanchez | General Cons... | 2/21/2020 |
| 7 | 305 - 307 East 61 Street | DOB | 123455803-01-EW MH | Victor Sanchez | Mechanical/HVAC | 2/21/2020 |
| 8 | 305 - 307 East 61 Street | DOB | 123455796-01-EW SP | Joseph Lamarca | Sprinkler | 6/4/2020 |

# PERMITS

| | ADDRESS | AGENCY | PERMIT # | ISSUED TO | TYPE | EXPIRES |
|---|---|---|---|---|---|---|
| 9 | 305 - 307 East 61 Street | DOB | 123455803-01-PL | Joseph Lamarca | | 6/5/2020 |

## WORK ORDERS

No Work Orders found...

# EXHIBIT E

FILED: NEW YORK COUNTY CLERK 06/04/2019 10:46 PM 08:24   INDEX NO. 150289/2019
NYSCEF DOC. NO. 70                                        RECEIVED NYSCEF: 06/04/2019

Pg 64 of 67

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT: HON. LYNN R. KOTLER, J.S.C.                    PART 8

_____

MITCHELL MARKS,                                        INDEX NO. 150289/19

                                                       MOT. DATE
          - v -
                                                       MOT. SEQ. NO. 001 and 002
ACORN MACHINERY CORPORATION

_____

The following papers were read on this motion to/for __Yellowstone inj_____

| | |
|---|---|
| Notice of Motion/Petition/O.S.C. — Affidavits — Exhibits | NYSCEF DOC No(s)._____ |
| Notice of Cross-Motion/Answering Affidavits — Exhibits | NYSCEF DOC No(s)._____ |
| Replying Affidavits | NYSCEF DOC No(s)._____ |

There are two applications for *Yellowstone* injunctions. In motion sequence 001, plaintiff Mitchell Marks (Marks) moves by order to show cause for a Yellowstone injunction tolling the time for plaintiff to cure the alleged violations set forth in the Notice to Cure dated December 11, 2018, staying the notice and staying the defendant from terminating the lease pending the determination of this action. In sequence 002, plaintiff moves again to toll the time for plaintiff to cure the alleged violations of lease set forth in the notice to cure dated February 5, 2019, staying the notice and staying defendant from terminating the lease pending final determination of the action. Defendant Acorn Machinery Corporation (Acorn) opposes both motions.

Plaintiff is a shareholder in a co-op located at 182 Lafayette Street, New York, New York and the proprietary lessee of unit 1 pursuant to a proprietary lease made as of June 22, 2000. The building is comprised of a commercial unit on the ground and cellar levels, known as unit 1, and five full floor residential units on levels two through six. In or about April 2014, plaintiff sub-leased unit 1 to Monster Cycle, LLC (Monster) pursuant to the terms of a store sublease made on or about April 11, 2014. Monster markets itself as an extreme workout facility with loud amplified sound system and intense visual components. Plaintiff, who was the principal of the sponsor that converted the building from a commercial loft building to a residential co-op, was permitted under the terns of the lease to sub-let unit 1 to Monster without the consent of the co-op.

Under Section 2 of the Monster Sublease, Monster Cycle is permitted to use unit 1 for a bicycle fitness facility. An excerpt from the Monster Cycle website shows "NO, THE MONSTER CYCLE IS NOT SCARY...BUT YES WE ARE AN UNAPOLOGETIC, UNCENSORED RIDE. YOU WILL HEAR EXPLIC-IT LANGUAGE AND MOST LIKELY SEE SOME BAD ASS MUSIC VIDEOS". *** WE ARE A MUSIC VIDEO RIDE, THERE WILL BE VISUALS, STROBING LIGHTS, BLACK LIGHTS, DARKNESS AND A LOUD SOUND SYSTEM. EAR PLUGS ARE AVAILABLE AT THE CHECK IN DESK".

Dated: ___6/3/19___                                    _____
                                                       HON. LYNN R. KOTLER, J.S.C.

**1. Check one:**                    ☐ CASE DISPOSED    ☒ NON-FINAL DISPOSITION

**2. Check as appropriate: Motion is**    ☐ GRANTED ☒ DENIED ☐ GRANTED IN PART ☐ OTHER

**3. Check if appropriate:**         ☐ SETTLE ORDER ☐ SUBMIT ORDER ☐ DO NOT POST

                                     ☐ FIDUCIARY APPOINTMENT ☐ REFERENCE

After continuing complaints from co-op owners, the co-op engaged AKRF, an acoustical engineering firm, to conduct acoustic noise monitoring and to determine whether Monster Cycle was violating the NYC Noise Control Code [NYC Admin. Code Sec. 24-231] (hereinafter "Noise Code"). AKRF performed acoustic noise monitoring at the building in April and May 2018. According to the AKRF report, there were repeated violations of the Noise Code by Monster Cycle during its spin classes under two different provisions of the Noise Code, to wit: (i) Sec. 24-231(a)(1), by regularly exceeding the 42 dB(A) limits permitted for commercial music levels; and (ii) Sec. 24-231(a)(2) pertaining to 45 dB one-third octave band maximums for commercial music. The noise issue continued to worsen and on December 11, 2018, the co-op issued its first Notice to Cure on plaintiff advising him that he was in default of Sections 18(b) and 18(d) of the Lease and House Rule 4 because of continuous loud, disturbing music and amplified voices and vibrations coming from Unit 1 adversely effecting the other residents in the building. The Notice to Cure also alleged violations of paragraph 14 of the Lease Rider and House Rule 10, which have been resolved and are not part of this application.

After the service of the first notice to cure, the co-op's residents continued to complain of excessive noise problems from Monster Cycle's spin classes. In January 2019, the co-op engaged AKRF to perform a short-term survey in unit 2 at the building. AKRF issued a supplemental report dated January 22, 2019, which concluded that "Monster Cycle continues to violate the NYC Noise Code and the Lease with apparent impunity".

On February 5, 2019, defendant served a second notice to cure alleging lease violations pertaining to the illegal construction in unit 1, the illegal use of the Monster Cycle spin studio in violation of the building certificate of occupancy and without a special use permit. Plaintiff filed a second order to show cause for a Yellowstone injunction claiming that he needs more time to cure the alleged violations.

## MOTION SEQUENCE 001

Plaintiff argues that without an order tolling the cure period, he will "face imminent loss of the lease-and its valuable business and investment". Plaintiff further contends that "I need more time to cure the alleged violations" and that "if relief is not granted, I risk losing a valuable downtown storefront lease that has 77 years remaining, as well as the ownership interest in the cooperative corporation". Plaintiff claims that he is prepared to cure and that he just needs more time.

Defendant vehemently opposes the application and argues that plaintiff has done nothing to abate the excessive noise problems emanating from Unit 1 and the Monster Cycle spin classes, that plaintiff has not submitted any plans or specifications to the co-op board or provided names of any architect or contractor. Defendant further argues that there is no evidence that plaintiff has taken any steps to comply with the Notice to Cure and to stop his subtenant from violating the NYC Commercial Music Noise Code, the lease and house rules.

## MOTION SEQUENCE 002

Plaintiff argues that he requires an immediate temporary restraining order because the second notice to cure expires on March 11, 2019 and that he needs more time to cure the alleged violations. Plaintiff also contends that if the relief he seeks is not granted, then he risks losing a valuable downtown storefront lease that has 77 years remaining on it as well as the ownership interest in the cooperative corporation.

Defendant argues that plaintiff has failed to show in his application that he is willing and able to cure the Lease violations pertaining to the illegal construction in unit 1, the illegal use of Monster cycle spin studio in violation of the building certificate of occupancy and the lack of the required special use permit from the NYC Board of Standards and Appeals. Defendant further argues that plaintiff has failed again to present any credible evidence of any good faith effort to bring his sub-lessee into compliance within the applicable law and to cure any of the violations in the notice to cure.

Page 2 of 4

In order to obtain a *Yellowstone* injunction, plaintiff must demonstrate: [1] that he holds a commercial lease; [2] that he received either a notice of default, a notice to cure or a threat of termination of the lease from the landlord; [3] that the motion was made prior to the termination of the lease; and [4] that he is prepared and maintains the ability to cure (*Graubard Mollen Horowitz Pomeranz & Shapiro v. 600 Third Ave. Assocs.*, 93 NY2d 508 [1999]).

The thrust of defendant's opposition in both motion sequence 001 and 002 is that plaintiff cannot demonstrate an ability to cure, the fourth requirement for a Yellowstone injunction. The court agrees on both motion sequences.

In plaintiff's first application for a Yellowstone, plaintiff has woefully failed to demonstrate that not only does it have the ability to cure but that it has made good faith efforts to work to clear the violations of the sub-lease and the house rules. A tenant seeking a Yellowstone injunction must also convince the court "of his desire and ability to cure the defects by any means short of vacating the premises" (*Jemaltown of 125th St. v Betesh/Park Seen Realty Assocs.*, 115 AD2d 381, 382 [1st Dept 1985]). Here, plaintiff has not made the requisite showing of its willingness to cure the lease violations and the evidence in this record raises considerable doubt as to plaintiff's good faith.

Plaintiff's barebones conclusory affidavit stating that he has "engaged a contractor to undertake additional soundproofing measures, including installing a sound proof door, soundproofing an 8'x9' section of exposed ceiling and putting down a ¾" to 1" rubber floor in the studio" falls on deaf ears. Plaintiff failed to annex any credible proof from a contractor that it retained to perform the work and/or that the work is currently being performed in unit 1. What is troubling is the supplemental report by AKRF based on additional acoustic survey conducted in mid-January 2019 which evidences noise levels that were not only worse than the levels in the first long term survey conducted in April and May 2018 but also far exceed the noise code levels by 18 decibels. Affidavits from Co-op unit owners attest to the ongoing noise and vibrations during the Monster Cycle spin classes they have experienced in their individual units over the course of years. In plaintiff's affidavit, he avers that "I do not believe the subtenant is unreasonably disturbing other lessees or violating the NYC Noise Code". Plaintiff's claim that ARN Insulation indicate noise levels below the lawful maximum lacks any credible evidence to support that allegation. An additional four days of Unattended Noise Monitoring (3/26/19 to 3/29/19) in the second-floor residence as well as an Attended Noise Survey (4/4/19) were performed by AKRF with Proseda, plaintiff's acoustical consultant in attendance. The summary of the testing showed that the noise levels from Monster Cycle regularly exceeded the New York City Commercial Music Noise Code Sec. 24-231a.2. Moreover, plaintiff has failed to submit any plans or specifications from an architect or contractor for any soundproofing renovation or construction work in unit 1 to abate the noise problem from Monster Cycle pursuant to Section 21(a) of the Lease and paragraph 35 of the Stipulation accompanying plaintiff's lease.

Further, it is disingenuous for plaintiff to contend that he "needs more time" to cure the alleged violations when he denied that any default exists. Since the commencement of the litigation, plaintiff has wholly failed to take an active role in curing the alleged violations to ensure compliance with the lease and any NYC Commercial Music code regulations.

As to motion sequence 002, plaintiff thrusts himself at the mercy of the court because he "will face the imminent loss of the lease-and its valuable business and investment". Here, plaintiff again fails to show that he is able and willing to cure the Lease violations pertaining to the illegal construction in Unit 1 and the illegal use of Monster Cycle spin studio in violation of the building certificate of occupancy and without the special use permit from the NYC Board of Standards and Appeals. In both motion sequences, plaintiff's supporting affidavits are not only similar but contain conclusory self-serving statements without any evidentiary support for the relief he seeks. The fact that plaintiff served a Notice to Cure dated February 25, 2019 on his sub-lessee to cure the Lease violations of operating a cycling studio is completely contradictory to plaintiff's affidavit whereby he acknowledges that the work on unit 1 was done

Page 3 of 4

with his knowledge and that a certificate of occupancy exists. Plaintiff has failed to show a good-faith effort to bring the Monster Cycle use of the premises into compliance with the law as a physical culture establishment under the NYC Zoning Regulations which require a special use permit from the Board of Standards and Appeals. Plaintiff's retention of acoustical consultant Daniel Prosseda to conduct testing over the course of an hour on February 26, 2019 is of no moment. There is nothing in the record to conclude that plaintiff made any effort to rectify any of the violations since the service of the first notice. Based on the foregoing, plaintiff's applications for a *Yellowstone* injunction is denied.

Accordingly, it is hereby **ORDERED** that the orders to show cause under motion sequence 001 and 002 are denied and all previous granted stays are vacated; and it is further

**ORDERED,** that the parties are directed to appear for a preliminary conference on July 16, 2019 at 9:30 am at 80 Centre Street, Room 278, New York, New York.

Any requested relief not expressly addressed herein has nonetheless been considered and is hereby expressly denied and this constitutes the Decision and Order of the court.

Dated: ___6/3/19___                                         _____
                                                                              **HON. LYNN R. KOTLER, J.S.C.**