# EXHIBIT D

## SETTLEMENT AND FORBEARANCE AGREEMENT

**THIS SETTLEMENT AND FORBEARANCE, AGREEMENT** (this "Agreement") is made and entered into as of January __, 2020, by and between (i) Kenneth P. Silverman, in his capacity as Chapter 11 Trustee ("Trustee") of 305 East 61st Street Group, LLC (the "Debtor"), and (ii) 305 E 61st Street Lender LLC ("Lender"). Trustee, and Lender shall be hereinafter referred to individually as a "Party" and collectively as the "Parties".

### BACKGROUND

**WHEREAS**, the Debtor is the owner of certain real property, and all buildings and improvements therein, located at and known as 305-307 East 61st Street, New York, New York (the "Property");

**WHEREAS**, the Lender is the holder of three mortgage loans which the Debtor duly owes to the Lender, which loans were duly purchased by Lender on November 15, 2018 from PB (as defined below). Such loans are described as follows:

(a)    The Acquisition loan (the "Acquisition Loan") (i) evidenced by that certain *Secured Restated Promissory Note,* dated as of June 8, 2017, in the original principal amount of $20,000,000.00 (the "Acquisition Loan Note"), which was duly executed by the Debtor and delivered to Popular Bank (f/k/a Banco Popular North America) ("PB") and (ii) secured by, among other things, that certain *Mortgage Extension, Modification and Security Agreement* (the "Acquisition Mortgage"), dated as of June 8, 2017, in the original principal amount of $20,000,000.00 encumbering the Property which was recorded in the City Register of the City of New York, County of New York (the "Register") on July 7, 2017 as CRFN 2017000250851, and that certain

(b)    The Building loan (the "Building Loan") (i) evidenced by (a) that certain

Building Loan Agreement, dated as of June 8, 2017, in the original principal amount of up to $7,830,000.00 (the "Building Loan Agreement"), which was duly executed and delivered by the Debtor to PB, and (b) that certain *Building Loan Note,* dated as of June 8, 2017, in the original principal amount of up to $7,830,000.00 (the "Building Loan Note"), which was duly executed and delivered by the Debtor to PB, and (ii) secured by, among other things, that certain *Building Loan Mortgage and Security Agreement* (the "Building Mortgage"), dated as of June 8, 2017, in the original principal amount of $7,830,000.00 encumbering the Property which was recorded in the Register on July 7, 2017 as CRFN 2017000250852, and that certain

(c)    The Project loan (the "Project Loan"; and together with the Acquisition Loan and the Building Loan, collectively, the "Loans") (i) evidenced by (a) that certain Project Loan Agreement dated as of June 8, 2017, in the original principal amount of up to $2,170,000.00 (the "Project Loan Agreement"; and together with the Building Loan Agreement, collectively the "Loan Agreements"), which was duly executed and delivered by the Debtor to PB, and (b) that certain *Project Loan Note,* dated as of June 8 2017, in the original principal amount of up to $2,170,000.00 (the "Project Loan Note"; and together with the Acquisition Loan Note and the Building Loan Note, collectively, the "Notes"), which was duly executed and delivered by the Debtor to PB, and (ii) secured by, among other things, that certain *Project Loan Mortgage and Security Agreement* (the "Project Mortgage"; and together with the Acquisition Mortgage and the Building Mortgage, collectively, the "Mortgages"), dated as of June 8, 2017, in the original principal amount of $2,170,000.00 encumbering the Property which was recorded in the Register on July 7, 2017 as CRFN 2017000250853;

2

**WHEREAS**, each of the Loans are fully guaranteed by Jason D. Carter ("Carter") and Mitchell Adam Marks ("Marks") pursuant to (a) that certain *Guarantee,* dated as of June 8, 2017 (the "Payment Guarantee"), which was duly executed and delivered by Carter and Marks (Carter and Marks are sometimes referred to collectively herein as the "Guarantors") and in favor of PB and (b) that certain *Guaranty of Completion,* dated as of June 8, 2017 (the "Completion Guarantee"; and together with the Payment Guarantee, collectively the "Guarantees"), in favor of PB and which Completion Guaranty was duly executed and delivered by the Guarantors. The Loan Agreements, Notes, Mortgages, the Guarantees, and the PB Assignments (defined below) and all other documents evidencing, guarantying and/or securing the Loans are collectively referred to herein as the "Loan Documents";

**WHEREAS**, reference is further made to that certain (i) *Assignment of Mortgage* (the "Acquisition Assignment"), dated as of November 15, 2018, through which PB assigned all of its right, title and interest in and to the Acquisition Loan and applicable Loan Documents to the Lender, (ii) *Assignment of Mortgage* (the "Building Assignment"), dated as of November 15, 2018, through which PB assigned all of its right, title and interest in and to the Building Loan and applicable Loan Documents to the Lender and (iii) *Assignment of Mortgage* (the "Building Assignment"; and together with the Acquisition Assignment and the Building Assignment, collectively the "PB Assignments"), dated as of November 15, 2018, through which PB assigned all of its right, title and interest in and to the Project Loan and applicable Loan Documents to the Lender. Each of the PB Assignments have been duly recorded in the Register;

**WHEREAS**, on June 10, 2019 the Debtor filed a petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

3

**WHEREAS**, on October 24, 2019 the Bankruptcy Court entered an Order Appointing a Chapter 11 Trustee (ECF No. 72);

**WHEREAS**, by Order of the Bankruptcy Court dated October 28, 2019 (ECF No. 79), the Bankruptcy Court approved the appointment of Kenneth P. Silverman as the Chapter 11 Trustee of the Debtor;

**WHEREAS**, following his appointment the Trustee conducted his own independent investigation as to, among other things, the Debtor's Property, the status and needs with respect to the construction of the building located on the Property, the validity and amount of the claims of the Lender with respect to the Loans, and the possible refinancing of the Loans;

**WHEREAS**, on December 4, 2019 the Trustee filed a motion seeking to obtain a refinancing of the Loans (the "Lazarus DIP Motion") pursuant to a new debtor-in-possession loan in the principal sum of $45,000,000 (the "Lazarus Loan") from Lazarus 5, LLC ("Lazarus"), which is an affiliate of Carter;

**WHEREAS**, Lender has advised the Trustee that it intends to object to the Lazarus Loan and the Lazarus DIP Motion;

**WHEREAS**, the Trustee has determined in his business judgment that Lazarus may not be able to close on the proposed Lazarus Loan within the time period contemplated in the Lazarus DIP Motion and has determined that it is in the interest of the Debtor's estate to (i) withdraw the Lazarus DIP Motion, (ii) settle Lender's claims, (iii) obtain certain default interest rate relief on Lender's Loans, (iv) sell the Property to Lender subject to higher and better offers, and grant Lender break-up fee protection, and (v) obtain a $2,000,000 loan from Lender to pay for costs of maintaining the Property and certain administrative costs of the estate pending a sale of the Property;

4

**WHEREAS**, the Trustee has conducted his own independent investigation of the payoff amount that Lender has asserted is due and owing under the Loans; and

**WHEREAS**, the Trustee and the Lender desire to effectuate a global settlement of all the obligations and disputes such Parties may have against each other concerning the Loans, pursuant to the terms of this Agreement, without the expense, delay and uncertainty of litigation, and to enter into the abode-described transactions with Lender.

**NOW, THEREFORE,** for good and valuable consideration set forth herein, the adequacy and sufficiency of which is recognized for all purposes, the Parties agree as follows:

1.    Allowance of Lender's Claim

As of the close of business on December 31, 2019, the Lender asserts that the aggregate amount owed by the Debtor to the Lender under the Loan Documents is (i) $43,243,051.09, plus (ii) all fees and expenses, including without limitation, attorneys' fees and expenses, and all charges and protective advances incurred from and after December 1, 2019 (such aggregate sum described in clauses (i) and (ii) immediately above is hereinafter referred to as the "Lender's Asserted Claim"). The Parties agree to permanently settle and resolve Lender's Asserted Claim as follows:

(a)    Lender's Asserted Claim is reduced and allowed in the amount of the sum equal to (x) $41,093,000.00, plus (y) all interest accruing on and after January 1, 2020, until the Loans are paid in full plus (z) an amount equal to all actual attorneys' fees and expenses incurred by Lender and all protective advances made by Lender on and after January 1, 2020, until the date that Loans are paid in full (such aggregate sum being described in clauses (x), (y), and (z) immediately above is herein referred to as the "Lender's Allowed Claim"); provided however, (i) in addition to having the Lender's Allowed Claim, the Lender shall have, and reserves any

and all rights to assert, the "Lender's Additional Claim" (as defined below) against the Debtor's estate and each of the Guarantees, and (ii) it is agreed that Lender's Additional Claim shall survive this Agreement and the Trustee acknowledges that the Debtor and the Debtor's estate are and remain bound by the Loan Documents.  The "Lender's Additional Claim" shall mean any claims under the Completion Guaranty and, in addition, any contingent, unliquidated, and /or unknown claims for any indemnities, charges, costs, expenses, fees, and other obligations to which Lender is entitled to under the Loan Documents, other than late fees and pre-December 31, 2019 default rate interest;

(b)     The Lender's Allowed Claim is hereby allowed and constitutes an allowed, legal, valid, binding, enforceable and non-avoidable obligation of the Debtor, its estate, and the Guarantors, and is not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and neither the Trustee, the Debtor, nor the Debtor's estate possesses or will assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, amount, enforceability and non-avoidability of any of the Lender's Allowed Claim; and

(c)     The Lender's Allowed Claim and Lender's Additional Claims are fully secured pursuant to the Loan Documents by valid, perfected, enforceable and non-avoidable first priority security interests and liens granted by the Debtor to the Lender upon all of the collateral and mortgaged property described in the Loan Documents existing as of the Filing Date and all rents, issues, profits, proceeds, and products thereof whether prior to or after the Filing Date (collectively, together with any other property of the Debtor's estate (as used herein "Estate" shall include all items included under section 541 of the Bankruptcy Code) in which a mortgage, security interest or lien was granted to the Lender (or its predecessors in interest) prior to the

6

Filing Date, being referred to herein as the "Collateral"). The liens of the Lender in the Collateral

are senior to all other liens on the Collateral. Neither the Trustee, the Debtor, nor the Debtor's

estate will assert any claim counterclaim, setoff or defense of any kind, nature or description

which would in any way affect the validity, amount, enforceability and non-avoidability of the

obligations under the Loan Documents or any part of the Lender's Allowed Claim or any liens of

Lender in the Collateral.

2.    Release of Lender by the Debtor and its Estate.  In consideration for the covenants

and agreements set forth in this Agreement and for other good and valuable consideration, the

receipt and sufficiency of which are hereby acknowledged, except with respect to any rights

arising under this Agreement, the Trustee (on behalf of the Debtor and the Debtor's estate)

hereby forever releases, remises and  discharges the Lender, and each of its predecessors,

successors, assigns, representatives, affiliates, attorneys, professionals, agents and consultants

(collectively, the "Lender Related Parties"), from any and all claims  or causes of action and

from any and all liabilities, damages, debts, duties, contracts, promises, controversies,

responsibilities and covenants of any kind, nature or description whatsoever, direct or indirect,

whether known or unknown, contingent or not contingent, based on, arising out of, or related to

the Loans, the Loan Documents and the Property, from the beginning of time to the date hereof

(all of the foregoing being collectively the "Trustee Released Claims").  Notwithstanding the

foregoing or anything to the contrary in this Agreement, and for the avoidance of doubt, (i) the

Trustee shall have the right to dispute the amount, but not the existence of, the Lender's

Additional Claim; and (ii) under all circumstances, the Trustee, the Debtor and the Debtor's

estate shall in no event whatsoever have any rights to assert (and the Trustee, the Debtor and the

Debtor's estate shall not in any way seek or assert) any affirmative relief of any kind whatsoever

(whether for damages, injunctive relief or otherwise) against the Lender or any other Lender Related Parties. Each of the Trustee, the Debtor and the Debtor's estate hereby agrees to indemnify and hold the Lender and the other Lender Related Parties harmless from any and all costs, charges, and expenses, including without limitation, all reasonable attorneys' fees and expenses, arising from any discovery sought by such respective party, or any affiliate thereof, from Lender or any other Lender Related Parties based on, or related in any manner to, the Loans, Loan Documents or the Property.

3.  Loan to Trustee. (a) Lender has agreed to make a post-petition loan to the Trustee, on behalf of the Debtor's estate, in the aggregate sum of $2,000,000.00 ("Trustee Loan") pursuant to the terms of (a) a Secured Promissory Note (the "Trustee Note") and (b) a Mortgage, Assignment of Leases and Rents and Security Agreement (the "Trustee Mortgage"; and together with the Trustee Note and the "Financing/Settlement Approval Order" (as defined below), are collectively referred to herein as the "Post-Petition Loan Documents").

(b)  The Trustee Loan is subject to the timely occurrence of the "Conditions to Effectiveness" as set forth in Paragraph 9 below, including: (i) entry of an order of the Bankruptcy Court, in the form of Exhibit 1 hereto and without any changes other than changes agreed to by the Trustee and Lender (the "Financing/Settlement Approval Order"), among other things, approving this Agreement, Lender's Allowed Claim, the Trustee Loan, Trustee Note, and the Trustee Mortgage; and (ii) entry of a second order of the Bankruptcy Court, in the form of Exhibit 2 hereto and without any changes other than changes agreed to by the Trustee and Lender (the "PSA and Break-Up Fee Approval Order"), among other things, approving the "Purchase Agreement" (as defined below), and the payment of the "Break-Up Fee" (as defined in the Purchase Agreement) to the Lender.

8

4.      Purchase and Sale Agreement. Simultaneously herewith the Trustee and Lender are executing and delivering a Purchase and Sale Agreement, of even date herewith (the "Purchase Agreement"), pursuant to which, among other things (i) the Trustee has agreed to sell the Property and all other property described therein, to the Lender for a sum equal to (x) a credit of the amount of the Lender's Allowed Claim then existing on the closing date plus (y) a credit of the amount owed by the Trustee to Lender under the Trustee Loan and Post-Petition Loan Documents plus (z) the sum of $3,000,000.00 (collectively, the "Purchase Price") not later than July 31, 2020, time being of the essence, (ii) the sale will be subject to higher or better offers, and (iii) the Trustee will pay Lender a break-up fee in the amount of $950,000.

5.      Plan of Reorganization. The Trustee shall use his best efforts to file and confirm a chapter 11 plan of reorganization for the Debtor, prior to July 15, 2020, which plan provides for a sale of the Property pursuant to the Purchase Agreement.

6.      Interest Rate Forbearance. (a) The Notes are hereby modified such that interest shall accrue on the Lender's Allowed Claim as follows: from January 1, 2020, until the Default Interest Forbearance Termination Date, interest shall accrue on "Principal/Expense Portion of Lender's Allowed Claim" (as defined below) at the rate of 14% per annum, with all other terms of the Loan Documents remaining unaltered. For illustration purposes, based on the amount of the Principal/Expense Portion of Lender's Allowed Claim existing on the date hereof, the amount of such interest is $10,807.11 per calendar day.

(b)      Notwithstanding the foregoing or anything whatsoever to the contrary, upon the occurrence of any Default Interest Forbearance Termination Date, interest shall automatically (and without any notice from Lender) accrue on the Principal/Expense Portion of Lender's Allowed Claim at the default interest rate set forth in the Notes (i.e., 24% per annum) from the

date of the occurrence of the Default Interest Forbearance Termination Date until the date that the Loans are actually paid in full.

(c)     The term "Default Interest Forbearance Date Termination Date" shall mean the earliest date on which any of any of the following first occurs: (i) any Event of Default under the Trustee Mortgage; (ii) the date the Property, in whole or in part, is sold, assigned, transferred, or conveyed to any person or entity; or (iii) July 31, 2020.

(d)     The term "Principal/Expense Portion of Lender's Allowed Claim" shall mean that portion of Lender's Allowed Claim equal to the sum of (i) the principal amount of the Loans, (ii) the amount of all protective advances made by Lender, and (iii) the amount of attorneys' fees and expenses paid or incurred by Lender.  The Principal/Expense Portion of Lender's Allowed Claim is subject to increase in amount over time as protective advances and attorneys' fees and expenses are paid or incurred by Lender from time to time.

(e)     Nothing herein shall in any way effect or release any obligations of any of the Guarantors under any of the Loan Documents as modified hereby.

7.     <u>Representations and Warranties.</u>

(a)     <u>Trustee Representations and Warranties</u>: The Trustee (on behalf of the Debtor and the Debtor's estate) hereby represents and warrants to the Lender that (i) he (or it, as applicable) has the full power, authority and legal right to execute and deliver this Agreement, the Post-Petition Loan Documents and the Purchase Agreement (collectively, the "<u>Transaction Documents</u>") and to perform the Trustee's obligations hereunder and thereunder and has taken all necessary action to authorize the execution, delivery and performance of his (or its, as applicable) obligations under the Transaction Documents; (ii) the Trustee has not assigned or transferred, in whole or in part, any of the Trustee Released Claims, and will not transfer same;

and (iii) this Agreement and the Purchase Agreement constitutes (and upon execution and delivery of the Post-Petition Loan Documents that he is a party to, the Post-Petition Loan Documents will constitute) a valid and binding agreement by the Trustee enforceable in accordance with its terms.

(b)    Lender Representations and Warranties. Lender hereby represents and warrants to Borrower Parties that:

i.    This Agreement has been duly authorized by Lender and is binding upon Lender. Lender has full legal power to execute and deliver this Agreement and perform its obligations hereunder; and

ii.    This Agreement constitutes the legal, valid and binding obligation of Lender, enforceable in accordance with its terms.

8.    Leases. The Trustee will not enter into any leases for any part of the Property without Lender's prior written consent except as otherwise permitted in the Purchase Agreement.

9.    Conditions to Effectiveness.

(a)    The terms and conditions of this Agreement and the other Transaction Documents all of the Parties' obligations hereunder are subject to, and conditioned upon, the occurrence of the following (the "Conditions to Effectiveness"):    (a) entry of the Financing/Settlement Approval Order in the form of Exhibit 1 hereto and without any changes (other than such changes that are acceptable to each Party); and (b) entry of the PSA and Break-Up Fee Approval Order in the form of Exhibit 2 hereto and without any changes (other than changes that are acceptable to each Party).

(b)    If both of the Conditions to Effectiveness have not occurred on or before February 28, 2020, then this Agreement and the other Transaction Documents shall be deemed null and

void, of no force and effect, and shall not be used against any Party or admissible in any litigation against any Party, and all of the Parties shall have all of their rights, claims, remedies and defenses with respect to the Loans and the Loan Documents, at law and in equity.

(c)    This Agreement and the other Transaction Documents are part of an integrated series transactions and the Parties shall in no event be bound under any Transaction Document if all of the Transaction Documents are not approved by the Bankruptcy Court and both the Financing/Settlement Approval Order and the PSA Break-Up Fee Approval Order are not entered in their current forms (or with such changes as the Trustee and Lender may each agree).

10.    <u>Motion for Court Approval</u>.  Within one business (1) day after execution of this Agreement, the Trustee shall (i) file motions seeking Bankruptcy Court approval of all the transactions contemplated in each of the Transaction Documents and the entry of both the Financing/Settlement Approval Order and the PSA and Break-Up Fee Approval Order; and (ii) file with the Bankruptcy Court a withdrawal of the Lazarus DIP Motion.

11.    <u>Entire Agreement</u>.  This Agreement and the other Transaction Documents, constitute the entire agreement and understanding between the Parties pertaining to the subject matter hereof and supersedes any and all prior or contemporaneous agreements, representations and understandings of the Parties concerning the subject matter hereof. The recitals set forth above in the preamble of this Agreement are incorporated into the body of this Agreement.

12.    <u>No Admission</u>.  This Agreement is not intended to be, and shall not be, deemed, construed or treated in any respect as an admission of liability or wrongdoing by any person or entity for any purpose.

13.    <u>Amendment; Waiver</u>.  This Agreement may not be terminated, amended or modified in any way except by written instrument signed by both Parties.  No waiver of any

provision of this Agreement shall be deemed to constitute a waiver of any other provision hereof, whether or not similar, nor shall such waiver constitute a continuing waiver.

14.    <u>Assignment</u>.    This Agreement may not be assigned by any Party without the prior written consent of the other Party, and any assignment that is effectuated without such consent shall be void; <u>provided</u> <u>however</u>, notwithstanding the forgoing or anything to the contrary, Lender may at any time assign its rights hereunder and/or under any of the Transaction Documents, without the Trustee's consent, to any affiliate of Lender.

15.    <u>Successors</u>.    This Agreement shall be binding upon, inure to the benefit of and be enforceable against the Parties and their respective estates, heirs, personal representatives, executors, successors and permitted assigns.

16.    <u>Negotiated Agreement</u>.    This Agreement and the other Transaction Documents have been fully negotiated by both Parties.    Each Party acknowledges and agrees that the Transaction Documents have been drafted jointly, and the rule that ambiguities in an agreement or contract may be construed against the drafter shall not apply in the construction or interpretation of this Agreement or the other Transaction Documents.

17.    <u>No Severability</u>.    In the event that any term or provision of this Agreement or any other Transaction Documents is not approved, then all Transaction Documents shall be deemed null and void, of no force and effect, and shall not be used against any Party or admissible in any litigation against any Party, and all of the Parties shall have all of their rights, claims, remedies and defenses with respect to the Loans and the Loan Documents, at law and in equity.

18.    <u>Counterparts; Electronic Copy of Signatures</u>.    This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same document.    Each

13

Party may evidence its execution of this Agreement by delivery to the other Party of scanned or faxed copies of its signature, with the same effect as the delivery of an original signature.

19.   Governing Law. This Agreement and any claim related directly or indirectly to this Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to the principles of conflicts of law thereof), and the Bankruptcy Code. Each Party hereby waives on behalf of itself and its successors and assigns any and all right to argue that the choice of New York law provision is or has become unreasonable in any legal proceeding.

20.   JURISDICTION; WAIVER OF JURY TRIAL.

(a)    THE  BANKRUPTCY  COURT  SHALL  HAVE  EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT.

(b)    EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

21.   Notices. All notices, requests, demands, consents and communications necessary or required under this Agreement shall be in writing and shall be delivered by hand or sent by registered or certified mail, return receipt requested, by overnight mail with confirmation, by facsimile (receipt confirmed) or by electronic means (receipt confirmed), in each case addressed and copied as set forth on the applicable signature page hereto. A Party may change its address for receiving notice by giving notice of a new address in the manner provided herein.

All such notices, requests, demands, consents and other communications shall be deemed to have been duly given or sent on the date on which it was transmitted by electronic mail.

22.    <u>No Third-Party Beneficiaries</u>.    Except as expressly provided in <u>Section 2</u>, the Parties do not intend to confer any benefit by or under this Agreement upon any person or entity other than the Parties hereto and their respective successors and permitted assigns.

23.    <u>Captions and Rules of Construction</u>.    The captions in this Agreement are inserted only as a matter of convenience and for reference and do not define, limit or describe the scope of this Agreement or the scope or content of any of its provisions. Any reference in this Agreement to a section is to a section of this Agreement.    "Including" is not intended to be a limiting term.

THE BALANCE OF THIS PAGE IS LEFT INTENTIONALLY BLANK

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be duly executed and

delivered as of the date set forth above.

<u>**TRUSTEE**</u>

                                   **KENNETH P. SILVERMAN, THE CHAPTER 11
TRUSTEE OF
305 EAST 61st STREET GROUP LLC**

                                   By: *s/ Kenneth P. Silverman*
                                       Kenneth P. Silverman, Trustee

Address:
Kenneth P. Silverman, Esq.
Silverman Acampora LLP
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753

Email:
ksilverman@silvermanacampora.com

[TRUSTEE SIGNATURE PAGE TO SETTLEMENT AGREEMENT]

16

**305 E 61ST STREET LENDER LLC**

**305 E 61st STREET LENDER LLC**

**By:** _s/ David Aviram_____
        Name: David Aviram
        Its:     Manager

Address:

305 E 61st Street Lender LLC
100 Park Avenue, Suite 2805
New York, New York 10017
Email: Legal@maverickrep.com

With a copy to:

Steven H. Newman, Esq.
Katsky Korins LLP
605 Third Avenue
New York, NY 10158
Email: snewman@katskykorins.com

[305 E 61st STREET LENDER LLC SIGNATURE PAGE TO SETTLEMENT AGREEMENT]

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re:                                                    Chapter 11

305 EAST 61ˢᵗ STREET GROUP LLC,                           Case No.: 19-11911 (SHL)

                        Debtor.

---------------------------------------------------------------x

### FINAL ORDER: (i) AUTHORIZING THE TRUSTEE TO OBTAIN POST-PETITION FINANCING AND GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105(a), 364(c) AND 364(d); (ii) GRANTING REPLACEMENT LIENS AND RIGHTS TO ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 105 AND 361; (iii) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; (iv) SETTLING CLAIMS UNDER BANKRUPTCY RULE 9019, AND (v) GRANTING RELATED RELIEF

Upon the motion [ECF No. ___] ("**Motion**") of Kenneth P. Silverman ("**Trustee**"), in his capacity as Chapter 11 Trustee of the estate ("**Estate**") of 305 East 61ˢᵗ Street Group LLC ("**Debtor**"), seeking the entry of a final Order: (i) pursuant to §§ 105(a), 364(c) and 364(d) of title 11 of the United States Code ("**Bankruptcy Code**"), authorizing the Estate to obtain financing in the principal amount of up to $2,000,000.00 (the "**Financing**") from 305 E 61ˢᵗ Street Lender LLC ("**Lender**"), and grant liens and superpriority administrative expense status, upon the terms set forth herein and in certain loan documents, including: (a) a *Secured Promissory Note*; (b) a *Mortgage, Assignment of Leases and Rents and Security Agreement*, and (c) a *Settlement and Forbearance Agreement* in substantially the form of **Exhibits A**, **B**, and **D** to the Motion, and needed by the Trustee in order to perform his obligations on behalf of the Estate; (ii) granting replacement liens and rights to adequate protection pursuant to sections 105 and 361 of the Bankruptcy Code; (iii) modifying the automatic stay pursuant to section 362 of the Bankruptcy Code; (iv) settling claims under Bankruptcy Rule 9019; and (v) granting related relief; and upon the Declaration of the Trustee dated January ___, 2020 filed in support of the

1

Motion [ECF No. __] (the "**Trustee Declaration**"); and upon the notice of motion dated

January __, 2020 with respect to the Motion (ECF No. __] (the "**Notice of Motion**"); and

upon the Affidavit of Service evidencing proof of service of the Notice of Motion, the

Motion and the Trustee Declaration filed with the Court [ECF No. __]; and upon the final

hearing on the Motion conducted by the Court on February 5, 2020, the record of which is

incorporated by reference herein; and due deliberation having been had thereon; and sufficient

cause appearing therefor, this Court hereby makes the following findings of facts and

conclusions of law:

A.     On June 10, 2019 ("**Petition Date**"), a voluntary petition was filed by the Debtor

under Chapter 11 of the Bankruptcy Code.

B.     Pursuant to an Order of this Court dated October 24, 2019 [ECF No. 72], this

Court directed the appointment of a Chapter 11 trustee of the Debtor pursuant to sections

1104(a)(1) and 1104(a)(2) of the Bankruptcy Code.

C.     Pursuant to an Order of this Court dated October 28, 2019 [ECF No. 79], this

Court approved the appointment of Kenneth P. Silverman as Chapter 11 trustee of the Estate of

the Debtor.

D.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and

1334.

E.     The statutory predicates for the relief sought in the Motion and the basis for the

approvals and authorizations contained in this Order include, without limitation, sections 105(a),

363(b) and (f), 364(c) and (d), and 502 of the Bankruptcy Code and Bankruptcy Rule 9019.

F.     This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (D),

(K), (M), and (O).

G.    Venue of this case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

H.    Sufficient notice of the relief sought in the Motion has been given and such notice complies with Bankruptcy Rule 4001(c), and no further notice is required. The Trustee has adequately disclosed all material facts necessary to permit the Court, the Debtor's creditors, and all other parties in interest to evaluate the merits of the Motion and the relief sought thereby. A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all interested persons and entities.

I.    The Debtor's Estate is the fee owner of that certain real property commonly known as 305-307 East 61st Street, New York, New York 10065 (Block: 1436, Lots: 5 (the "**Real Property**").

J.    The Lender is the due owner and holder of the following three secured loans made to the Debtor prior to the Petition Date:

   i.    The acquisition loan (the "**Acquisition Loan**") (i) evidenced by that certain *Secured Restated Promissory Note,* dated as of June 8, 2017, in the original principal amount of $20,000,000.00 (the "**Acquisition Loan Note**"), which was duly executed by the Debtor and delivered to Popular Bank (f/k/a Banco Popular North America) ("**PB**") and (ii) secured by, among other things, that certain *Mortgage Extension, Modification and Security Agreement* (the "**Acquisition Loan Mortgage**"), dated as of June 8, 2017 in the original principal amount of $20,000,000.00 encumbering the Real Property which was duly recorded in the City Register of the City of New York, County of New

3

York (the "**Register**") on July 7, 2017 as CRFN 2017000250851.
Copies of the Acquisition Loan Note and Acquisition Mortgage are
attached as Exhibits 2 and 3 to the Lender's Proof of Claim.[1]  The
Acquisition Loan Mortgage constitutes a first priority lien on the Real
Property and the other collateral described therein and secures the
Debtor's obligations under the Acquisition Loan and Acquisition Loan
Note.    The Acquisition Loan Note and the Acquisition Loan
Mortgage, together with all other documents evidencing, securing or
guarantying the Acquisition Loan, including, without limitation, the
Acquisition Allonge (defined below), the Guarantees (defined below),
and the Acquisition Assignment (defined below), are collectively
referred to herein as "**Acquisition Loan Documents**";

ii.    The building loan (the "**Building Loan**") (i) evidenced by that certain
(a) Building Loan Agreement, dated as of June 8, 2017, in the original
principal amount of up to $7,830,000.00 (the "**Building Loan
Agreement**"), which was duly executed and delivered by the Debtor
to PB, and (b) *Building Loan Note,* dated as of June 8, 2017, in the
original principal amount of up to $7,830,000.00 (the "**Building Loan
Note**"), which was duly executed and delivered by the Debtor to PB,
and (ii) secured by, among other things, that certain *Building Loan
Mortgage and Security Agreement* (the "**Building Loan Mortgage**"),

---

[1] Lender filed a proof of claim with respect to the Pre-Petition Loan Documents (as defined below), which proof of claim was assigned Claim No. 5 on the claims register maintained by the Court in this bankruptcy case (such proof of claim is referred to herein as the "**Proof of Claim**").

dated as of June 8, 2017, in the original principal amount of
$7,830,000.00 encumbering the Real Property which was recorded in
the Register on July 7, 2017 as CRFN 2017000250852. Copies of the
Building Loan Note, the Building Loan Agreement, and the Building
Loan Mortgage are attached as Exhibits 6, 7 and 8 to the Lender's
Proof of Claim. The Building Loan Mortgage constitutes a first
priority lien on the Real Property and the other collateral described
therein and secures the Debtor's obligations under the Building Loan,
the Building Loan Note, and the Building Loan Agreement. The
Building Loan Agreement, the Building Loan Note and the Building
Loan Mortgage, together with all other documents evidencing,
securing or guarantying the Building Loan, including, without
limitation, the Building Allonge (defined below), the Guarantees
(defined below), and the Building Assignment (defined below) are
collectively referred to herein as the "**Building Loan Documents**";

iii.    The project loan (the "**Project Loan**"; and together with the
Acquisition Loan and the Building Loan, collectively, the "**Loans**")
(i) evidenced by that certain (a) Project Loan Agreement dated as of
June 8, 2017, in the original principal amount of up to $2,170,000.00
(the "**Project Loan Agreement**"; and together with the Building Loan
Agreement, collectively the "**Loan Agreements**"), which was duly
executed and delivered by the Debtor to PB, and (b) *Project Loan
Note,* dated as of June 8 2017, in the original principal amount of up

to $2,170,000.00 (the "**Project Loan Note**"; and together with the
Acquisition Loan Note and the Building Loan Note are collectively
referred to herein as the "**Notes**"), which was duly executed and
delivered by the Debtor to PB, and (ii) secured by, among other
things, that certain *Project Loan Mortgage and Security Agreement*
(the "**Project Loan Mortgage**"; and together with the Acquisition
Loan Mortgage and the Building Loan Mortgage are collectively
referred to herein as the "**Mortgages**"), dated as of June 8, 2017, in
the original principal amount of $2,170,000.00 encumbering the Real
Property which was recorded in the Register on July 7, 2017 as CRFN
2017000250853.  Copies of the Project Loan Note, the Project Loan
Agreement, and the Project Loan Mortgage are attached as Exhibits
10, 11 and 12 to the Lender's Proof of Claim.  The Project Loan
Mortgage constitutes a first priority lien on the Real Property and the
other collateral described therein and secures the Debtor's obligations
under the Project Loan, the Project Loan Note, and the Project Loan
Agreement.  The Project Loan Agreement, the Project Loan Note and
the Project Loan Mortgage, together with all other documents
evidencing, securing or guarantying the Project Loan, including,
without limitation, the Project Allonge (defined below), the
Guarantees (defined below), and the Project Assignment (defined
below), are collectively referred to herein as the "**Project Loan
Documents**".

K.    Each of the Loans are guaranteed by Jason D. Carter ("**Carter**") and Mitchell Adam Marks ("**Marks**"), pursuant to (x) that certain *Guarantee,* dated as of June 8, 2017 (the "**Payment Guarantee**"), which was duly executed and delivered by Carter and Marks (Carter and Marks are sometimes referred to collectively herein as the "**Guarantors**") and in favor of PB and (y) that certain *Guaranty of Completion,* dated as of June 8, 2017 (the "**Completion Guarantee**"; and together with the Payment Guarantee are collectively referred to herein as the "**Guarantees**") in favor of PB and which Completion Guaranty was duly executed by the Guarantors.

L.    Pursuant to, among other things, an allonge to the Acquisition Loan Note (the "**Acquisition Allonge**") and that certain *Assignment of Mortgage* (the "**Acquisition Assignment**"), dated as of November 15, 2018, PB duly assigned all of its rights, title and interests in and to the Acquisition Loan and Acquisition Loan Document to the Lender.[2]

M.    Pursuant to, among other things, an allonge to the Building Loan Note (the "**Building Allonge**") and a certain *Assignment of Mortgage* (the "**Building Assignment**"), dated as of November 15, 2018, PB duly assigned all of its rights, title and interests in and to the Building Loan and the Building Loan Documents to the Lender.

N.    Pursuant to, among other things, an allonge to the Project Loan Note (the "**Project Allonge**") and a certain *Assignment of Mortgage* (the "**Project Assignment**"; and together with the Acquisition Assignment and the Building Assignment, are collectively referred to herein as the "**PB Assignments**"), dated as of November 15, 2018, PB duly assigned all of its right, title and interest in and to the Project Loan and Project Loan Documents to the Lender.  Each of the PB Assignments have been duly recorded in the

---

[2] The term Lender as used herein may be used to describe both PB and 305 E 61st Street Lender LLC as successor-in-interest to PB.

Register. A copy of the Acquisition Assignment is attached as Exhibit 4 to the Lender's Proof of Claim. A copy of the Building Assignment is attached as Exhibit 9 to the Lender's Proof of Claim. A copy of the Project Assignment is attached as Exhibit 13 to the Lender's Proof of Claim. The Acquisition Loan Documents, the Building Loan Documents, and the Project Loan Documents are collectively referred to herein as "**Pre-Petition Loan Documents**."

O.     As a result of the above-described PB Assignments, the Lender is now the owner and holder of the Acquisition Loan, the Building Loan, the Project Loan and all of the Loan Documents and the Lender is entitled to enforce its rights under all of the Loan Documents.

P.     Lender has asserted that the aggregate amount that is owed by the Debtor to the Lender under and in connection with the Pre-Petition Loan Documents is $43,243,051.09[3] through December 31, 2019, plus all default rate interest accruing thereon, and all fees, costs, expenses, and other charges accrued, accruing, or chargeable with respect thereto all of which will continue to accrue until the Loans are paid in full (collectively, the "**Asserted Pre-Petition Obligations**").

Q.     The Trustee has carefully reviewed the Pre-Petition Loan Documents and the Asserted Pre-Petition Obligations and has determined in his business judgment that it is in the best interest of the Debtor and the Debtor's estate to enter into that certain Settlement and Forbearance Agreement dated as of January __, 2020, attached as Exhibit D to the Motion (the "**Settlement Agreement**"). Pursuant to the Settlement Agreement, among other things, (i) the Lender has

---

[3] This sum includes attorneys' fees and expenses and protective advances only through November, 2019. Additional attorneys' fees and expenses and protective advances have accrued and continue to accrue after November 30, 2019 and such additional amounts shall be added to the above-described sum.

agreed to provide the Financing to the Trustee pursuant to the Loan Documents (as defined

below) and (ii) the Trustee has agreed to permanently settle, fix, and allow the amount of

Lender's claim, under the Pre-Petition Loan Documents, in the sum of $41,093,000,[4] as of

December 31, 2019, plus all interest and default rate interest accruing thereon, and all fees, costs,

expenses (including, without limitation, attorneys' fees and expenses), and other charges accruing

on or after January 1, 2020, or chargeable on or after January 1, 2020 with respect thereto (such

aggregate amount is hereinafter referred to as the **"Allowed Pre-Petition Claim"**).  In addition to

having the Allowed Pre-Petition Claim, the Lender shall have, and reserves any and all rights to

assert, the "Lender's Additional Claim" (as defined below) against the Debtor, the Estate, and

each of the Guarantors. Lender's Additional Claim shall survive the Settlement Agreement and

the Debtor, the Debtor's estate, and Guarantors are and remain bound by the Pre-Petition Loan

Documents with respect thereto.  The **"Lender's Additional Claim"** shall mean any claims

under the Completion Guaranty and, in addition, any contingent, unliquidated, and/or unknown

claims for any indemnities, charges, costs, expenses, fees, and other obligations to which Lender

is entitled to under the Pre-Petition Loan Documents, other than late fees and pre-December 31,

2019 default rate interest.  The Allowed Pre-Petition Claim and the Lender's Additional Claim

are sometimes hereinafter collectively referred to as the **"Pre-Petition Obligations"**.

      R.    The Settlement Agreement was negotiated at arm's length and entered into in

good faith by the Trustee and the Lender.  The Trustee's business decision to enter into the

Settlement Agreement exceeds the lowest point in the range of reasonableness.

      S.    The Allowed Pre-Petition Claim hereby constitutes an allowed, legal, valid,

---

[4] This sum includes interest, default rate interest, attorneys' fees and expenses and protective advances only through
December 31, 2019. Additional interest, default rate interest, costs, and expenses (including, without limitation
attorneys' fees and expenses) and protective advances have accrued and/or may continue to accrue on and after
January 1, 2020 and all such additional amounts shall be added to and be part of the Allowed Pre-Petition.

binding, enforceable and non-avoidable claim and obligation of the Trustee, the Debtor, and the

Debtor's estate, and is not subject to any offset, defense, counterclaim, avoidance,

recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law,

and neither the Estate, the Debtor, nor the Trustee possesses or will assert any claim,

counterclaim, setoff or defense of any kind, nature, or description which would in any way affect

the validity, amount, enforceability, and non-avoidability of any part of the Allowed Pre-Petition

Claim. Nothing herein shall in any way limit any obligations of the Guarantors concerning or

with respect to Allowed Pre-Petition Claim.

T.    As of the Petition Date, the Allowed Pre-Petition Claim and Lender's Additional

Claim are fully secured pursuant to the Pre-Petition Loan Documents by valid, perfected,

enforceable and non-avoidable first priority security interests and liens granted by the Debtor to the

Lender upon all of the collateral and mortgaged property described in the Pre-Petition Loan

Documents existing as of the Petition Date and all rents, issues, profits, proceeds, and products

thereof whether prior to or after the Petition Date (collectively, together with any other property of

the Debtor's Estate (as used herein "**Estate**" shall include all items included under section 541 of

the Bankruptcy Code) in which a mortgage, security interest or lien was granted to the Lender

(or PB) prior to the Petition Date, being referred to herein as "**Pre-Petition Collateral**"), which

liens of the Lender are senior to all other liens on the Pre-Petition Collateral. The Trustee, the

Debtor, and the Estate do not possess and will not assert any claim, counterclaim, setoff, or

defense of any kind, nature or description which would in any way affect the validity, amount,

enforceability and non-avoidability of any part of the Allowed Pre-Petition Claim or any of the

Lender's claims, liens, mortgages, or security interests in any of the Pre-Petition Collateral. The

acknowledgment and agreement by the Trustee, the Debtor, and the Estate of the Allowed Pre-

Petition Claim and the liens, rights, priorities and protections granted to or in favor of the Lender as set forth herein and in the Pre-Petition Loan Documents and the Settlement Agreement shall constitute a proof of claim on behalf of the Lender in this case and the Court hereby orders that the Lender shall not be required to file any further proof of claim in this case.

U.      The Loan Documents (as defined below) and any other documents memorializing the provisions thereof were negotiated and entered into (or will be entered into) in good faith and pursuant to arm's-length bargaining positions by and between the Trustee and the Lender. Any credit extended to Trustee under the terms of this Order shall be deemed to have been extended in good faith by the Lender as that term is used in section 364(e) of the Bankruptcy Code.

V.      The Trustee is unable to obtain any financing without granting a senior first priority lien on all property and assets of the Debtor and its Estate pursuant to section 364(d)(1) of the Bankruptcy Code, which lien shall have priority over any other lien or encumbrance of any kind or nature (whether now existing or hereafter created) on any property or assets of the Debtor and its Estate, whether now or hereafter existing and wherever located.

W.      The Trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.

X.      The terms and conditions of the Financing, the Loan Documents and the settlement of Lender's claims as set forth herein and thereon, including, without limitation, the liens and provisions set forth therein and herein, are: (i) fair, just, and reasonable; (ii) are ordinary and appropriate for secured financing to a Chapter 11 trustee; (iii) reflect the Trustee's exercise of his prudent business judgment consistent with his fiduciary duties; (iv) are supported by reasonably equivalent value and consideration; and (v) are necessary in order to preserve the assets of the Debtor's Estate.

Y.      Sufficient cause exists for immediate entry of this Order pursuant to Bankruptcy Rule 4001(c)(2). No party appearing in this case has filed or made an objection to the relief sought in the Motion and the entry of this Order, or if any objections were made (to the extent such objections have not been withdrawn) all objections to the Motion are hereby overruled.

Based upon the forgoing, and after due consideration and good cause appearing therefor, it is hereby ORDERED, DETERMINED, ADJUDGED AND DECREED AS FOLLOWS:

1.      The Settlement Agreement is hereby approved in all respects and the Trustee is hereby authorized to enter into and perform under the Settlement Agreement in all respects.

2.      The Trustee is hereby authorized and empowered to immediately borrow and obtain the Financing from the Lender and to incur indebtedness and obligations owing to Lender pursuant to the terms and conditions of this Order and the Loan Documents (as defined below). The Trustee shall use the proceeds of the Financing in accordance with the Loan Documents.

3.      The Trustee is authorized to enter into and deliver: (a) a *Secured Promissory Note* ("**Note**"); (b) a *Mortgage, Assignment of Leases and Rents and Security Agreement* (the "**Mortgage**"); and (c) the Settlement Agreement, each in substantially the forms of **Exhibits A**, **B**, and **D** to the Motion or containing such non-material changes or modifications thereto as the Trustee shall, in his sole discretion, determine to be reasonable, necessary or appropriate.

4.      The Trustee is authorized to enter into, execute and deliver to the Lender, any and all other documents, agreements and instruments contemplated by, related to or to be delivered pursuant to or in connection with the Financing from the Lender, which are reasonably requested by the Lender to evidence or effectuate any of the transactions or other matters contemplated by or set forth in the Loan Documents or this Order, each as may be amended hereafter from time to time without further order of this Court (and all such other documents, agreements or

instruments, together with the Note, the Mortgage, and the Settlement Agreement are collectively referred to herein as "**Loan Documents**"). The Trustee's execution and delivery of the Note, Mortgage, Settlement Agreement and/or any other Loan Document shall be conclusive evidence of Trustee's determination that the Note, Mortgage, Settlement Agreement and each such other Loan Document is reasonable, necessary and appropriate.

5.    The Trustee is further authorized to perform his obligations under the Loan Documents on behalf of the Estate of the Debtor, and to take any and all actions, and execute any and all documents, that the Trustee determines to be reasonable, necessary or appropriate to effectuate and/or to consummate the transactions contemplated in the Loan Documents as the Trustee, in his sole discretion, determines may be reasonable or necessary to provide capital improvements to the Real Property and maintain the Real Property in accordance with the Loan Documents. The Trustee's performance of any such action or execution of any such document shall be conclusive evidence of the Trustee's determination that such action and/or document is reasonable and necessary.

6.    The Loan Documents (including, without limitation, the Note, the Mortgage, and the Settlement Agreement) and each term set forth therein are approved and are hereby incorporated into the terms and conditions of this Order. All of such terms, conditions, and covenants shall be sufficient and conclusive evidence of the borrowing arrangements by and between the Trustee and the Lender and of the Trustee's adoption of all of the terms, conditions, and covenants of the Loan Documents for all purposes, including, without limitation, to the extent applicable, the payment of all "Debt" (as defined in the Mortgage) arising under or in connection with the Loan Documents, including, without limitation, all principal, interest, fees and expenses of any kind, including, without limitation, all of Lender's reasonable attorneys' fees and legal

expenses, as more fully set forth in the Loan Documents (in all cases, whether absolute or contingent, fixed, or liquidated or unliquidated, matured or unmatured and whether now or hereafter existing or arising, collectively referred to herein as "**Post-Petition Obligations**"). (The Post-Petition Obligations and the Pre-Petition Obligations are collectively referred to herein as "**Obligations**").

7.      The Allowed Pre-Petition Claim shall be, and hereby is, allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction, or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and Lender's pre-petition liens on and security interest in the Pre-Petition Collateral shall be, and hereby is, determined legal, valid, perfected, enforceable, and unavoidable for all purposes and of first and senior priority. All of the Obligations hereby shall constitute legal, valid, and binding obligations of the Trustee, the Debtor, and Debtor's estate, and are hereby enforceable against the Trustee, the Debtor, and Debtor's estate, and their successors or assigns (including, without limitation, any successor trustee or other estate representative in this Chapter 11 case, or subsequent Chapter 7 or Chapter 11 case) in accordance with their respective terms.

8.      Subject to the terms and conditions of the Loan Documents, after execution and delivery of the Note and Mortgage, the Trustee and the Lender may amend, modify, supplement, or waive any provision of the Loan Documents (an "**Amendment**") without further approval or order of this Court so long as such Amendment is not material (for purposes hereof, a "**material**" Amendment shall mean any Amendment that operates to increase the rate of interest other than as currently provided in the Loan Documents, increase the Maximum Outstanding Principal Sum (as defined in the Note), add specific new events of default or enlarge the nature and extent of default remedies available to Lender following an event of default, or otherwise modify any financial

14

terms and conditions in any Loan Documents in a manner materially less favorable to the Trustee, in the good faith judgment of the Lender and the Trustee). Any material Amendment to the Loan Documents must be approved by the Court to be effective.

9.    The Trustee is authorized to pay all sums which the Trustee determines are reasonable, necessary or appropriate to effectuate, consummate and perform under the transactions contemplated under the Loan Documents and the Pre-Petition Loan Documents, including, without limitation, all principal, interest and default rate interest, fees, expenses and any other amounts required or allowed to be paid in accordance with the Loan Documents and the Pre-Petition Loan Documents, or which may arise therefrom, all without further order of this Court. The Trustee's payment of any amounts to Lender shall be conclusory evidence of the Trustee's determination that such payments are reasonable, necessary and appropriate to effectuate, consummate and perform under the Loan Documents and the Pre-Petition Loan Documents.  No payments made by the Trustee to the Lender shall be avoidable or recoverable from Lender under sections 544, 547, 548, 550, 553 or any other provision of the Bankruptcy Code or on account of any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law, or otherwise. Lender shall apply any payments to the Obligations first to the Obligations under the Note and Mortgage, and then to the Obligations under the Pre-Petition Loan Documents.

10.    To secure the prompt payment and performance of any and all Post-Petition Obligations of the Trustee to Lender of whatever kind or nature or description, absolute or contingent, now existing or hereafter arising, Lender shall have and is hereby granted, effective as of the date hereof, valid and perfected first priority security interests, mortgages and liens, superior to all other liens, claims and/or security interests that any creditor of the Debtor's Estate may have,

in and upon all of the Collateral (as such term is defined in the Mortgage), including, without limitation, the Real Property (the liens granted to the Lender pursuant to this section 10 of this Order and the Loan Documents are collectively referred to herein as "**Post-Petition Liens**").

11.    Pursuant to section 364(d)(1) of the Bankruptcy Code, the mortgages, security interests and liens granted to the Lender under the Loan Documents and this Order in the Collateral to secure all Post-Petition Obligations: (a) shall be and shall continue to be first and senior in priority to all other interests, security interests, mortgages, liens and encumbrances of every kind, nature and description, whether created consensually, by an order of this Court or any other Court, or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with sections 363, 364, and/or any other sections of the Bankruptcy Code or other applicable law; and (b) shall not at any time whatsoever be made subject or subordinate to, or made *pari passu* with, any other lien, security interest or claim against any property of the Trustee or the Debtor's Estate, whether any such liens now exist or are hereafter created, pursuant to sections 363 or 364 of the Bankruptcy Code or otherwise.

12.    This Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the Post-Petition Liens and the Replacement Liens (as defined below), effective as of the date and time of entry of this Order, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the Collateral or other act to validate or perfect such security interest, mortgage, or liens including, without limitation any control agreements with any financial institutions, banks or securities intermediary holding any depository, brokerage, or securities account consisting of Collateral (a "**Perfection Act**"). Notwithstanding the foregoing, if the Lender shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, the

Lender is hereby authorized to perform such act and the Trustee is hereby authorized to perform such act to the extent reasonably necessary or required by the Lender, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file, and/or record any document in regard to such act in accordance with applicable law without payment of any kind. Lender may choose to file, record, or present a certified copy of this Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Order in accordance with applicable law. Should the Lender so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, or perfection of the Post-Petition Liens by virtue of entry of this Order.

13.    Post-Petition Obligations shall have superpriority in payment afforded by section 364(c)(1) of the Bankruptcy Code (**"Superpriority Claim"**), which shall have priority in right of payment over any and all other unsecured obligations, liabilities, indebtedness, and claims of any kind and nature, now in existence or hereafter incurred by the Trustee (or any successor trustee whether in this case or any subsequent Chapter 7 case) including, without limitation, any and all administrative expenses of the kinds specified or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, and other sections of the Bankruptcy Code, including those resulting from the conversion of this to a case under Chapter 7 of the Bankruptcy Code, and shall at all times be senior to the rights of the Trustee, any successor trustee, or any creditor or other party in interest in this case or any subsequent proceedings or cases under the Bankruptcy Code.

14.    As adequate protection to Lender for the liens, rights, priorities, claims and

protections granted to it pursuant to any Pre-Petition Loan Documents, the Lender is hereby

granted: (a) replacement liens on all of the Collateral ("**Replacement Liens**") to the extent of any

diminution in the value of its pre-petition liens and security interests in all Pre-Petition Collateral

securing the Pre-Petition Obligations, including any diminution in such Pre-Petition Collateral that

may result or arise from the Trustee's use, sale, lease, depreciation, decline in market price or

otherwise as to the Pre-Petition Collateral, in each case resulting or arising from and after the

Petition Date (collectively, "**Collateral Diminution**"), which Replacement Liens shall be junior

and subordinate in all respects to the Post-Petition Liens, and (b) a priority administrative expense

claim pursuant to section 507(b) of the Bankruptcy Code in respect of any and all Collateral

Diminution ("**Adequate Protection Administrative Claim**") having priority over all any and all

other unsecured obligations, liabilities, indebtedness, and claims of any kind and nature, now in

existence or hereafter incurred by the Debtor or the Trustee (or any successor trustee in this case

or any subsequent chapter 7 case), including, without limitation, any and all administrative

expenses of the kinds specified or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b),

506(c), 507(a), 507(b), 546(c), 726, 1114, and other sections of the Bankruptcy Code, including

those resulting from the conversion of this case to a case under Chapter 7 of the Bankruptcy Code,

and shall at all times be senior to the rights of the Trustee, any successor trustee, or any creditor or

other party in interest in this case or any subsequent proceedings or cases under the Bankruptcy

Code; provided, however, the Adequate Protection Administrative Claim shall be subject and

subordinate in all respects to Lender's Superpriority Claim and the Carve-Out Expenses (as

defined below).

15.    The Lender's liens, claims and security interests in the Collateral shall be subject

only to the right of payment of the following expenses (**"Carve Out Expenses"**):

a.  Statutory fees and interest payable to the U.S. Trustee pursuant to 28 U.S.C. section 1930(a)(6);

b.  Subject to the terms and conditions of this Order, in the event of the closing of a sale of the Real Property (in whole) to Lender (or any designee or assignee thereof), which sale is conducted in accordance with a process and terms and conditions which have been approved by Lender, the commissions (but not expenses) of any retained real estate broker(s) but only to the extent: (i) Lender has agreed in writing to the retention of such particular broker(s) and the terms and commissions thereof; and (ii) such commission shall not exceed the aggregate sum of one-half percent (0.5%) of the amount bid by the Lender (or any designee or assignee thereof) in the event that Lender (or any designee or assignee thereof) is the successful bidder and takes title to the Real Property;

c.  Subject to the terms and conditions of this Order, the unpaid and outstanding: (i) reasonable commissions, fees and expenses of the Trustee approved by a final order of the Court pursuant to section 326 of the Bankruptcy Code (**"Allowed Trustee Fees"**); and (ii) the reasonable fees and expenses actually incurred on or after October 28, 2019 and approved by a final order of the Court pursuant to sections 327, 328, 330, or 331 of the Bankruptcy Code (collectively, **"Allowed Professional Fees"**) by the attorneys and accountants retained under section 327 of the Bankruptcy Code by the Trustee (collectively, the **"Professionals"**), in a cumulative, aggregate sum for both the Trustee and all Professionals not to exceed $1,500,000 (**"Professional Fee Carve Out"**) but excluding any real estate

broker(s), which shall be subject to Section 15(b), <u>provided that</u> if the Debtor's

case is converted to one under Chapter 7 of the Bankruptcy Code, the sum of

$2,000 shall be reserved from the Professional Fee Carve Out for any post-

conversion expenses of the Chapter 7 trustee.

16.     Notwithstanding anything to the contrary in this Order, the Professional Fee Carve

Out shall not be used to pay any Allowed Professional Fees incurred in connection with any of the

following: (a) an assertion or joinder in (or investigation into) any claim, counter-claim, action,

proceeding, application, motion, objection, defense, or other contested matter seeking any order,

judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection,

or enforceability of any of the Obligations or the Lender's claims and liens on and security interests

in any Pre-Petition Collateral or the Collateral, (ii) invalidating, setting aside, avoiding, or

subordinating, in whole or in part, the Lender's claim for the Obligations or the Lender's liens on

and security interests in any Pre-Petition Collateral or the Collateral, or (iii) preventing, hindering,

or delaying the Lender's assertion or enforcement of any lien, claim, right or security interest or

realization upon any Pre-Petition Collateral or the Collateral, (b) a request to use any cash

collateral (as such term is defined in section 363 of the Bankruptcy Code) without the prior written

consent of the Lender, (c) a request for authorization to obtain post-petition loans or other financial

accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code or otherwise other than

from the Lender unless such other financial accommodations repay to Lender all Obligations

indefeasibly in full in accordance with this Order and the Pre-Petition Loan Documents and the

Loan Documents, simultaneously within the closing of any such other financial accommodations,

(d) the commencement or prosecution of any action or proceeding of any claims, causes of action,

or defenses against the Lender or any of their respective officers, directors, members, employees,

agents, attorneys, affiliates, assigns, or successors, including, without limitation, any attempt to recover or avoid any claim or interest from the Lender under Chapter 5 of the Bankruptcy Code, or (e) any act which has or could have the effect of materially and adversely modifying or compromising any of the rights and remedies of the Lender, or which is contrary, in a manner that is material and adverse to the Lender to any term or condition set forth in or acknowledged by this Order, any of the Pre-Petition Loan Documents or any of the Loan Documents.

17.    At the Lender's sole and absolute discretion, Lender may fund at any time and in any increment in Lender's sole and absolute discretion an amount equal to the Carve-Out Expenses by, among other things, making one or more Advances (as defined in the Note), to be added to the Obligations owing by the Debtor and the Estate to the Lender in order to pay any Professional in respect of the Professional Fee Carve-Out or any other party entitled to receive payment in respect of a Carve Out Expense.

18.    Any payment or reimbursement made either directly by or on behalf of the Lender at any time or by or on behalf of the Trustee in respect of any Allowed Professional Fees, Allowed Trustee Fees, or any fees and expenses of the Trustee or any of the Trustee's Professionals prior to the approval thereof by this Court shall, in either case, permanently reduce the amount of the Professional Fee Carve Out on a dollar-for-dollar basis. Lender's obligation to fund or otherwise pay the Professional Fee Carve Out and the other Carve Out Expenses shall be added to and made a part of the Post-Petition Obligations, secured by the Collateral, and entitle the Lender to all of the rights, claims, liens, priorities and protections under this Order, the Loan Documents, the Bankruptcy Code, and/or applicable law. Payment of any Carve Out Expenses, whether by or on behalf of the Lender (or by or on behalf of the Trustee), shall not and shall not be deemed to reduce the Obligations and shall not and shall not be deemed to subordinate any of the Lender's liens and

security interests (on account of any of the Obligations) in the Pre-Petition Collateral or in the

Collateral or its Superpriority Claim or Adequate Protection Administrative Claim to any junior

pre-petition or post-petition lien, interest, or claim in favor of any other party. Except as otherwise

provided herein with respect to the Professional Fee Carve Out and the other Carve Out Expenses,

the Lender shall not be responsible for the direct or indirect payment or reimbursement of any fees

or disbursements of the Trustee or any Professionals incurred in connection with this case (or any

subsequent case under any chapter of the Bankruptcy Code), and nothing in this Order shall be

construed to obligate the Lender in any way, to pay compensation to or to reimburse expenses of

the Trustee or any Professional, or to ensure that the Trustee or the Estate has sufficient funds to

pay such compensation or reimbursement.

19.    The automatic stay imposed under section 362(a) of the Bankruptcy Code shall

be, and hereby is, modified as to the Lender to allow implementation of the provisions of this

Order and enforcement of Lender's rights and remedies under the Loan Documents, without

further notice or any further order of the Bankruptcy Court, including, without limitation: (a) to

implement the post-petition financing arrangements authorized by this Order and pursuant to the

terms of the Loan Documents, (b) to take any act to create, validate, evidence, attach, or perfect

any lien, security interest, right or claim in the Collateral, and (c) to assess, charge, collect,

advance, deduct, and receive payments with respect to the Obligations, including, without

limitation, all interests, fees, costs, expenses permitted under the Loan Documents, and apply such

payments to the Post-Petition Obligations pursuant to the Loan Documents. In addition, and

without limiting the foregoing, upon the occurrence of any default under the Loan Documents,

subject to the provisions of the Loan Documents and any notice provisions therein, the

transmission of which shall not be a violation of the automatic stay under section 362 of the

Bankruptcy Code, the Lender shall be entitled to take any action and exercise all rights and remedies provided to it by this Order, the Loan Documents and/or applicable law as it may deem appropriate in its sole discretion to, among other things, proceed against and realize upon the Collateral and any other assets and properties of the Estate upon which the Lender has been or may hereafter be granted liens and security interests to obtain the full and indefeasible repayment of all Post-Petition Obligations.

20.     At all times during this case, and whether or not a default has occurred under the Loan Documents, the Trustee irrevocably waives any rights that it may have to seek authority: (a) to use cash collateral of Lender under section 363 of the Bankruptcy Code; (b) to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code from any person or entity, other than from the Lender, unless the full amount of all Obligations is paid to Lender by wire transfer to Lender on the date the closing of any such other post-petition loan; (c) to challenge the application of any payments authorized by this Order pursuant to section 506(b) of the Bankruptcy Code or otherwise; (c) to assert that the value of any Pre-Petition Collateral is less than the Pre-Petition Obligations; or (d) to propose or support a plan of reorganization that does not provide for the indefeasible payment in full and satisfaction of all Obligations owed to the Lender by the Debtor and the Estate on the effective date of such plan.

21.     Except for Carve-Out Expenses, no costs or expenses of administration which have been or may be incurred in this case at any time shall be charged against the Lender or the Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the Lender.

22.    In the event the Trustee, the Debtor or the Estate seek to sell or in any way transfer, whether in whole or in part, the Real Property, whether pursuant to a sale under Section 363 of the Bankruptcy Code, a transaction under a plan, or otherwise, Lender shall have at all times the right to credit bid the full amount of both the Allowed Pre-Petition Claim and the amount owed to Lender under the Loan Documents.

23.    Until all of the Obligations owed to the Lender shall have been indefeasibly paid and satisfied in full and without further order of the Court, no other party with notice of this Order shall foreclose or otherwise seek to enforce any junior lien or claim in any Collateral.

24.    Notwithstanding: (a) any stay, modification, amendment, supplement, vacating, revocation, or reversal of this Order, the Loan Documents, or any term hereunder or thereunder; (b) the failure to obtain a final order pursuant to Bankruptcy Rule 4001(c)(2); or (c) the dismissal or conversion of this case (a "**Subject Event**"), (x) the acts taken by Lender in accordance with this Order, and (y) the Post-Petition Obligations incurred or arising prior to the Lender's actual receipt of written notice from the Trustee expressly describing the occurrence of such Subject Event shall be governed in all respects by the original provisions of this Order, and the acts taken by Lender in accordance with this Order, and the Post-Petition Liens granted to the Lender, and all other rights, remedies, privileges, and benefits in favor of the Lender pursuant to this Order and the Loan Documents shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code. For purposes of this Order, the term "appeal", as used in section 364(e) of the Bankruptcy Code, shall be construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating this Order by this Court or any other tribunal.

25.    Unless the Obligations will be paid in full in cash to Lender prior to the Maturity Date (as defined in the Note), the Trustee shall not sell, transfer, lease, encumber or otherwise

dispose of any portion of the Collateral without the prior written consent of the Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by the Lender).

26.      This Order shall be binding upon the Trustee, all parties in interest in this case, and their respective successors and assigns, including any trustee or other fiduciary appointed in this case or any subsequently converted bankruptcy case(s) of the Debtor. This Order shall also inure to the benefit of Lender, the Trustee, the Estate, and their respective successors and assigns. The provisions of this Order and the Loan Documents, and any and all rights, remedies, privileges, and benefits in favor of the Lender provided or acknowledged in this Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Order pursuant to Bankruptcy Rules 6004(g) and 7062, shall continue in full force and effect, and shall survive entry of any such other order, including, without limitation, any Order which may be entered confirming any plan of reorganization, converting this case to any other chapter under the Bankruptcy Code, or dismissing this case. Any Order dismissing this case under section 1112 of the Bankruptcy Case or otherwise shall be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that: (a) the Superpriority Claim and Lender's liens in the Collateral shall continue in full force and effect notwithstanding such dismissal until all Debt (as defined in the Mortgage) is indefeasibly paid and satisfied in full; and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and liens in the Collateral.

27.      The rights, remedies, powers, privileges, liens, and priorities of the Lender as contemplated herein shall not be modified, altered or impaired by any subsequent order of this Court or any other court (including, but not limited to, any financing order or any confirmation order), by any plan or reorganization or liquidation in this case, or any successor case, without

25

the express prior written consent of the Lender, unless the Financing has been indefeasibly paid in full in cash and completely satisfied, and the commitments of the Debtor as set forth in the Loan Documents have been terminated.

28.    This Court shall retain jurisdiction to enforce the provisions of this Order and the Loan Documents and to resolve any disputes concerning this Order, the Loan Documents, the distribution of the loan proceeds or the rights and duties of the parties thereunder.

29.    This Order may be recorded in the land records in which title to any property of the Trustee or Debtor's Estate granted or pledged as security in connection with the Financing is registered or recorded. Each and every federal, state and local governmental agency or department is hereby directed to accept and record this Order any and all documents and instruments necessary and appropriate to consummate the transactions (including, without limitation, the granting and perfection of any mortgage, security interest, and other liens) contemplated by the Loan Documents and this Order, all without payment of any fee.

30.    The Trustee is authorized to pay, disburse or reserve, as the case may be, the distributions provided for under the Loan Documents from the proceeds of the Financing pursuant to the Loan Documents, together with the costs and expenses under the Loan Documents payable by the Trustee.

31.    The Trustee shall hold the balance, if any, of the proceeds of the Financing not paid or disbursed after any Advance (as defined in the Note) in a segregated account and shall distribute said proceeds only in accordance with the terms of the Loan Documents.

Dated: January __, 2020
       New York, New York


                                        _____
                                        Hon. Sean H. Lane
                                        United States Bankruptcy Judge

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re:                                                           Chapter 11

305 EAST 61st STREET GROUP LLC,                                  Case No.: 19-11911 (SHL)

                        Debtor.

-------------------------------------------------------------x

### ORDER APPROVING (I) PURCHASE AND SALE AGREEMENT BETWEEN TRUSTEE AND 305 E 61st STREET LENDER LLC, (II) BREAK-UP FEE TO BE PAID TO THE INITIAL BIDDER; (III) BIDDING PROCEDURES, AND (IV) THE TIME, DATE, PLACE AND FORM OF NOTICE FOR AUCTION

Upon that portion (the "**Bid Procedures Portion**") of the motion (the "**Motion**"), dated

_____, 2020, of Kenneth P. Silverman ("**Trustee**"), in his capacity as Chapter 11 Trustee

of the estate ("**Estate**") of 305 East 61st Street Group LLC ("**Debtor**"), by its counsel, Silverman

Acampora LLP, for entry of an order, pursuant to sections 105, 363 and 365 of title 11 of the United

States Code (the "**Bankruptcy Code**") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), authorizing and approving the (i) Trustee's proposed sale of the

Debtor's property located at 305-307 East 61st Street, New York, New York (the "**Real Property**")

and the other "Property" described in and pursuant to that certain Purchase and Sale Agreement

between the Trustee and 305 E 61st Street Lender LLC (the "**Stalking Horse Bidder**"), a copy of

which agreement is attached as Exhibit __ to the Motion (the "**Sale Agreement**")[1], (ii) approving the

payment of the break-up fee to Stalking Horse Bidder, (iii) the form of the proposed bidding

procedures (the "**Bidding Procedures**") to be used in connection with the Trustee's proposed sale of

the Real Property to the Stalking Horse Bidder or to any competing qualified bidder or bidders that

submits a higher or better offer for the Property (the Stalking Horse Bidder or such qualified bidder

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Agreement. For purposes of clarity, the term Sale Agreement as used herein shall refer only to that certain Sale Agreement by and between Trustee and Stalking Horse Bidder and Stalking Horse Bidder's permitted assigns.

that submits a higher bid being the "**Successful Bidder**"), and (iv) approving the form and manner of

notice of the auction of the Property ("**Auction**") and the hearing to approve confirmation of the sale

to the Successful Bidder at the Auction (the "**Sale Hearing**"); and this Court having reviewed the Bid

Procedures Portion of the Motion; and this Court having considered the Bid Procedures Portion of the

Motion and having heard the Trustee, by its attorneys, and the other parties in attendance at a hearing

conducted on February 5, 2020 (the "**Procedures Hearing**"); and based on the Bid Procedures

Portion of the Motion and the record of the Procedures Hearing, it appearing that the relief requested

in the Bid Procedures Portion of the Motion is in the best interests of the Debtor's estate and all

parties in interest; and after due deliberation thereon and good cause appearing therefore and no

further notice being required:

**IT IS HEREBY FOUND AND DETERMINED.THAT:**

A.      This Court has jurisdiction over the Motion and the relief requested therein pursuant

to 28 U.S.C. §§ 157 and 1334 and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

Venue of this case in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      Good and sufficient notice of the relief sought in the Procedures Motion has been

given and no further notice is required. A reasonable opportunity to object or be heard regarding

the relief requested in the Bid Procedures Portion of the Motion has been afforded to all creditors

and interested persons and entities.

C.      The notice of the Bid Procedures Portion of the Motion is good, appropriate,

sufficient and is reasonably calculated to provide all creditors and other interested parties with timely

and proper notice of the relief sought at this time by the Trustee and no other or further notice of the

is required.

D.    The Trustee has articulated good and sufficient cause for this Court to grant the relief
requested in the Bid Procedures Portion of the Motion, including this Court's (i) approval of the Break
Up Fee and (ii) the Sale Agreement.

E.    The Trustee has articulated good and sufficient cause for, and the best interests of
the Debtor's estate will be served by, this Court scheduling a subsequent hearing to consider,
whether to grant the remainder of the relief requested in the Motion, including approval of the
proposed Sale in accordance with either (i) the Sale Agreement or (ii) such other agreement by and
between the Trustee and the Successful Bidder free and clear of, among other things, all liens,
claims, encumbrances, and Interests (as defined in the Sale Agreement), other than permitted
exceptions (collectively, "**Liens/Interests**"), with any Liens/Interests to attach to the proceeds of the
Property with the same validity, priority and extent as exist on the Closing Date, pursuant to section
363(f) of the Bankruptcy Code.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Bid Procedures Portion of the Motion is GRANTED to the extent provided in
this Order.

2.    All objections to entry of this Order or to the relief provided herein and requested in
the Procedures Motion that have not been withdrawn, waived, resolved, or settled are hereby denied
and overruled in their entirety.

3.    The Sale Agreement is hereby authorized and approved in all respects.

## THE BIDDING PROCEDURES

4.    The Bidding Procedures in the form of Exhibit A attached hereto are hereby approved
in all respects and shall govern all bids and bid proceedings relating to the sale of Property by the
Trustee.  The Trustee is authorized to take any and all actions necessary or appropriate to implement

the Bidding Procedures and schedule the Auction and the Sale Hearing without further order of

the Court. Solely with respect to the Stalking Horse Bidder, in the event of any conflict between

the Bidding Procedures and the Sale Agreement, the terms and provision of the Sale Agreement

shall control. Solely with respect to the Stalking Horse Bidder, notwithstanding anything to the

contrary, the Sale Agreement shall not in any way be superseded by any of the Bidding

Procedures.

## THE BREAK-UP FEE

5.    The payment of a break-up fee in the amount of $950,000.00 (the "**Break-Up Fee**")

to the Stalking Horse Bidder, at such times and under the circumstances set forth in and in

accordance with the terms of the Sale Agreement, is hereby authorized and approved in all respects.

The terms of the Sale Agreement shall govern (i) the conditions under which the Stalking Horse

Bidder's bid and the Sale Agreement are terminable, and (ii) the payment of the Break-Up Fee to

the Stalking Horse Bidder.

## NOTICE OF THE AUCTION AND SALE HEARING

6.    The proposed form of the notice of sale as annexed to the Motion as <u>Exhibit D</u> ( the

"**Notice of Sale**") is hereby approved in all respects and shall provide interested parties with, among

other things, the date, time and location of the Auction, and the date and time of the Sale Hearing.

The Trustee shall serve a copy of the Notice of Sale by first class mail upon: (i) the Debtor, (ii) the

members of the Debtor or to their respective counsel such counsel appeared in this case, (iii) the

Office of the United States Trustee; (iv) the Internal Revenue Service; (v) the New York State

Environmental Control Board; (vi) parties in interest who have filed a notice of appearance in this

case, pursuant to Bankruptcy Rule 2002; (vii) all known creditors of the Debtor as reflected on the

Debtor's schedules and the claims register , and (viii) all other parties entitled to notice of the

4

Motion.

7.      The Notice of Sale shall constitute good and sufficient notice of the Bidding

Procedures, the Auction, the Sale Hearing and the proposed Sale Order (as defined in the Sale

Agreement), and no other or further notice of the Bidding Procedures, the Auction, the Sale Hearing

and/or the proposed Sale Order shall be necessary or required.

## OBJECTIONS TO THE SALE

1.      Objections, if any, to the Motion, other than with respect to the relief granted herein,

shall be filed with this Court (with a copy delivered to chambers), and served so <u>as to be received</u> no

later than five (5) days prior to the Sale Hearing (the "**Objection Deadline**"), by: (i) Silverman

Acampora LLP, counsel to the Trustee, One Hundred Jericho Quadrangle, Suite 300, Jericho, New

York 11753, Attn: Ronald J. Friedman, Esq.; (ii) the United States Trustee, 201 Varick Street,

Room 1006, New York, New York 10014, Attn: Paul Schwartzberg, Esq.; (iii) counsel for the

Stalking Horse Bidder, Katsky Korins LLP, 605 Third Avenue, 16th Floor, New York, New York

10158, Attn: Steven H. Newman, Esq.; and (iv) all other parties that have filed a Notice of

Appearance in this Chapter 11 case.

2.      The failure of any person or entity to file an objection to the Motion on or before the

Objection Deadline shall forever bar any such objection to the Motion, the relief requested therein, or

the Sale Order or to the consummation of the Sale contemplated by the Sale Agreement or agreement

with the Successful Bidder, if any, including, without limitation, the transfer of the Property free and

clear of any and all claims, Interests, encumbrances and other Liens/Interests whatsoever.

## **ADDITIONAL PROVISIONS**

3.      The Trustee is hereby authorized and empowered to take such steps, incur and pay
such costs and expenses, and do such things as may be reasonably necessary to fulfill the notice
requirements established by this Order.

4.      This Court shall retain jurisdiction over any matter or dispute arising from or relating
to the implementation of this Order.


Dated: _____, 2020
        New York, New York




_____
SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT A</u>**

## SALES PROCEDURES

Set forth below are the sales procedures and terms and conditions of sale (the "Terms of Sale" or "Terms and Conditions of Sale") to be employed with respect to sale of certain real property located at 305-307 East 61st Street, New York, New York (the "Property") owned by 305 East 61st Street Group LLC (the "Debtor"), more fully described below.

### Background

1.    On June 10, 2019, the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The Debtor's Chapter 11 case is pending under case number 19-11911 (SHL).

2.    By Order dated October 24, 2019 the Bankruptcy Court directed the appointment of a Chapter 11 Trustee. By Order dated October 25, 2019, Kenneth P. Silverman, Esq. was appointed as the Chapter 11 Trustee of the Debtor's estate (the "Trustee"). The Trustee is represented by Silverman Acampora, LLP ("SA"), with offices at 100 Jericho Quadrangle, Suite 300, Jericho, NY 11753.

3.    The Property is encumbered by senior liens belonging to 305 East 61st Street Lender LLC (the "Senior Lienholder").

4.    These Terms and Conditions of Sale are promulgated in connection with the Bankruptcy Court-authorized Public Sale (the "Public Sale" or "Auction") as described below.

### Description of Assets

5.    The assets to be sold at the Public Sale consist of the Property, which is being offered as follows:

| Description | Tax ID |
|---|---|
| 305-307 East 61st Street New York New York 10065 | Block: 1436 Lot: 5 |

6.    The Trustee shall sell, at the Public Sale, all right title and interest in and to the Property, which shall include any other rights, plans, and permits of whatever kind or nature, as set forth in documents "of record" pertaining to the Property.

### Agent of Sale

7.    The Public Sale shall be conducted by the Trustee's Bankruptcy Court retained real estate auctioneer ("Sales Agent"), for the sales contemplated herein. The Trustee shall be the sole authorized party to execute any and all such documents as are necessary for the sale and transfer of the Property following the Public Sale.

<u>Qualified Bidder</u>

8.     In order to be permitted to bid on the Property, prior to the commencement of the Public Sale, each prospective bidder ("<u>Bidder</u>") must deliver to the Sales Agent an executed copy of these terms and conditions of sale, agree to be bound thereby and remit the deposit as provided herein.  The Bid submission shall include a correspondence containing the following terms and conditions:

(a)     It sets forth the Bidder's opening offer for the Property;

(b)     it is in writing and is irrevocable through a closing of the sale of the Property;

(c)     it provides for (i) a cash purchase price for the Property, expressed in U.S. Dollars;

(d)     it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Trustee to make a reasonable determination as to the Bidder's financial and other capabilities to consummate the transaction contemplated by bid;

(e)     it is not conditioned on any contingencies, such as, without limitation: (i) the outcome of unperformed due diligence by the Bidder, (ii) the granting or extension of any permit rights, and/or (iii) obtaining financing;

(f)     it includes an acknowledgement and representation that the Bidder: (i) has had an opportunity to conduct any and all required diligence regarding the Property prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Property in making its bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Property or the completeness of any information provided in connection therewith or the Auction; and (iv) is not entitled to any expense reimbursement or break-up fee;

(h)     it includes evidence, in form and substance reasonably satisfactory to the Trustee (who will confer with  the Senior Lienholder), of authorization and approval from the Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of these Terms and Conditions of Sale; and

(i)     it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Trustee), or certified check or such other form acceptable to the Trustee, payable to the order of the "Silverman Acampora LLP Attorney Escrow IOLA Account" and in the amount of $_____ to be qualified to bid (the "<u>Qualifying Deposit</u>"), which shall serve as a partial good faith deposit against payment of the purchase price.

2

9.      Any Bidder who submits a Bid that conforms to the requirements of Paragraph 8 above, shall be considered a "Qualified Bidder" provided the Trustee receives all of the required supporting documentation and the Qualifying Deposit.

10.      Notwithstanding anything to the contrary, (i) the Senior Lienholder (a) shall in all events be deemed a Bidder and a Qualified Bidder, (b) has entered into a Purchase and Sale Agreement approved by the Bankruptcy Court (the "Stalking Horse Contract"), (c) shall not be required to pay a Qualifying Deposit or any other Deposit whatsoever, except a deposit required to be paid under the Stalking Horse Contract, and (d) is not required to comply with the provisions of Paragraph 8 and 9 hereto.

11.      For the avoidance of doubt, and notwithstanding the foregoing, any overbid submitted by the Buyer at any Auction on substantially the same terms as its initial offer (apart from any increase in price) shall be a "Qualified Competing Bid."

## Public Sale

12.      The Public Sale will be held on _____, 2020 at 1:00 pm (the "Sale Date") at the United States Bankruptcy Court Southern District of New York, One Bowling Green, New York, New York 10004 or such other location as the Trustee determines upon reasonable notice.

13.      On the tenth business day before the Public Sale the Trustee will post the rules for the conduct at the Auction. The rules will be designed to ensure that the Auction will be conducted in a manner that will achieve the maximum value for the Property. Such terms and conditions may include, by way of example, one or more rounds of sealed or open bids from any Qualified Bidder who submitted a Bid (a "Qualified Competing Bid") and the increments of such bids.

14.      The highest or otherwise best bid, as determined by the Trustee in his reasonable discretion, in consultation with the Senior Lienholder, shall be the starting bid at the Public Sale.

15.      The sale price of the Property must exceed a reserve price (the "Reserve Price"), which shall be agreed to between the Trustee and the Senior Lienholder. The Reserve Price will not be disclosed to the Bidders.

## Selection Of Successful Bid

16.      Prior to the conclusion of the Public Sale, the Trustee will, in consultation with his professionals and the Senior Lienholder, (a) review and evaluate each Qualified Competing Bid, (b) determine the highest or otherwise best offer for the Property received at the Auction (such bid, the "Successful Bid" and the bidder making such bid, the "Successful Bidder") and (c) communicate to each Qualified Bidder the identity of the Successful Bidder and the details of the Successful Bid. The determination of the Successful Bid or Successful Bids by the Trustee shall be final, subject to approval by the Bankruptcy Court.

17.    The Trustee will sell the Property to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of the Successful Bid by the Bankruptcy Court at the Sale Hearing.

18.    For the avoidance of doubt, the Trustee shall not consider or support any bid (whether or not such bid is a Qualified Competing Bid) for the Property received after the close of the Auction.

19.    The Successful Bidder will, at the time and place of the conclusion of the Public Sale, sign a memorandum of sale (the "Memorandum of Sale") in accordance with these Terms and Conditions of Sale substantially in the form annexed hereto. Notwithstanding anything to the contrary, the Senior Lienholder shall not be required to sign a Memorandum of Sale unless it makes a bid at the Auction in an amount higher than the amount in the Stalking Horse Contract after a competing bid is made.

### Deposit, Sale and Closing

20.    Within 48 hours after conclusion of the Public Sale, the Successful Bidder shall deliver to Silverman Acampora, by bank check or bank teller's check made payable to "Silverman Acampora LLP Attorney Escrow IOLA Account" or by wire in immediately available federal funds, an amount equal to ten (10%) percent of such Successful Bid minus the Qualifying Deposit (together with the Qualifying Deposit, the "Deposit") plus the Buyer's Premium (as hereinafter defined). Failure of the Successful Bidder to tender the Deposit and the Buyer's Premium within 48 hours after conclusion of the Public Sale shall result in an immediate default under the terms of these Terms and Conditions of Sale and the Memorandum of Sale and shall result in the forfeiture of all earnest monies paid, including the Buyer's Premium. The Successful Bidder and the competing Bidder who the Trustee determines to have made the second highest or best bid for the Property (the "Second Highest Bidder") must execute, and thereby agree to be bound by these Terms and Conditions of Sale and the Memorandum of Sale. **At the conclusion of the Public Sale, the Trustee will return the Qualifying Deposits to all Bidders, except for the Successful Bidder and Second Highest Bidder. The Second Highest Bidder's Qualifying Deposit shall be returned within two (2) business days following approval of the Public Sale by the Bankruptcy Court ("Court Approval Date").**

21.    As set forth in more detail in the order of the Bankruptcy Court setting the terms of the Sales Agent's retention, the Successful Bidder, and the Second Highest Bidder in the event of a Successful Bidder's Default (as hereinafter defined), are solely responsible to pay the Trustee 2.5 percent of each Successful Bid (the "Buyer's Premium"). The Buyer's Premium shall be deemed to have been earned immediately upon the fall of the hammer. The sum of the Successful Bid and related Buyer's Premium is defined herein as the "Purchase Price." In the event that the sale is not consummated, the Buyer's Premium shall be property of the Debtor's estate.

4

22.     Notwithstanding anything to the contrary, (a) the Senior Lienholder's Court approved Stalking Horse Contract shall not be superseded by any of these Sale Procedures or Terms of Sale whatsoever, (b) if Senior Lienholder makes a bid at the Auction in an amount higher than the amount in the Stalking Horse Contract after a competing bid is made, it shall thereafter by bound by the "Second Highest Bidder" terms (but no other terms) provided herein in all respects; provided however, in such event the Senior Lienholder shall (I) not be required to deliver any Additional Deposit or other Deposit whatsoever and (II) pay a Buyer's Premium in the amount of only 2.5% of the difference between (A) its Successful Bid and (B) the sum of (i) the purchase price in the Stalking Horse Contract and (ii) $950,000.00.

23.     The Successful Bidder must pay the balance of the Purchase Price for the Property to the Trustee by bank check or bank teller's check or by wire in immediately available federal funds. The Successful Bidder must close title to the Property at a date that is no more than thirty (30) days after the Court Approval Date, **TIME BEING OF THE ESSENCE as to the Successful Bidder**, although such date may be extended solely by the Trustee in consultation with the Senior Lienholder. Notwithstanding the foregoing, the Trustee shall grant the Successful Bidder a single thirty (30) day extension (the "Extension"), at the request of the Successful Bidder, provided the Successful Bidder posts an additional, non-refundable deposit of ten (10%) percent of the purchase price, for an aggregate non-refundable deposit equal to twenty percent (20%) of the Purchase Price prior to the twentieth (20th) day following court approval (the "Additional Deposit"). The Additional Deposit shall be made by certified check or bank check made payable to the "Silverman Acampora LLP Attorney Escrow IOLA Account" or by wire in immediately available federal funds and, together with the original Deposit, shall be deemed the "Deposit." If the Successful Bidder elects to exercise the Extension, the Closing shall take place on or before the sixtieth (60th) day following court approval, **TIME BEING OF THE ESSENCE as to the Successful Bidder,** although such date may be extended solely by the Trustee.  If the Successful Bidder elects to exercise the Extension, the Successful Bidder shall be responsible for all real estate taxes incurred from the 30th day after the Court Approval Date through closing and shall pay interest on the Purchase Price at a nine (9%) percent annual rate from the 30th day after the Court Approval Date through to the actual day of closing.

24.     If the Successful Bidder fails to post the total required Deposit and Buyer's Premium within 48 hours following the Public Sale ("Successful Bidder's Default"), the Trustee, in his sole and absolute discretion, may, within three (3) business days of the Successful Bidder's Default, deem the Second Highest Bidder to hold all benefits and obligations under the Terms and Conditions of Sale and Memorandum of Sale, as a new Successful Bidder (the "New Successful Bidder"). The New Successful Bidder shall not receive credit for any Deposit and/or Buyer's Premium forfeited by the initial Successful Bidder. The New Successful Bidder must close title to the Property no later than thirty (30) days following receipt of written notice to the New Successful Bidder of the Successful Bidder's Default (the "New Successful Bidder's Closing"), **TIME BEING OF THE ESSENCE as to such New Successful Bidder,** although such date may be extended solely by the Trustee. Notwithstanding the foregoing, Trustee shall grant the New Successful Bidder a single thirty (30) day extension (the "New Successful Bidder's Extension"), at the request of the New Successful Bidder, provided the New Successful Bidder posts an additional, non-refundable deposit of ten percent (10%), so that the New Successful Bidder's aggregate non-refundable deposit is equal to twenty percent (20%) of the

New Successful Bidder's Purchase Price prior to the twenty fifth (25th) day following the New Successful Bidder's receipt of notification of the Successful Bidder's Default (the "New Successful Bidder's Additional Deposit"). The New Successful Bidder's Additional Deposit shall be made by bank check or bank teller's check made payable to "Silverman Acampora LLP Attorney Escrow IOLA Account" or by wire in immediately available federal funds and, together with the original Deposit, shall be deemed the "Deposit." If the New Successful Bidder elects to exercise the New Successful Bidder's Extension, the Closing shall take place on or before the sixtieth (60th) day following receipt of notification of the Successful Bidder's Default, **TIME BEING OF THE ESSENCE as to the New Successful Bidder,** although such date may be extended solely by the Trustee. If a New Successful Bidder elects to exercise a New Successful Bidder's Extension, the New Successful Bidder shall be responsible for all real estate taxes incurred from the 30th day following receipt of notification of Successful Bidder's Default through closing and shall pay interest on the Purchase Price at a nine (9%) percent annual rate from the 30th day following receipt of notification of Successful Bidder's Default through to the actual day of closing.

25.    The closing shall take place at the offices of Silverman Acampora, LLP, 100 Jericho Quadrangle, Suite 300, Jericho, NY, 11743 (the "Closing"), or such other location as the Trustee may direct.

26.    The Successful Bidder, or the New Successful Bidder, as the case may be, shall pay any and all costs and expenses in connection with the Closing related to obtaining a survey; fee title or mortgage insurance; title company endorsement, search and escrow charges; environmental, engineering or other property inspections; appraisals, reports and other costs of property due diligence; and County, State, New York City, or other real property transfer, deed or documentary tax, or other taxes imposed upon the sale due in connection with the transfer of the Property from the Trustee at Closing (to the extent the sale will be pursuant to a plan of reorganization, there may be no such transfer type taxes owed pursuant to section 1146(a) of the Bankruptcy Code). The Successful Bidder acknowledges that it will be responsible for the completion of any ACRIS forms, if required. The Trustee shall not be required to execute any form of title affidavit (but may in his sole and absolute discretion) and all title exceptions customarily omitted from a title policy on account of such title affidavit shall be deemed permitted exceptions. The Successful Bidder, or the New Successful Bidder, as the case may be, acknowledges it will be responsible for the preparation of all Closing documents required including, but not limited to, transfer tax forms, if required. In connection with the Closing and Closing date, the Successful Bidder or the New Successful Bidder, as the case may be, is hereby given notice that **TIME IS OF THE ESSENCE against the Successful Bidder or the New Successful Bidder, as the case may be, and the failure of the Successful Bidder or the New Successful Bidder, as the case may be, to close for any reason whatsoever (except as otherwise provided herein) including its failure to pay the balance of the Purchase Price on the Closing date, will result in an immediate forfeiture of the Deposit, Buyer's Premium, and any Additional Deposit, and the termination of the Successful Bidder's or the New Successful Bidder's, as the case may be, right to acquire the Property under these Terms and Conditions of Sale and the Memorandum of Sale**. The Successful Bidder or the New Successful Bidder, as the case may be, shall be obligated to close title to the Property and, except as expressly set forth herein, there is no contingency of any kind or nature that will permit the

Successful Bidder, or the New Successful Bidder, as the case may be, to cancel or avoid its obligation under these Terms of and Conditions of Sale and the Memorandum of Sale other than the Trustee's inability to deliver insurable title to the Property. Further, the Successful Bidder or the New Successful Bidder, as the case may be, shall have demonstrated, to the satisfaction of the Trustee and the Senior Lienholder, evidence of its ability to conclude the transaction upon these Terms and Conditions of Sale and the Memorandum of Sale, without delay. The Trustee reserves the right to reject any Bidder who the Trustee believes, in his sole discretion, is not financially capable of consummating the purchase of the Property. Expenses incurred by the Successful Bidder, or any other Bidder, concerning any due diligence shall be the sole responsibility of such Bidder and, under no circumstances shall the Trustee, the Debtor, or their professionals be responsible for, or pay, such expenses.

27.    The Successful Bidder or the New Successful Bidder shall have five (5) days from the Court Approval Date to order title, a copy of which shall promptly be provided to the Trustee, otherwise the Successful Bidder or New Successful Bidder shall be required to utilize a reputable title insurance company of the Trustee's selection licensed in the State of New York which shall provide the title insurance. The Successful Bidder or the New Successful Bidder has twenty (20) days from the Court Approval Date to advise the Trustee (by electronic mail to rfriedman@silvermanacampora.com) of any and all title issues or defects that would in any way be an impediment to the Closing on the sale of the Property, or any portion thereof. Failure of the Successful Bidder or the New Successful Bidder to advise the Trustee within twenty (20) days from the Court Approval Date of any such title issues or defects shall be deemed a waiver of any and all rights to raise any such title issues or defects, with Trustee reserving the right to specify a particular title company to insure title, provided said company is licensed in the State of New York.

<u>Free and Clear, No Representations</u>

28.    All of the rights, title, and interests of the Debtor in and to the Property, or any portion thereof, will be sold, conveyed, transferred, and assigned free and clear of all Liens, Claims, Interests, and Encumbrances pursuant to Sections 363 and 365 of the Bankruptcy Code, such Liens, Claims, Interests, and Encumbrances to attach to the gross proceeds of the sale of the Property, except to the extent otherwise set forth in the Memorandum of Sale

29.    The Sales Agent, the Trustee and the Debtor and their respective professionals have not made and do not make any representations or warranties as to the physical condition, expenses, operations, value of the land or buildings thereon, or any other matter or thing affecting or related to the Property or this Public Sale, which might be pertinent to the purchase of the Property, or any portion thereof, including, without limitation, (i) the current or future real estate tax liability, assessment or valuation of the Property; (ii) the potential qualification of the Property for any and all benefits conferred by or available under federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated; (iii) the compliance or non-compliance of the Property, in its current or any future state, with applicable present or future zoning ordinances or other land use law or regulation, or the ability to obtain a change in the zoning or use, or a variance in respect to the Property; (iv) the availability of any financing for

7

the purchase, alteration, rehabilitation or operation of the Property from any source, including, but not limited to, any state, city or federal government or institutional lender; (v) the current or future use of the Property; (vi) the current or future rents, other operating income or expenses; (vii) the presence or absence of any laws, ordinances, rules or regulations issued by any governmental authority, agency or board and any violations thereof; (viii) the compliance or non-compliance with environmental laws and the presence or absence of underground fuel storage tanks, any asbestos, any lead paint or other hazardous materials anywhere on the Property, or notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued by any governmental department, agency or bureau having authority as to but not limited to lands, housing, buildings, fire, health, environment and labor conditions affecting the Property. Each Bidder hereby expressly agrees and acknowledges that no such representations or warranties have been made. The Sales Agent, the Trustee, the Debtor and their respective professionals shall not be liable or bound in any manner by expressed or implied warranties, guarantees, promises, statements, representations or information pertaining to the Property, made or furnished by the Sales Agent, the Trustee, or the Debtor or any real estate broker, agent, employee, servant or other person or professional representing or purporting to represent the Sales Agent, the Trustee, or Debtor unless such warranties, guaranties, promises, statements, representations or information are expressly and specifically set forth in writing within these Terms and Conditions of Sale and the Memorandum of Sale.

30.    The Property being sold **"AS IS" "WHERE IS"**, **"WITH ALL FAULTS"**, without any representations, covenants, guarantees or warranties of any kind or nature, and free and clear of any liens, claims, or encumbrances of whatever kind or nature, with such liens, if any, to attach to the proceeds of sale in such order and priority as they existed immediately prior to the Closing. The sale of the Property is subject to, among other things (a) any state of facts that an accurate survey may show; (b) any covenants, restrictions and easements of record; (c) any state of facts a physical inspection may show; (d) any building or zoning ordinances or other applicable municipal regulations and violations thereof; (e) leases and (f) environmental conditions; provided, however, **the Property shall be delivered free and clear of any and all monetary liens**. By delivering their respective Qualifying Deposits, all Bidders acknowledge that they have had the opportunity to review and inspect the Property, the state of title thereof and laws, rules and regulations applicable thereto, and will rely solely thereon and on their own independent investigations and inspections of the Property in making their bids. Neither the Sales Agent, the Trustee, the Debtor nor any of their collective representatives makes any representations or warrantees with respect to the permissible uses of the Property including, but not limited to, the zoning of the Property. All Bidders acknowledge that they have conducted their own due diligence in connection with the Property and are not relying on any information provided by the Sales Agent, the Trustee, the Debtor, or their respective professionals. The Property will be sold subject to any and all violations requiring corrective action.

31.    The Trustee shall convey the Property by delivery of a quitclaim or Trustee deed. The quality of title shall be that which any reputable title insurance company authorized to do business in the State of New York is willing to approve and insure. If the Successful Bidder or the New Successful Bidder, as the case may be, is unable to obtain title insurance, subject to the permissible exceptions contained herein, the Trustee may, at its option, arrange for the issuance

of a title insurance policy by such a company at the sole cost and expense of the Successful Bidder, or the New Successful Bidder, as the case may be.

32.     Nothing contained in these Terms and Conditions of Sale is intended to supersede or alter any provisions of the Stalking Horse Contract, the "Bankruptcy Code," any orders entered in these Cases, or otherwise interfere with the jurisdiction of the Bankruptcy Court. All of the terms and conditions set forth in these Terms and Conditions of Sale are subject to modification as may be directed by the Trustee, with the consent of the Senior Lienholder, or by the Court. The Trustee reserves the right to modify these Terms and Conditions of Sale at the Public Sale or thereafter to maintain consistency with the provisions of the Bankruptcy Code and/or prior orders of the Court. With respect to the Senior Lienholder, in the event of any conflict between the terms of Stalking Horse Contract and these Terms and Conditions of Sale the terms of the Stalking Horse Contract shall control.

33.     These Terms and Conditions of Sale will be read into the record, or specifically incorporated by reference, at the Public Sale of the Property. By making a bid for the Property all Bidders will be deemed to have acknowledged having read and understood these Terms and Conditions of Sale and have agreed to be bound by them.

34.     If the Trustee is unable to deliver the Property, in accordance with these Terms and Conditions of Sale for any reason whatsoever, the Trustee's and Sales Agent's only obligation will be to refund the Deposit and Buyer's Premium, without interest, to the Successful Bidder or the New Successful Bidder, as the case may be, and upon such refund, the Successful Bidder or the New Successful Bidder, as the case may be, will have no claim or recourse against the Trustee, the Sales Agent, the Debtor, the Senior Lienholder, or any of their respective professionals and shall have no further rights under these Terms and Conditions of Sale or Memorandum of Sale.

<u>Sale Hearing</u>

35.     The Public Sale of the Property is subject to confirmation by the Trustee and pursuant to a further order of the Bankruptcy Court confirming the Public Sale.

36.     A hearing to approve the sale of the Property to the Successful Bidder will be held on _____, 2020 before the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, NY 10002.

37.     The Trustee shall notify the Successful Bidder or the New Successful Bidder, as the case may be, whether the Public Sale is confirmed.

41.     Neither the Trustee, Trustee's counsel, Sales Agent, the Senior Lienholder, nor the Debtor's estate is liable or responsible for the payment of fees or any broker that has not previously been approved by Order of the Bankruptcy Court.

42.    The Bankruptcy Court shall determine any disputes concerning the Public Sale of the Property. By participating in the Public Sale, all Bidders consent to the jurisdiction of the Bankruptcy Court to determine such disputes under the Debtor's pending case.

I have read these Terms and Conditions of Sale and agree to be bound by them.

By:_____   Date:_____

Print Name: _____

## MEMORANDUM OF SALE – SUCCESSFUL BIDDER

High Bid Realized at Public Sale: _____

Buyer's Premium: _____

**Purchase Price:** _____

The undersigned has this _____ 2020, agreed to purchase the Property (as defined in the annexed Terms and Conditions of Sale) and sold by Kenneth P. Silverman, Esq., as Chapter 11 Trustee pursuant to the Order of the United States Bankruptcy Court for the Southern District of New York entered on _____ 2020 authorizing the sale of the Property, for the sum of $_____ DOLLARS and hereby promises and agrees to comply with the annexed Terms and Conditions of Sale of the Property and this Memorandum of Sale.

_____
SUCCESSFUL BIDDER (Signature)

_____
PRINT NAME

_____
ADDRESS

_____
ADDRESS (City, State, Zip)

_____
TELEPHONE NUMBER

_____
EMAIL ADDRESS

Received from _____ the sum of $_____,000 DOLLARS, as a non-refundable deposit for the purchase of the Property pursuant to the Terms and Conditions of Sale.

This is to verify that the final Purchase Price in the above sale was for the sum of $_____.

_____
[SALES AGENT]

## SUCCESSFUL BIDDER ATTORNEY INFORMATION

Name _____

Address _____

Phone _____

## MEMORANDUM OF SALE – SECOND HIGHEST BIDDER

High Bid Realized at Public Sale: _____

 Buyer's Premium: _____

**Purchase Price:** _____

The undersigned has this _____, 2020, agreed to purchase the Property (as defined in the annexed Terms and Conditions of Sale) and sold by Kenneth p. Silverman, Esq., the Chapter 11 Trustee of the Debtor for the sum of \$_____ DOLLARS in the event of the Successful Bidder's Default and if deemed by the Trustee, in his sole and absolute discretion, and to hold all benefits and obligations of a Successful Bidder under the Terms and Conditions of Sale and this Memorandum of Sale and hereby promises and agrees to comply with the annexed Terms and Conditions of Sale of said Property and this Memorandum of Sale.

_____
SECOND HIGHEST BIDDER (Signature)

_____
PRINT NAME

_____
ADDRESS

_____
ADDRESS (City, State, Zip)

_____
TELEPHONE NUMBER

_____
EMAIL ADDRESS

Received from _____ the sum of \$_____ DOLLARS, as a non-refundable deposit for the purchase of the Property pursuant to the Terms and Conditions of Sale.

This is to verify that the final Purchase Price for the 2nd Highest Bid was in the above sale was for the sum of \$_____.

_____
[SALES AGENT]

13

## SECOND HIGHEST BIDDER ATTORNEY INFORMATION

Name _____

Address _____    Phone: _____