TANNENBAUM HELPERN SYRACUSE & HIRSCHTRITT LLP
Michael J. Riela
Vincent J. Syracuse
900 Third Avenue, 13th Floor
New York, New York 10022
Telephone: (212) 508-6700
Fax: (212) 371-1084
Email:  Riela@thsh.com
           Syracuse@thsh.com


           and

GANFER SHORE LEEDS & ZAUDERER LLP
Steven J. Shore
Justin R. Bonanno
360 Lexington Avenue, 14th Floor
New York, New York 10017
Telephone: (212) 922-9250
Fax: (212) 922-9335
Email: sshore@ganfershore.com
           jbonanno@ganfershore.com

*Co-Counsel for Little Hearts Marks Family II, L.P.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ————————————————————————x | : | |
| In re | : | Chapter 11 |
| | : | |
| 305 EAST 61st STREET GROUP LLC, | : | Case No. 19-11911 (SHL) |
| | : | |
| Debtor. | : | *Re:  Docket Nos. 116 and 117* |
| | : | |
| | : | |
| ————————————————————————x | | |

**OBJECTION OF LITTLE HEARTS MARKS FAMILY II, L.P.**
**TO CHAPTER 11 TRUSTEE'S (I) MOTION FOR ENTRY**
**OF AN ORDER AUTHORIZING THE TRUSTEE TO OBTAIN**
**POST-PETITION FINANCING AND TO SETTLE CLAIMS WITH LENDER, AND**
**(II) MOTION FOR ENTRY OF AN ORDER APPROVING PURCHASE AND**
**SALE AGREEMENT AND BIDDING PROCEDURES FOR SALE OF THE PROPERTY**

Little Hearts Marks Family II, L.P. ("Marks LP"), a 30% member and a significant creditor of the above-captioned debtor (the "Debtor"), hereby files this objection (this "Objection") to the following two motions that were filed by Kenneth P. Silverman, Esq., the Chapter 11 operating trustee (the "Trustee") in this case:

- *Trustee's Motion For Entry of a Final Order (i) Authorizing the Trustee to Obtain Post-Petition Financing and Grant Liens and Superpriority Administrative Expense Status Pursuant to §§ 105(a), 364(c), and 364(d); (ii) Granting Replacement Liens and Rights to Adequate Protection Pursuant to 11 U.S.C. §§ 105 and 361; (iii) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; and (iv) Settling Claims Under Bankruptcy Rule 9019; and (v) Granting Related Relief* [Docket No. 116] (the "DIP/9019 Motion"); and

- *Trustee's Motion for Entry of an Order Approving (i) Purchase and Sale Agreement Between Trustee and 305 E. 61st Street Lender LLC, (ii) Break-up Fee to be Paid to Stalking Horse Bidder; (iii) Bidding Procedures, and (iv) the Time, Date, Place and Form of Notice for Auction and Sale Hearing* [Docket No. 117] (the "Bidding Procedures Motion", and together with the DIP/9019 Motion, the "Motions").

In support of this Objection, Marks LP respectfully states as follows:

## PRELIMINARY STATEMENT

1.      This Chapter 11 case never should have been filed in the first place. Jason Carter (the person in charge of managing the Debtor at the time) commenced this Chapter 11 case to put pressure on Marks LP and the Debtor's other members, and to avoid a ruling from a New York state court that was almost certain to be adverse to Mr. Carter. The stated reason for the bankruptcy filing was to stay certain pending litigation against the Debtor, including a foreclosure proceeding that was commenced by 305 East 61st Lender, LLC (the "Lender"). However, the foreclosure proceeding was no reason to commence this Chapter 11 case. This is because all the Debtor needed to do to repay the Lender is to enforce its rights against its members (each, a "Member", and

2

collectively, the "Members")[1] pursuant to their subscription agreements with the Debtor (collectively, the "Subscription Agreements"), Section 2 and Exhibit A of the August 15, 2016 amendment to the Debtor's operating agreement (the "Operating Agreement Amendment"), and the promissory notes that each member executed with respect to the acquisition loan (collectively, the "Notes").[2] Those documents require the Members to provide sufficient funds to allow the Debtor to repay its secured obligations to the Lender under an acquisition loan and a construction loan (together, the "Existing Loans").[3] Taking that step would have satisfied the Lender's claims, and would have avoided the foreclosure proceeding.

      2.      However, now that the Debtor is in Chapter 11, Marks LP respectfully submits that this Court should deny both of the Motions, and that this Court should direct the Trustee to proceed instead as follows:

- The Trustee should compel all of the Members to comply immediately with their repayment obligations to the Debtor under the Subscription Agreements, the Operating Agreement Amendment and the Notes;

- The Trustee should use those payments from the Members to immediately repay the uncontested portion of the Lender's pre-petition claim against the Debtor (which the Trustee had earlier estimated to be approximately $33,493,917.80); and

- The Trustee should not seek to sell the Debtor's real property that is located at 305 East 61st Street, New York, New York (the "Property") at this time, particularly because the Lender's stalking horse bid is approximately $40 million less than what

---

[1] The Members are: Marks LP, which holds a 30% Class B membership interest; 61 Prime LLC ("Prime"), which holds a 50% Class B interest; Onestone305 LLC ("Onestone"), which holds a 10% Class A interest; and Thaddeus Pollock, who holds a 10% Class A interest.

[2] The Subscription Agreements are annexed hereto as Exhibit A. The Debtor's operating agreement (the "Operating Agreement"), without the exhibits and amendments thereto, is annexed hereto as Exhibit B. The Operating Agreement Amendment (without Exhibit B thereto) is annexed hereto as Exhibit C. The executed Notes relating to the acquisition loan are annexed hereto as Exhibit D.

[3] The DIP/9019 Motion refer to the construction loan as the "Building Loan" and the "Project Loan." The Debtor ultimately borrowed less than $10 million under the construction loan.

the Property's value is in its completed state. Instead, the construction of the Property should be completed as soon as possible.

3. Doing anything other than the above would harm the Debtors' creditors and Members, who would suffer a destruction of value from the sale of an unfinished building through a rushed sale process that involves a very low stalking horse bid. It would also cause grievous injury to Marks LP and its principal Mitchell Marks ("Mr. Marks"), who invested over $2 million in the Debtor already, who provided valuable services to the Debtor for over four years without receiving any management fees, and who personally guaranteed the Debtor's obligations under the Existing Loans with the expectation that the Members would ultimately comply with their repayment obligations to the Debtor under the Subscription Agreements, the Operating Agreement Amendment and the Notes.

4. Inexplicably, while the Debtor was controlled by 61 Prime LLC ("Prime") and Prime's manager Mr. Carter, the Debtor failed to enforce its right to cause the Members to comply with their repayment obligations to the Debtor. Instead, Mr. Carter permitted the Debtor to default under the Existing Loans by failing to repay them when they matured on December 8, 2018 (the "Maturity Date"). The Existing Loans have been accruing default-rate interest of 24% per annum, at least since the Maturity Date.

5. Now, more than one year after the Debtor failed to enforce its repayment rights against the Members (and subsequently defaulted in its obligation to repay the Existing Loans), and more than six months after this Chapter 11 case commenced, the Trustee now requests this Court's authorization to: (i) enter into a settlement agreement between the Trustee and the Lender that is annexed as Exhibit D to the DIP/9019 Motion (the "Settlement Agreement"); (ii) obtain $2 million of new money debtor-in-possession financing (the "DIP Loan"); and (iii) enter into a purchase and sale agreement with the Lender, in which the Lender has submitted a stalking horse

bid that is about $40 million less than what the value of the Property would be in its completed state.

6.	Marks LP believes that the value of the Property is over $85 million, once construction is completed. Construction can be completed promptly. The Lender's stalking horse bid for the Property is only approximately $46 million. Pursuant to the Settlement Agreement, the Trustee is required to use his best efforts to confirm a Chapter 11 plan (which would provide for the sale of the Property) by July 15, 2020.

7.	**The DIP/9019 Motion Must Be Denied.** The DIP/9019 Motion should be denied for at least two reasons:

8.	First, granting the Lender an allowed claim in the amount of $41,093,000 as of December 31, 2019 is not reasonable, because the Lender's asserted claim of $43,243,051.09 is inflated. The Lender's claim includes interest at the default rate beginning when the Existing Loans were first made, because the Lender inaccurately asserts that the Debtor had made false representations to the Lender at that time. Marks LP vigorously denies the Lender's contentions in this regard.

9.	The Trustee also appears to agree that the Lender's claim may be inflated, because in his December 4, 2019 motion requesting authorization to obtain DIP financing from Lazarus 5, LLC (Docket No. 91) (the "Lazarus DIP Motion"), the Trustee stated that he intended "to use a substantial portion of the Post-Petition Financing to pay the undisputed portion of the Lender's Claim (estimated to be approximately $33,493,917.80), and escrow the disputed portion (estimated, at most, to be approximately $10,043,281.70)." *See* Lazarus DIP Motion at n. 3 (emphasis added).

10. Now, only one month after stating in the Lazarus DIP Motion that the undisputed portion of the Lender's claim was only $33,493,917.80, the Trustee requests authority to give the Lender an allowed claim of $41,093,000 as of December 31, 2019. It is not clear why the Trustee now believes that settling the Lender's claim for approximately $7.5 million more than the "undisputed" amount is reasonable.

11. Instead of giving the Lender an allowed claim of $41,093,000, the Trustee should require each of the Members to immediately comply with their repayment obligations to the Debtor under the Subscription Agreements, the Operating Agreement Amendment and the Notes. To the extent that any Member breaches its repayment obligation to the Debtor, the Operating Agreement provides that another party may pay the Debtor instead, and in exchange obtain the right to use and occupy the floor(s) of the defaulting Member. The Debtor should use the proceeds of the repayments from the Members to promptly repay the uncontested portion of the Lender's claim against the Debtor.[4] The remaining portion of the Lender's asserted claim can be either allowed or disallowed through the claims allowance process. To the extent the Lender prevails in its claim for any disputed amount, the Members will be responsible for paying their share of the additional allowed claim.

12. <u>Second</u>, the Debtor does not actually need the $2 million in financing that the Trustee is seeking to obtain through the DIP Loan. This is because the Members themselves are responsible for the costs of construction and maintenance of their respective floors of the Property,

---

[4] The Operating Agreement provides that to the extent that any Member fails to satisfy its obligations to the Debtor and does not cure such default after notice is given, such Member is deemed to have withdrawn from the Debtor and forfeits its membership interests, as well as its right to its floor(s) in the Property. If any Member fails to repay its Note to the Debtor, any of the remaining Members or any third party may elect to pay such Note (and thus acquire the defaulting Member's rights under the Operating Agreement). Marks LP believes that one or more of the other Members, or a third party, will be willing to pay the obligations of any defaulting Member in exchange for obtaining the right to use and occupy the floor(s) that the defaulting Member originally had.

as well as for their respective shares of the insurance, utilities and maintenance of the Property. The Trustee is only responsible for completing the work that is common to the entire Property, and the costs of completing the outstanding common work should be assessed to the Members pursuant to the Operating Agreement. To the extent the Trustee needs any financing now to finish the common work and to pay its professionals' fees in this case, such funding can be obtained from another lender that would not force the Trustee to try to sell the Property.

13. **The Bidding Procedures Motion Must Be Denied.** The Bidding Procedures Motion should be denied for at least two reasons:

14. <u>First</u>, the Lender's stalking horse bid of approximately $46 million is only about one-half of the value of what the Property will be in its completed state, and the Trustee is being required to use his best efforts to confirm a Chapter 11 plan (which would provide for the sale of the Property) by July 15, 2020. As stated above, the uncontested portion of the Existing Loans can be repaid once the Trustee enforces the Debtor's rights against the Members, and the Debtor does not need to borrow an additional $2 million. Accordingly, there is no need for the Trustee to commence a process to sell the Property, with the Lender having bid a "bargain basement" price. Construction of the Property should be completed instead.

15. <u>Second</u>, even if this Court were to approve any bidding procedures, the Lender should not receive any break-up fee.[5] Here, the Lender is retaining its right to credit bid its "Lender's Allowed Claim" and the DIP Loan in connection with its stalking horse bid. Here, a break-up fee is not needed to incentivize the Lender to bid for the Property, because it is sufficiently incentivized by its desire to protect its secured position. Although the Lender has

---

[5] In the Bidding Procedures Motion, the Trustee requests approval of a potential break-up fee of $950,000 to the Lender.

included a $3 million cash component in its bid, the proposed break-up fee is an astronomical ***31.67%*** of the cash portion of the Lender's bid. Accordingly, the proposed break-up fee to the Lender is inappropriate, and should not be approved.

## BACKGROUND

### A.     The Debtor's Governing Documents

16.     The Debtor is governed by the Operating Agreement, pursuant to which each of the Members acquired exclusive use of one or more floors of the Property with the right to "retain, use, occupy [and] develop" their designated floors. Marks LP gained exclusive use of the "basement/cellar and first floor," the second floor, and the "10th floor and roof"; Prime gained exclusive use of the fourth, fifth, sixth, seventh and ninth floors; Mr. Pollock acquired exclusive use of the third floor; and Onestone acquired exclusive use of the eighth floor.[6]

17.     Pursuant to Section 1(b) of the Subscription Agreements, Section 2 and Exhibit A of the Operating Agreement Amendment, and the executed Notes with respect to the acquisition loan, the Members each agreed to assume a portion of the Existing Loans. In sum, Prime agreed to assume up to $18,750,000 of the principal amount of the Existing Loans (5/8 of up to $30 million), and Marks LP, Onestone and Thad Pollock each agreed to assume up to $3,750,000 of the Existing Loans (1/8 each).[7]

---

[6] *See Operating Agreement Amendment* at Exhibit A.

[7] Section 1(b) of the Subscription Agreements state the aggregate among of financing each Member agreed to assume. The executed Notes set forth the principal amount of the acquisition loan (in the principal amount of $20 million) that each Member agreed to assume, and Section 2 and Exhibit A of the Operating Agreement Amendment sets forth the principal amount of the construction loan that each Member agreed to assume.

Pursuant to the Operating Agreement Amendment, the Members were also to sign separate promissory notes relating to the construction loan. Marks LP has been unable to locate the signed notes relating to the construction loan. Whether the Members signed those promissory notes, however, is of no consequence because under the Members already obligated themselves to pay their portion of the construction loan under the Subscription Agreements and under Section 2 of the Operating Agreement Amendment.

18.     The Operating Agreement provides that if any Member refuses to pay its share of the Existing Loans, that Member would be deemed to have withdrawn from the Debtor, would forfeit its membership interests without consideration, and would forfeit its right to its floor(s) in the Property.[8]    At that time, any of the remaining Members or any third party could make the defaulting Member's payment instead (and thus acquire the defaulting Member's rights under the Operating Agreement).[9]    Marks LP believes that one or more of the other Members, or a third party, will be willing to pay the amount due from any Member that breaches its obligations to repay the Debtor, in exchange for obtaining the right to use and occupy the floor(s) that the defaulting Member originally had.

19.     Both Mr. Marks and Mr. Carter personally guaranteed the Debtor's obligations under the Existing Loans.  Mr. Marks agreed to execute his personal guaranty with the expectation that all Members would timely comply with their obligations to the Debtor under the Subscription Agreements, the Notes and the Operating Agreement Amendment.

**B.      Events Before the Petition Date**

20.     Marks LP was the Debtor's first manager.  Marks LP invested over $2 million in the Debtor already, and provided valuable services to the Debtor for over four years without receiving any management fees.  Moreover, Marks LP paid the salaries of two full-time employees, and Marks LP did not receive reimbursement for any of the expenses that it incurred in connection with the Property.

21.     Mr. Carter failed to pay $62,500 of Prime's original subscription price for its membership interests in the Debtor.  When the Debtor requested that money from Prime, Mr.

---

[8]  See Operating Agreement at ¶ 16(B); Subscription Agreements at ¶ 2.

[9]  See Operating Agreement at ¶ 16(C).

Carter refused to pay. This lead to Marks LP's decision to file a lawsuit on the Debtor's behalf against Prime in the Supreme Court of the State of New York, County of New York (the "State Court").

22.     In retaliation, Mr. Carter commenced an action in the State Court. In that lawsuit, Prime alleged that it and the two minority members validly removed Marks LP as the Debtor's manager during a meeting held on the eve of Memorial Day weekend in 2018. Despite Prime's protestations to the contrary, Marks LP was not properly removed as the Debtor's manager, because there was no duly-called meeting at which Marks LP could have been removed as Manager.

23.     Nevertheless, on July 2, 2018, Prime secured a temporary restraining order (the "TRO") from the State Court, based on false statements that Mr. Carter made to the State Court. Prime obtained the TRO without notice to Marks LP, and without posting a bond. The TRO effectively removed Marks LP as manager, and substituting Prime in its place. The TRO broadly enjoined Marks LP and Mr. Marks from, among other things, (i) "[r]epresenting to any third parties that … [they] are authorized to represent 305 East 61st Street Group, LLC", and (ii) "[t]aking any action on behalf of or in connection with, pertaining to or affecting 305 East 61st Street Group, LLC, or the building or property located at 305 East 61 Street without plaintiffs' prior written consent." Thus, the TRO enabled Mr. Carter to take over management of the Debtor.

24.     Prime's and Mr. Carter's actions while he was in control of the Debtor were malicious and destructive. After taking over as the Debtor's manager after the TRO was issued, Prime and Mr. Carter failed to renew the building permits with the New York City Department of Buildings, and caused the issuance of a full stop work order and a halt to all construction, which cost the Debtor of hundreds of thousands of dollars per month. Prime and Mr. Carter also cut the

power and water to the ground floor unit of the Property, which is currently subleased by Marks LP to Acqua Ancien Bath New York, Inc. (the "Spa"), and locked the Spa out of the ground floor unit. Prime and Mr. Carter also permitted the Debtor to default under the Existing Loans by failing to repay them on the Maturity Date. Mr. Carter also threatened the Members, telling them that he would sabotage the deal if the Members did not comply with his directives. Moreover, while in control of the Debtor, Prime and Mr. Carter failed to enforce the Debtor's rights against the Members, and allowed the Existing Loans to mature without repayment. Additional details about Prime's and Mr. Carter's misdeeds while in control of the Debtor are set forth in Marks LP's July 24, 2019 motion for appointment of a Chapter 11 trustee (Docket No. 26).

25.     The issue of whether Marks LP was properly removed as manager was one of the key issues in the State Court Action and was addressed at a hearing held in the State Court on February 7 and 8, 2019 (after the TRO had been issued). After that hearing, the State Court was to decide, among other things, whether to vacate the TRO and to allow Marks LP to co-manage the Debtor together with Prime. During a hearing on May 17, 2019, the State Court observed that Mr. Carter had failed to show that Marks LP violated any law or contractual provision while managing the Project.[10]

---

[10]     The May 17, 2019 transcript reads in pertinent part:

MS. HALPERIN [Carter's counsel]: That's never been the case, Judge. Respectfully, that has never been the plaintiff's position. The plaintiff's position has been that the plaintiff did not want to be held hostage by a former manager, the initial manager that committed a number of, shall we say, breaches --

THE COURT: That was not what occurred during the two days of hearings before me. It was just the opposite; two days of hearing that proved the entitlement for the other way: to appoint a receiver, at the request of Little Hearts Marks. You gave it your best shot, and in two days, all you did was prove that you don't have a case.

### C.     **This Chapter 11 Case**

26.     On June 10, 2019, while still under the management of Prime and Mr. Carter in accordance with the TRO, the Debtor commenced the instant Chapter 11 case.  Mr. Carter commenced this Chapter 11 case just before construction of the Property was to be completed, and before the State Court could issue its decision on the issue of whether his attempt to remove Marks LP as the Debtor's manager was valid.  Marks LP suspects that Mr. Carter decided to commence this Chapter 11 case, at least in part, to avoid the vacatur of the TRO, so that Mr. Carter could continue to improperly exclude Marks LP from the Debtor's management.  Marks LP also suspects that Mr. Carter's ultimate objective in commencing this case was to purchase the Property "free and clear" for less than its real value, after all Members had spent considerable time and effort constructing their floors of the Property.

27.     On October 24, 2019, this Court entered an order appointing a Chapter 11 Trustee. On October 25, 2019, the Office of the United States Trustee filed an application for the appointment of Kenneth P. Silverman as the Chapter 11 operating trustee.

28.     On January 14, 2020, Mr. Marks sent the Trustee a draft demand notice to be sent to the Members, to demand their compliance with their repayment obligations to the Debtor.  To date, the Trustee has not enforced the Debtor's rights against the Members.

29.     Marks LP believes that the value of the Property is over $85 million, once construction is completed.  The Lender's stalking horse bid for the Property, as set forth in the Bidding Procedures Motion and Section 2.2 of the purchase and sale agreement annexed thereto, is only approximately $46 million.  Section 5 of the Settlement Agreement provides that the Trustee must use his best efforts to confirm a Chapter 11 plan (which would provide for the sale

of the Property) by July 15, 2020.  Moreover, in the Bidding Procedures Motion, the Trustee

requests this Court's approval of a break-up fee in the Lender's favor in the amount of $950,000.

## ARGUMENT

### I.     The DIP/9019 Motion Must Be Denied

#### A.     The Trustee Has Not Satisfied Section 364 of the Bankruptcy Code

30.     In the DIP/9019 Motion, the Trustee requests authority to obtain $2 million of

secured post-petition financing outside the ordinary course of business, pursuant to Sections 364(c)

and 364(d) of the Bankruptcy Code.  Sections 364(c) and (d) of the Bankruptcy Code provide:

> (c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —
>
> > (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3)     secured by a junior lien on property of the estate that is subject to a lien.
>
> (d) (1)     The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if —
>
> > > (A)     the trustee is unable to obtain such credit otherwise; and
> > >
> > > (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2)     In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. §§ 364(c), 364(d).

31.     The Trustee may not obtain Court approval for extending secured credit under Section 364(c) of the Bankruptcy Code, unless he first establishes that he is otherwise unable to reasonably obtain unsecured credit under Sections 364(a) and (b) of the Bankruptcy Code, and that the credit is necessary for the Debtor's continued operation. *See* 11 U.S.C. § 364(c); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990); *In re Barbara K. Enterprises, Inc.*, Case No. 08–11474 (MG), 2008 WL 2439649 at *8 (Bankr. S.D.N.Y. June 16, 2008); *In re Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (stating that requests for post-petition financing must show the funds are "necessary to preserve the assets of the estate").

32.     Credit should not be approved when it is sought for the primary benefit of a party other than the debtor or when funds are readily available from insiders or others without providing the lender with the benefits of any priority. *See, e.g.*, *Aqua Associates*, 123 B.R. at 196. Similarly, the Trustee may not obtain credit under section 364(d) if it appears that the Trustee can obtain credit under the other subsections of 364. *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. at 37.

33.     Once the unavailability of less intrusive credit has been shown and adequate protection is found (if required), then the Trustee must prove that (i) the credit transaction is necessary to preserve the assets of the estate; and (ii) the terms of the agreement are fair, reasonable and adequate. *See Barbara K. Enterprises, Inc.*, 2008 WL 2439649 at *10, citing *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987). In making that determination, courts generally consider whether the terms of the proposed financing "would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits." *Ames Dep't Stores, Inc.*, 115 B.R. at 37, citing *In re Crouse Group, Inc.*, 71 B.R. at 550-51.

34.     As the bankruptcy court in *Ames Dep't Stores* explained:

> "A proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate. *Crouse* was such a case. There the debtor, a contractor, sought section 364(c) financing to meet job costs connected with certain construction projects. The proposed lender had bonded pre-petition the debtor's performance for those projects. At an interim hearing, the court approved emergency financing to fund pay roll for one week. In exchange for the loan, the lender received a "first position security interest" in the accounts receivable on the bonded projects. The debtor sought to extend the loan. The lender agreed because it needed more time to find a replacement contractor. The court refused to approve the arrangement. It found that, rather than benefit the estate by preserving its assets, the proposed agreement merely allotted more time for the lender to locate a replacement for the debtor while giving the lender priority status among creditors. Thus, the terms were not "fair, reasonable, and adequate under the circumstances."

*Ames Dep't Stores, Inc.*, 115 B.R. at 39 (internal citations omitted).

35.     The DIP/9019 Motion should be denied because the Trustee has not established that a DIP loan of $2 million is necessary to preserve the assets of the Debtor's estate. Here, the Members themselves are responsible for the costs of construction and maintenance of their own respective floors of the Property, as well as for their share of the common work to the entire Property (the costs of which may be assessed to the members per the Operating Agreement). Thus, the Trustee needs substantially less than $2 million to finish the common work and to pay its professionals' fees in this case.

36.     The Trustee also has not established that he is unable to obtain the funding that he actually needs, under Section 364(a), (b) or (c) of the Bankruptcy Code. In this case, the value of the Property substantially exceeds the amount of the Lender's claim. Another lender may very

well be willing to provide the funding that the Trustee actually needs under Section 364(a), (b) or (c) of the Bankruptcy Code.[11]

37.     Finally, the terms of the DIP Loan are not fair or reasonable, because the Trustee is being required (as part of its overall agreement with the Lender) to sell the Property before it is completed and to accept stalking horse bid from the Lender that is tens of millions less than the value of the Property when it is completed.  If the Trustee were to seek financing from another lender, such other lender might not force the Trustee to attempt to sell the Property.

**B.      The Trustee Has Not Satisfied the Bankruptcy Rule 9019 Standards**

38.     Bankruptcy Rule 9019(a) provides, in relevant part:  "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).

39.     The decision to approve or deny a particular settlement lies within the discretion of this Court.  *See, e.g.*, *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 641 (Bankr. S.D.N.Y. 2012).  To approve a proposed settlement under Bankruptcy Rule 9019(a), this Court must first determine that the settlement is fair, equitable, and in the best interests of the Debtor's estate.  *See, e.g.*, *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *Air Line Pilots Assoc. v. Am. Nat'l Bank & Trust Co. of Chi. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y.1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).

---

[11]  To the extent any other lender were to require a priming lien, the Lender currently has sufficient adequate protection because of its substantial equity cushion.  *See* 11 U.S.C. § 364(d)(1); *In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) (stating that "[t]he exist[ence] of an equity cushion seems to be the preferred test in determining whether priming of a senior lien is appropriate under section 364."); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (finding adequate protection to be present when an increase in value would result from the proposed renovations).

40.     In the Second Circuit, courts must balance seven interrelated factors in determining whether a settlement is fair and equitable.  *See, e.g.*, *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007).  Those factors are:

- the balance between the litigation's possibility of success and the settlement's future benefits;

- the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment;

- the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement;

- whether other parties in interest support the settlement;

- the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement;

- the nature and breadth of releases to be obtained by officers and directors; and

- the extent to which the settlement is the product of arm's length bargaining.

*See In re Iridium Operating LLC*, 478 F.3d at 462, citing *TMT Trailer Ferry, Inc.*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968).  The bankruptcy court must exercise its own independent judgment in analyzing these foregoing factors.  *See, e.g.*, *Dewey & LeBoeuf LLP*, 478 B.R. at 641.

41.     Although it does not need to conduct a "mini-trial" of the dispute between the Debtor's estate and the Lender, this Court still needs to be apprised of the facts that are necessary to enable it to evaluate the proposed settlement and to make a considered and independent judgment.  *See id.* at 640-41.

42.     In this case, the following *Iridium* factors weigh against approving the Settlement Agreement:

### i. The balance between the litigation's possibility of success and the settlement's future benefits.

43. Just last month (in the Lazarus DIP Motion), the Trustee stated that the undisputed portion of the Lender's Claim to be only $33,493,917.80. Now, the Trustee proposes to grant the Lender an allowed claim of $41,093,000 as of December 31, 2019. The DIP/9019 Motion does not contain any information about the Trustee's evaluation of the *bona fides* of the Lender's claim for pre-Maturity Date default rate interest. Moreover, the Trustee does not state in his motion why he believes it is reasonable to grant the Lender an allowed claim in an amount that is approximately $7.5 million more than the amount that he called "undisputed" only one month ago.

44. Accordingly, this Court currently does not have sufficient facts to enable it to evaluate, and to make a considered and independent judgment regarding, the Settlement Agreement. While settlements are generally favored in bankruptcy, this Court should not approve a settlement where the basis of the Lender's position and the Trustee's evaluation of the merits of the Lender's position are not disclosed to the Court or to parties in interest.

### ii. The likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment.

45. The Trustee should use the funds it receives from the Members to repay the uncontested portion of the Lender's claim immediately. The Lender can continue to assert its claim for pre-Maturity Date default interest, and such claim can be addressed through the claims allowance process. To the extent the Lender prevails in its claim for pre-Maturity Date default interest, each Member would be obligated to pay its share of the amount of default interest that the Lender is ultimately awarded.

46. The Debtor is solvent, so the allowed claims of the Debtor's creditors will most likely be paid in full under any Chapter 11 plan. If that ends up being the case, creditors would

not bear any costs that would be incurred during the claim allowance process with respect to the Lender's proof of claim. Instead, any such costs would ultimately be borne by the Members.[12]

> ### iii. The paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement.

47. As noted above, only the Members would bear the risk of any claims litigation against the Lender, and the holders of 80% of the Debtor's outstanding membership interests (*i.e.*, Marks LP and Prime)[13] have filed objections to the DIP/9019 Motion. Thus, the holders of a clear majority of the real economic interests in the proposed Settlement Agreement oppose it.

48. Additionally, rushing into a sale process of the unfinished Property, in which the stalking horse bid is approximately $40 million less than the value of the Property in its finished state, unfairly prejudices the Debtor's creditors and Members.

> ### iv. Whether other parties in interest support the settlement.

49. The Settlement Agreement is opposed by Marks LP and by Prime, who together hold 80% of the Debtor's outstanding membership interests.

## II. The Bidding Procedures Motion Must Be Denied

### A. The Trustee Has Not Satisfied Section 363 of the Bankruptcy Code

50. In the Bidding Procedures Motion, the Trustee requests that this Court approve proposed bidding procedures with respect to the sale of the Property, with the Lender being the stalking horse bidder. As part of those bidding procedures, the Trustee requests authority to pay the Lender a break-up fee in the amount of $950,000.

---

[12] Collection on any judgment is not an issue in this case, as the Trustee and the Lender seek to settle the amount of the Lender's claim against the Debtor. The Trustee is not seeking to collect on any judgment against the Lender.

[13] Prime and Mr. Carter have filed a preliminary objection to the DIP/9019 Motion. *See* Docket No. 123.

51.     Section 363(b) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).

52.     The standard used for judicial approval of the use of estate property outside of the ordinary course of business is the business judgment of the debtor.  However, there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b) of the Bankruptcy Code.  *See, e.g., In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983).  "[A] judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application." *Id.* at 1071.  *Lionel* further instructs as follows:

> "In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value."

*Id.* at 1071.

53.     The debtor carries the burden of demonstrating by a preponderance of the evidence that a sale outside the ordinary course of business is justified, while the objecting party is required to produce evidence with respect to its objections.  *See, e.g.*, *In re Flour City Bagels, LLC*, 557 B.R. 53, 77 (Bankr. W.D.N.Y. 2016), *citing Lionel*, 722 F.2d at 1071.

54.     In light of the facts of this case, which are summarized above, Marks LP respectfully submits that the Trustee should not start a bidding process for the sale of the Property in an unfinished state, at a price that is tens of millions of dollars less than its value upon completion.

**B.      The Proposed $950,000 Break-Up Fee Should Not Be Approved**

55.     The purpose of any asset sale is to maximize the recovery of value for the benefit of the bankruptcy estate.  To that end, the bidding procedures that are proposed through a sale process must establish a framework for competitive bidding to ensure the maximization of such value.  *See, e.g.*, *In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009); *In re Cormier*, 382 B.R. 377, 388 (Bankr. W.D. Mich. 2008). ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate").

56.     As this Court observed in a previous case, there are three questions for courts to consider in assessing a proposed break-up fee: (i) whether the relationship of the parties who negotiated the break-up fee is tainted by self-dealing or manipulation; (ii) whether the fee hampers, rather than encourages, bidding; and (iii) whether the amount of the fee is unreasonable relative to the proposed purchase price.  *See, e.g.*, *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 657 (S.D.N.Y. 1992).  Generally,  if break-up fees encourage bidding,  they  are  enforceable,  and  if they stifle bidding, they are not enforceable.  *See, e.g.*, *In re Integrated Resources, Inc.*, 147 B.R. at 659.

57.     In this case, the proposed break-up fee to the Lender is unnecessary.  The Lender is submitting a bid for the Property to protect its secured claim, and is reserving the right to credit bid its over $41 million "Lender's Allowed Claim" and the DIP Loan in connection with its bid.

A break-up fee is not needed to incentivize the Lender to credit bid for the Property in this case, because the Lender is sufficiently incentivized by its desire to protect its secured position.

58.      Additionally, the amount of the proposed break-up fee is excessive, when compared to the $3 million cash component of the Lender's bid.  Indeed, the proposed break-up fee is equal to 31.67% of the cash portion of the Lender's bid, which is far in excess of the range of break-up fee percentages that bankruptcy courts in this District and elsewhere typically approve.

## CONCLUSION

WHEREFORE, Marks LP respectfully requests that the Court: (i) deny both Motions; (ii) compel the Trustee immediately to require the Members to repay their obligations to the Debtor, and to pay the uncontested portion of the Lender's claim against the Debtor from the proceeds thereof; and (iii) grant Marks LP such other and further relief as may be just and proper.

Dated: New York, New York
    January 29, 2020

TANNENBAUM HELPERN SYRACUSE &
HIRSCHTRITT LLP

*/s/ Michael J. Riela*
Michael J. Riela
Vincent J. Syracuse
900 Third Avenue, 13th Floor
New York, New York 10022
Telephone: (212) 508-6700
Facsimile: (212) 371-1084
Email: Riela@thsh.com
        Syracuse@thsh.com

and

GANFER SHORE LEEDS & ZAUDERER LLP
Steven J. Shore
Justin R. Bonanno
360 Lexington Avenue, 14th Floor
New York, New York 10017
(212) 922-9250
(212) 922-9335 (fax)
sshore@ganfershore.com
jbonanno@ganfershore.com

*Co-Counsel for Little Hearts Marks Family II, L.P.*